**2013-1428**
**(Reexamination No. 90/011,438)**

# United States Court of Appeals
# for the Federal Circuit

IN RE RONALD A. KATZ TECHNOLOGY LICENSING L.P.

*Appeal from the United States Patent and Trademark Office,*
*Patent Trial and Appeal Board*

## APPELLANT'S OPENING BRIEF

LORI R. MASON
LOWELL D. MEAD
COOLEY LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
(650) 843-5000 (telephone)
(650) 857-0663 (facsimile)
lmason@cooley.com
lmead@cooley.com

FRANK V. PIETRANTONIO
JONATHAN G. GRAVES
COOLEY LLP
Reston Town Center
One Freedom Square
11951 Freedom Drive
Reston, VA 20190-5656
(703) 456-8000 (telephone)
(703) 456-8100 (facsimile)
fpietrantonio@cooley.com
jgraves@cooley.com

*Attorneys for Appellant*
*Ronald A. Katz Technology Licensing L.P.*

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**In re Ronald A. Katz Technology Licensing, L.P., Appeal No. 2013-1428**

**CERTIFICATE OF INTEREST**

Counsel for the Katz Ronald A. Katz Technology Licensing, L.P. certifies the following:

1.    The full name of every party or amicus presented by me is:

> Ronald A. Katz Technology Licensing, L.P.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

> N/A

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

> N/A

4.    The following law firm and attorneys are expected to appear as counsel in this Court:

> Cooley LLP:  Stephen C. Neal, Frank V. Pietrantonio, Jonathan G. Graves, Lori R. Mason, Lowell D. Mead

The following law firms and attorneys appeared in the Patent Office on behalf of Ronald A. Katz Technology Licensing, L.P.:

> Cooley LLP:  Frank V. Pietrantonio

> Berry & Associates:  Reena Kuyper

Date:  August 28, 2013            /s/ Frank V. Pietrantonio
                                  Frank V. Pietrantonio

# TABLE OF CONTENTS

**Page**

I.      STATEMENT OF RELATED CASES ................................................. 1

II.     STATEMENT OF JURISDICTION .................................................... 2

III.    STATEMENT OF THE ISSUES ........................................................ 3

IV.     STATEMENT OF THE CASE ........................................................... 4

V.      STATEMENT OF FACTS .................................................................. 5

    A.      The Patented Technology Dates from the 1980s. ....................... 5

    B.      The '762 Patent Teaches Inventions For Automated
        Telephonic Credit Verification Based on a Caller-Entered
        Customer Number ....................................................................... 6

    C.      The Patented Technology Has Achieved Extensive
        Commercial Success ................................................................... 9

    D.      Procedural History of the '762 Patent and Reexamination ....... 10

    E.      Asserted Prior Art References .................................................. 11

VI.     SUMMARY OF THE ARGUMENT ............................................... 12

VII.    ARGUMENT ................................................................................... 14

    A.      Standard of Review .................................................................. 14

        1.      Obviousness Must Be Evaluated From the Time of
            the Claimed Invention, and Is Reviewed *De Novo* ......... 14

    B.      The Board's Claim Constructions Are Reviewed *De Novo* ..... 16

    C.      An Expired Patent in Reexamination Should Be Construed
        According to *Phillips* ............................................................... 16

    D.      The Board Erred in Ruling That Claims 41, 54, and 57 Are
        Obvious ..................................................................................... 17

        1.      Credit verification for verifying "on-line" "said"
            caller-entered customer number means verifying the
            customer number entered by the caller ........................... 20

# TABLE OF CONTENTS
## (continued)

Page

2.    Under the proper claim interpretation, the Board
      erred in finding that Barger discloses the credit
      verification structure ...................................................... 25

3.    The Board erred in ruling that it would have been
      obvious to add Yoshizawa's registration number to
      Barger's system for order cancellation ........................... 26

4.    The Board erred in ruling that Barger discloses or
      renders obvious limiting use with respect to a dollar
      amount ............................................................................. 35

      a.    The Board erred in finding that Barger
            discloses limiting use with respect to a dollar
            amount ................................................................. 37

      b.    The Board erred in finding that Yoshizawa
            renders obvious modifying Barger to use a
            limit on use with respect to a dollar amount ........ 39

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..................... 43

ADDENDUM

      Board Decision ........................................................JA000001

      U.S. Patent No. 5,898,762 ........................................JA000027

CERTIFICATE OF SERVICE

CERTFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page**

CASES

*Ex parte Papst-Motoren*,
No. 650-04, 1 U.S.P.Q.2d 1655 (B.P.A.I. Dec. 23, 1986) ....................... 16

*In re Abbott Diabetes Care Inc.*,
696 F.3d 1142 (Fed. Cir. 2012) ................................................. 16

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) ................................................. 15

*In re Glatt Air Techniques, Inc.*,
630 F.3d 1026 (Fed. Cir. 2011) ................................................. 16

*In re Kao*,
639 F.3d 1057 (Fed. Cir. 2011) ...................................... 15, 31, 41

*In re Katz Interactive Call Processing Patent Litigation*,
639 F.3d 1303 (Fed. Cir. 2011) ..........................................*passim*

*In re Kotzab*,
217 F.3d 1365 (Fed. Cir. 2000) ................................................. 15

*In re NTP, Inc.*,
654 F.3d 1279 (Fed. Cir. 2011) ............................... 14, 31, 32, 41

*In re Rambus Inc.*,
694 F.3d 42 (Fed. Cir. 2012) .................................................. 16

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)........................................................... 14, 35

*NTP, Inc. v. Research In Motion, Ltd.*,
418 F.3d 1282 (Fed. Cir. 2005) ................................................. 22

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ................................ 16, 22, 23

# TABLE OF AUTHORITIES
## (continued)

Page

*Rolls-Royce, PLC v. United Techs. Corp.*,
603 F.3d 1325 (Fed. Cir. 2010) ............................................... 34

*Sensonics, Inc. v. Aerosonic Corp.*,
81 F.3d 1566 (Fed. Cir. 1996) ................................................ 15

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir.1996) ................................................ 22

STATUTES

28 U.S.C.
§ 1295(a)(4)(A) ................................................................... 2
§ 2107(b) ............................................................................ 3

35 U.S.C.
§ 103(a) ........................................................................ 4, 14
§ 141 .................................................................................. 2
§ 142 ............................................................................. 2-3

OTHER AUTHORITIES

37 C.F.R. § 1.304 ..................................................................... 3

Federal Circuit Rule 15(a)(1) .................................................... 3

MPEP § 2258 I.G ................................................................... 16

## I.    STATEMENT OF RELATED CASES

The following cases are believed to be related to the present case:

- *In re Katz Interactive Call Processing Patent Litigation*, Appeal Nos. 2009-1450, 2009-1451, 2009-1452, 2009-1468, 2009-1469, 2010-1017; Newman, Lourie, and Bryson, Circuit Judges; decided February 18, 2011; Rehearing and Rehearing En Banc Denied April 22, 2011; published in the Federal Reporter as *In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303 (Fed. Cir. 2011).

- *In re Ronald A. Katz Technology Licensing L.P.*, Appeal No. 2013-1137 (pending).

- *In re Ronald A. Katz Technology Licensing L.P.*, Appeal No. 2013-1138 (pending)

- *In re Ronald A. Katz Technology Licensing L.P.*, Appeal No. 2013-1139 (pending).

- *In re Ronald A. Katz Technology Licensing L.P.*, Appeal No. 2013-1272 (dismissed).

- *In re Ronald A. Katz Technology Licensing L.P.*, Appeal No. 2013-1273 (pending)

- *In re Ronald A. Katz Technology Licensing L.P.*, Appeal No. 2013-1274 (pending).

- *Ronald A. Katz Technology v. DHL Express (USA), Inc.*, Appeal No. 13-1510 (pending).

- Numerous actions pending in the *In re Katz Interactive Call Processing Patent Litigation* coordinated Multi-District Litigation ("MDL") proceedings, Case No. 2:07-ml-01816-RGK-FFM (C.D. Cal.).

## II.    STATEMENT OF JURISDICTION

This Court has exclusive jurisdiction over this appeal under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141.  Patent owner Ronald A. Katz Technology Licensing, L.P. ("Katz") appeals from a Decision on Request for Rehearing by the Board of Patent Trials and Appeals ("Board") of the United States Patent and Trademark Office ("PTO"), affirming the final rejection of U.S. Patent No. 5,898,762 claims 41, 54, and 57 in Reexamination No. 90/011,438.

The date of the Board's decision, which is an appealable final order, is February 25, 2013.  On April 22, 2013, Katz timely filed a Notice of Appeal to this Court and served it on the Solicitor for the PTO, pursuant to  35 U.S.C.

§ 142, 37 C.F.R. § 1.304, 28 U.S.C. § 2107(b), and Federal Circuit Rule
15(a)(1).

## III.    STATEMENT OF THE ISSUES

1.      Did the Board err by construing "credit verification structure" that
verifies "said" customer number data, in '762 patent claims 41, 54, and 57, to
encompass verifying data entered by a live operator, when "said" customer
number data expressly refers to the customer number data entered by a caller
into an automated interface that is verified "on-line," consistent with the
specification's teachings?

2.      Did the Board err by finding that the Barger[1] reference's
description of a customer service operator entering an account number, rather
than the caller entering the account number, discloses the "credit verification
structure" element as properly construed?

3.      Did the Board err by ruling that it would have been obvious to
incorporate the horse-race bet registration number from the Yoshizawa[2]
reference for automated order cancellation in the Barger music demonstration
system, where Barger does not disclose any need or concern for order

---

[1] U.S. Patent No. 4,071,698 to Barger, Jr. *et al.* ("Barger").  (JA000522-35.)

[2] Yoshizawa *et al.*, "Voice Response System for Telephone Betting," Hitachi
Review 26(6), June 1977, pp. 215-220 ("Yoshizawa").  (JA000515-20.)

cancellation, and automated order cancellation would run directly contrary to Barger's objectives of increasing sales and providing high-touch human customer service to maximize sales?

4.      Did the Board err by finding that Barger discloses a limit on use "with respect to a dollar amount," as recited in '762 patent claim 57, where Barger does not disclose a limit based on any dollar amount but discloses only a limit based on whether or not any purchase has been made?

5.      Did the Board err by ruling that it would have been obvious to incorporate the monetary limit on horse-race betting from Yoshizawa into the mail order system of Barger, thereby rendering obvious the "dollar amount" limitation of '762 patent claim 57, where Barger teaches only the contrary objectives of encouraging purchases and limiting use only where no purchase has been made?

## IV.    STATEMENT OF THE CASE

This is an appeal from a Board decision dated February 25, 2013 in Board Appeal No. 2012-008644, affirming the rejection of claims 41, 54, and 57 of U.S. Patent No. 5,898,762 in *ex parte* Reexamination Control No. 90/011,438.  Katz appeals the Board's ruling that claims 41, 54, and 57 are obvious under 35 U.S.C. § 103(a).

## V.    STATEMENT OF FACTS

### A.    The Patented Technology Dates from the 1980s.

Patent validity must be assessed from the standpoint of a skilled artisan at the time of the invention, without reliance on hindsight.  The early timeframe of the patented technology in this case, and the widespread implementation of computer-telephony integration in the years after the invention, provide a critical context for the Court's review of the Board's analysis.

The '762 patent is one of a related family of patents on the inventions of Mr. Ronald A. Katz, dating from the 1980s, directed to inventive methods and systems enabling telephone callers to exchange information with computer systems through a telephone network.  The invention at issue was made over a quarter of a century ago, between 1985 and 1988.  At the time of the invention, computers and telephony integration was in its infancy and call centers were in the early stages of automation.  The late 1980s saw the early stages of what would be an explosive growth through the 1990s to the present.  During this period of growth, hundreds of companies purchased licenses to the Katz patent portfolio and implemented automated call processing systems.  Today, automated interactive telephone systems have become ubiquitous.

**B.    The '762 Patent Teaches Inventions For Automated Telephonic Credit Verification Based on a Caller-Entered Customer Number.**

The '762 patent is based on a continuation-in-part application filed in May 1988.  The '762 patent shares the same specification as the related Katz '863 patent at issue in co-pending Appeal No. 13-1138.

Claims 41, 54, and 57 recite a telephonic interface system for use in conducting automated transactions with callers at remote terminals (for example, touch-tone telephones).

Among other things, the claims recite an interface structure for receiving a "customer number" that the caller enters from the caller's terminal (for example, using touch-tones).  The claims further recite a credit verification structure that can verify "on-line" the customer number to determine the caller's credit.  The claims also recite an "acknowledgement number generator" for providing a computer generated acknowledgement number to individual callers.

Dependent claims 54 and 57 further recite structure for qualifying callers based on a limit on use, including a limit on use with respect to a dollar amount.

The claims recite as follows, with certain key limitations bolded:

| Claims 41, 54, and 57 |
|---|
| 41. An analysis control system for use in a mail order facility or the like, said analysis control system for use with a communication facility including remote terminals for individual callers, wherein each of said remote terminals comprises voice communication means and digital input means in the form of an array of buttons for providing data, comprising: |
| interface structure coupled to said communication facility to interface said remote terminals for voice and digital communication and including means to provide answer data **signals provided by said individual callers from said remote terminals including signals indicative of an individual caller's customer number;** |
| **credit verification structure to verify on-line said individual caller's customer number to determine said individual caller's credit**; |
| record structure including memory and control means connected to said interface structure to receive and store data provided by said individual callers; |
| **acknowledgement generator structure for providing a computer generated acknowledgement number to said individual callers;** |
| switching structure for transferring certain of said individual callers to a live operator; and |
| central processing station coupled to said record structure to receive accumulated data on said individual callers. |
| 54. An analysis control system according to claim 41, further comprising: qualification structure coupled to said record structure to qualify said individual callers **based upon a limit on use**. |
| 57. An analysis control system according to claim 54, wherein **said limit on use is with respect to a dollar amount.** |

The '762 patent specification illustrates these inventions in its disclosed embodiments. The patent discloses an exemplary mail-order system enabling callers to complete mail order transactions over the telephone using an automated telephonic interface. As part of the system's operation, the caller may enter the caller's "customer number," such as by using telephone

touch-tones.  (JA000054 ('762 col. 11:4-6).)  The system then verifies the customer number entered by the caller, in a credit verification operation.  For example, the system may check the caller-entered customer number "to assure that the identified card and customer's number have not been cancelled, as for example in the case of credit cards that have been lost or stolen."  (JA000054 ('762 col. 11:17-34).)

Upon completion of a transaction in the exemplary mail-order embodiment, the system will "develop and announce . . . acknowledgement digits," which "serve to identify the order both for the caller and the mail-order house" and facilitate "tracing."  (JA000054 ('762 col. 11:49-56).)

In this manner, the system satisfies the objective of providing an efficient automated system to facilitate transactions with individual callers. (*See*, *e.g.*, JA000053-54 ('762 col. 10:66-11:43, 11:64-12:10).)

The '762 patent also discloses that the interface system may impose a limit on use based on a dollar amount, thereby advantageously providing automated control over the caller's access to the system.  For example, a person might be entitled to use the system "a limited number of times or to the extent of a limited dollar value," with the system updating a file "as to current use or

dollar value remaining for the caller's use."  (JA000054 ('762 col. 12:22-24,

12:60-63).)

### C.    The Patented Technology Has Achieved Extensive Commercial Success.

The business enterprises arising from Mr. Katz's inventions have

achieved considerable commercial and licensing success.[3]  Starting in 1988,

Mr. Katz partnered with American Express to form Call Interactive, a pioneer

in the field of automated interactive call processing services based on Mr.

Katz's inventions.  Call Interactive's early clients included The New York

Times, ABC's Monday Night Football, Beatrice Foods, and CBS News.  Call

Interactive continues to provide automated telephony services today as First

Data Voice Services, a unit of First Data Corporation.

Mr. Katz sold his interest in Call Interactive to American Express, and

later formed Ronald A. Katz Technology Licensing, L.P. ("Katz"), which

acquired the rights to Mr. Katz's patented inventions and is the appellant here.

The widespread implementation of the patented technology in the 1990s

is reflected by the many licensees to the Katz portfolio, including the '762

---

[3] Mr. Katz has decades of experience in business and innovation.  In 1961, Mr. Katz co-founded Telecredit Inc., the first company to provide online, real-time check credit authorization, and was named co-inventor on multiple patents issuing from these innovations.  Telecredit Inc. was later acquired by Equifax.

patent.  Approximately 300 companies have purchased licenses, many of them, such as IBM, Microsoft, Hewlett-Packard, Sony, and Sprint, through amicable license negotiations without litigation.

### D.    Procedural History of the '762 Patent and Reexamination

The '762 patent issued on April 27, 1999 based on a specification filed May 16, 1988, which is a continuation-in-part specification that ultimately claims priority to an application filed July 10, 1985.  The '762 patent expired in 2005.

The PTO commenced the present reexamination proceeding, Reexamination Control No. 90/011,438, based on a third-party request filed January 17, 2011.  The Examiner issued a non-final action rejecting '762 patent claims 41, 54, and 57 on April 29, 2011.  Katz filed a response on July 5, 2011. The Examiner issued a final action rejecting these claims on September 21, 2011.  Katz filed a response on November 21, 2011.

Katz appealed to the Board.  Katz filed its Board Appeal Brief on February 13, 2012.  The Examiner filed an Answer on March 7, 2012.  Katz filed a Reply Brief on May 7, 2012.  The Board issued its decision, affirming the Examiner's rejections, on April 22, 2013.  (JA000001-26.)  Katz appeals from the Board's decision.

### E.    Asserted Prior Art References

The Board affirmed the Examiner's rejection of claims 41, 54, and 57 as obvious in view of the Barger and Yoshizawa references.  These are the same Barger and Yoshizawa references at issue in other co-pending Katz appeals.[3]

Barger, a patent filed in 1977, describes a telephone call processing system designed to permit a caller to listen to an audio demonstration (such as a music selection) and then decide whether to buy the demonstrated product or service (such as a music recording).  (JA000522-35.)  Barger's Abstract summarizes the disclosed system, which includes a mode where the caller speaks with a live operator and a "push-button" mode where the caller interacts with an automated interface.  (JA000528.)

Yoshizawa, an article dated 1977, describes a telephone system for horse-race betting.  (JA000515-20.)  As part of the betting process, the system assigns a "registration number" and reports the current time.  (JA000517.)

---

[3] Barger is discussed in co-pending Appeal Nos. 13-1137, 13-1138, and 13-1273.  Yoshizawa is discussed in co-pending Appeal No. 13-1138. Yoshizawa was also discussed in the *Katz Interactive* MDL litigation appeal, *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1321, 1324 (Fed. Cir. 2011).  In *Katz Interactive*, this Court affirmed a combination of Yoshizawa with a reference to Szlam, with respect to a different Katz patent (U.S. Patent No. 6,335,965).  *In re Katz*, 639 F.3d at 1321.  The Board in this case did not rely on the Court's opinion.

## VI.    SUMMARY OF THE ARGUMENT

1.      The Board erred by construing "credit verification structure" that verifies "said" customer number data, as recited in '762 patent claims 41, 54, and 57, to encompass verifying data entered by a live operator.  The "said" customer number recited in the "credit verification structure" element refers to the customer number data entered by a caller into an automated interface, as recited in the immediately preceding "interface structure" element.  The plain claim language is consistent with the specification's teachings of an automated interface that verifies a caller-entered customer number.  The claim further recites that the caller-entered customer number is verified "on-line," further confirming that the system verifies the customer number entered by the caller on-line in connection with a computerized interface.

2.      The Board erred by finding that Barger's description of an operator entering an account number discloses the "credit verification structure" element as properly construed.  The claim element is directed to a structure for verifying "said" customer number entered by the caller.

3.      The Board erred by ruling that it would have been obvious to incorporate the horse-race bet registration number from Yoshizawa for order cancellation into the Barger music demonstration system.  Barger does not

disclose any need or concern for order cancellation at all. Barger's objective is to facilitate and maximize sales of goods such as music recordings, not to reduce or reverse sales. Furthermore, Barger teaches that whenever there is a problem with a caller that might impact sales, the caller is transferred to speak with a live customer service operator who can discuss the issue with the caller. Adding an automated order cancellation process would have run directly contrary to this type of high-touch customer service that Barger teaches.

4.      The Board erred by finding that Barger discloses a limit on use "with respect to a dollar amount." Barger's "free loader algorithm" discloses a limit based only on whether or not any purchase has been made, not based on any dollar amount. Barger does not disclose or suggest that any dollar amount (whether "zero" or otherwise) is recorded, checked, or otherwise used.

5.      The Board erred by ruling that it would have been obvious to incorporate the monetary limit on horse-race betting from Yoshizawa into the mail order system of Barger. The Board's obviousness rationale is not supported by substantial evidence and is erroneous as a matter of law. Yoshizawa does not describe that its betting limit would be applicable in any other context. Barger teaches that its objective is to facilitate and encourage purchases, not to limit purchases. The only relevant limit on use Barger

13.

discloses—the free loader algorithm—will limit the caller's access if the caller has not made any purchases, which is directly contrary to Yoshizawa's limit on the amount of bets that may be placed.

## VII.   ARGUMENT

### A.    Standard of Review

#### 1.    Obviousness Must Be Evaluated From the Time of the Claimed Invention, and Is Reviewed *De Novo*.

A claimed invention is obvious only if it "would have been obvious *at the time the invention was made* to a person having ordinary skill in the art." 35 U.S.C. § 103(a) (emphasis added).  Pursuant to this statutory mandate, this Court and the Supreme Court have long warned against the dangers of hindsight bias.  "A factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). "Care must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit."  *In re NTP, Inc.*, 654 F.3d 1279, 1299 (Fed. Cir. 2011) (reversing Board's obviousness ruling) (citations and internal quotation marks omitted).

> To draw on hindsight knowledge of the patented invention, when the prior art does not contain or

> suggest that knowledge, is to use the invention as a
> template for its own reconstruction — an illogical
> and inappropriate process by which to determine
> patentability.

*Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1570 (Fed. Cir. 1996)

(citations omitted).

These principles are particularly important here. The invention dates

from the 1980s, and automated call processing services flourished into

widespread commercial use thereafter, starting in the 1990s. It is

understandable that certain claimed functionalities might seem familiar or

"obvious" today to someone who has used automated telephone services over

the past 10 or 15 years. But it is imperative to insulate such familiarity from

any consideration of what might have been obvious at the time of the invention

25 years ago.

"Whether an invention is obvious is a question of law based on

underlying facts." *In re Kao*, 639 F.3d 1057, 1065 (Fed. Cir. 2011) (citing *In re*

*Kotzab,* 217 F.3d 1365, 1369 (Fed. Cir. 2000)). "This court reviews the

Board's ultimate determination of obviousness *de novo* and the Board's fact

findings for substantial evidence." *Id.* (citing *In re Gartside,* 203 F.3d 1305,

1316 (Fed. Cir. 2000)). "Substantial evidence is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Id.* In

addition, where the Board fails to establish a prima facie showing of obviousness, the rejection should be reversed. *In re Glatt Air Techniques, Inc.*, 630 F.3d 1026, 1030 (Fed. Cir. 2011).

### B.    The Board's Claim Constructions Are Reviewed *De Novo*.

The Board's claim construction rulings are legal questions that are reviewed *de novo*. *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1148 (Fed. Cir. 2012).

### C.    An Expired Patent in Reexamination Should Be Construed According to *Phillips*.

Where a patent in reexamination is expired and its claims cannot be amended, as in the present case, the claims are interpreted pursuant to the principles articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), the same standard used in infringement litigation. *See* MPEP § 2258 I.G; *In re Rambus Inc.*, 694 F.3d 42, 46 (Fed. Cir. 2012) (noting MPEP § 2258 I.G applies to interpreting expired patent-in-reexamination, "similar to that of a district court's review"); *Ex parte Papst-Motoren*, No. 650-04, 1 U.S.P.Q.2d 1655, 1656 (B.P.A.I. Dec. 23, 1986).

**D.    The Board Erred in Ruling That Claims 41, 54, and 57 Are Obvious.**

The following chart shows the claims and the Board errors challenged in this appeal.

| Claims 41, 54, and 57 | Board Rulings | Board Errors |
|---|---|---|
| 41. An analysis control system for use in a mail order facility or the like, said analysis control system for use with a communication facility including remote terminals for individual callers, wherein each of said remote terminals comprises voice communication means and digital input means in the form of an array of buttons for providing data, comprising: | | |
| interface structure coupled to said communication facility to interface said remote terminals for voice and digital communication and including means to provide answer data **signals provided by said individual callers from said remote terminals including signals indicative of an individual caller's customer number;** | | |

| | | |
|---|---|---|
| **credit verification structure to verify on-line said individual caller's customer number to determine said individual caller's credit**; | 1. The Board construed the credit verification structure to encompass verifying a customer number entered by a live operator instead of the caller. | 1. The Board erred because the structure for verifying "on-line" "said" customer number refers to verifying the customer number entered by the caller, as recited in the "interface structure" earlier in the claim. |
| | 2. The Board ruled that Barger's description that a live operator enters an account number discloses the credit verification structure. | 2. The Board erred because under the proper claim construction, the credit verification structure operates on "said" customer number entered by the caller, not by a live operator. |
| record structure including memory and control means connected to said interface structure to receive and store data provided by said individual callers; | | |
| **acknowledgement generator structure for providing a computer generated acknowledgement number to said individual callers**; | The Board ruled that it would have been obvious to add the registration number of Yoshizawa into the Barger system for automated order cancellation. | The Board erred because Barger has no need or use for automated order cancellation, which would run directly contrary to Barger's objectives of increasing sales and providing high-touch customer service. |

| | | |
|---|---|---|
| switching structure for transferring certain of said individual callers to a live operator; and | | |
| central processing station coupled to said record structure to receive accumulated data on said individual callers. | | |
| 54. An analysis control system according to claim 41, further comprising: qualification structure coupled to said record structure to qualify said individual callers **based upon a limit on use**. | | |
| 57. An analysis control system according to claim 54, wherein **said limit on use is with respect to a dollar amount.** | 1. The Board found that Barger's description of limiting use where the caller has not completed any purchases over time discloses limiting use "with respect to a dollar amount."<br><br>2. The Board ruled that it would have been obvious to add the horse-race betting limits from Yoshizawa into Barger's mail order system. | 1. The Board erred because Barger does not disclose any limit on use with respect to a dollar amount.<br><br>2. The Board erred because there was no reason to add gambling bet limits into Barger's system, where Barger's purpose is to encourage, not limit, purchases. |

1.    **Credit verification for verifying "on-line" "said" caller-entered customer number means verifying the customer number entered by the caller.**

Claims 41, 54, and 57 are each directed to an analysis control system that includes a "credit verification structure to verify on-line said individual caller's customer number to determine said individual caller's credit."

The Board construed the credit verification function, "to verify on-line said individual caller's customer number to determine said individual caller's credit," to encompass a customer number that could be entered by a customer service operator (such as in Barger), rather than referring to a customer number entered by the caller.  (JA000022-23.)  The Board agreed with the Examiner's arguments that the claims "do[] not require that it is the entry by the caller that initiates the verification, or that the verification must be based on the caller's entry."  (JA000022.)

The Board's claim construction is erroneous because the claim language expressly requires, consistent with the specification, that the structure verifies "*said*" customer number—that is, the customer number that is entered by the caller, as recited earlier in the claims.  There are several aspects of the claim language that inevitably lead to this conclusion.

The claims' shared preamble specifies that callers may use "remote terminals" that include "voice communication means and digital input means in the form of an array of buttons for providing data." The remote terminals may be, for example, touch-tone telephones.

The claims then recite an "interface structure coupled to said communication facility to interface said remote terminals for voice and digital communication and including means to provide answer data signals provided by said individual callers from said remote terminals including signals indicative of an individual caller's customer number." This element interacts with the communication facility to provide to the analysis control system with information that is provided by callers using their remote terminals. The information includes a caller's customer number, which the caller may provide, for example, by pressing buttons on a touch-tone telephone. The specification likewise illustrates that the automated telephonic system may prompt the caller to enter the caller's customer number using a touch-tone telephone. (JA000054 ('762 col. 11:4-6).) This caller-entered customer number is communicated through signals provided from the communication facility to the analysis control system via the interface structure element.

The next element recited in the claims is a "credit verification structure to verify on-line said individual caller's customer number to determine said individual caller's credit." This element recites a structure for verifying "said" customer number. The only prior reference to a customer number in the claims is the customer number entered by the caller as recited in the "interface structure" element. The credit verification structure verifies "said" caller-entered customer number. *See, e.g.*, *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1306 (Fed. Cir. 2005) (the definite article "the" indicates that the term takes antecedent basis from the previous recitation of the same word).

The '762 patent specification confirms the meaning of the plain claim language. As this Court has directed, "the specification 'is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir.1996)). Here, the specification discloses credit verification only based on a number entered on-line by the caller into an automated interface system using touch-tones. (JA000054 ('762 col. 11:4-34).) The specification does not

describe credit verification based on a customer service operator entering a customer number rather than based on a number entered by the caller.

The claim language further supports this interpretation by its reference to "on-line." The specification confirms the plain meaning of "on-line" in context, meaning that the caller is interfacing with an automated interface. (JA000058, 56 ('762 col. 19:65-67, 16:64-65) (callers "are on-line through an interface of a system of the present invention," such as in "an on-line operating format").) The specification also emphasizes that its exemplary automated formats involve processing "certain ID data provided directly from the telephone apparatus." (JA000054 ('762 col. 11:64-12:10.) In sum, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316.

To support its erroneous claim interpretation, the Board stated that the claims recite "signals" entered by the caller separately from the "customer number" itself. (JA000023.) The Board reasoned that the claims do not recite that the credit verification is performed on "signals" entered by the caller, but instead recite only that the credit verification is performed on the customer number. (*Id.*)

23.

The Board's discussion of the recited "signals" entered by the caller confuses the issue and misses the point.  The claims' "interface structure" recites structure for handling "signals provided by said individual callers from said remote terminals including signals indicative of an individual caller's customer number."  As expressly recited in the claims, the "signals" provided by the callers' telephones are merely a means for conveying the customer number:  the signals are "indicative of" the customer number.  For example, the caller may use a touch-tone telephone to push buttons indicating a customer number 1-2-3-4-5, which results in DTMF (dual-tone multifrequency) tones being generated; those tones are then recognized and decoded by an automated interface system using a tone decoder.  (*See, e.g.*, JA000050 ('762 col. 4:43-47) (interface 20 includes tone decoders); JA000043 ('762 Fig. 1, depicting interface 20).)  An internal structure then provides the customer number itself ("12345") for use within the analysis control system, such as for verifying the caller-entered customer number for credit verification.  (*See, e.g.*, JA000050, 51 ('762 col. 4:43-47, 6:52-60) (interface 20 provides caller-entered data within the system).)  The credit verification functionality of the invention is not directed towards verifying the initial signals used to convey the information, such as by measuring the frequencies of touch-tones.  The invention verifies the

24.

information represented by those signals—the customer number.  The claims,

therefore, recite that "said" caller-entered customer number data itself—in any

appropriate form for processing, not necessarily in the form of the "signals"

(e.g., touch tones) by which that number is initially conveyed—is verified by

the credit verification structure.

> **2.    Under the proper claim interpretation, the Board erred in finding that Barger discloses the credit verification structure.**

Under its erroneous claim interpretation, the Board affirmed the

Examiner's finding that Barger discloses the credit verification structure in

Barger's description that of a "credit verification function" where a customer

service operator (not the caller) provides information for credit verification.

(JA000022-23; JA000763-64; JA001239.)  This is the Board's only basis for

finding that the references disclose the "credit verification structure" element.

(JA000022-23.)[4]

Under the proper claim interpretation set forth above—the credit

verification structure verifies "said" customer number entered by the caller—

Barger's description of a customer service operator entering information does

---

[4] The Board declined to consider whether the rejections could be sustained
under the Patent Owner's claim construction.  (JA000023 ("we need not reach
those arguments").)

not disclose the "credit verification structure" element.  The Board's ruling that claims 41, 54, and 57 are obvious is unfounded and should be reversed.

### 3.    The Board erred in ruling that it would have been obvious to add Yoshizawa's registration number to Barger's system for order cancellation.

As a separate basis for reversing the rejections of claims 41, 54, and 57, the Board erred in ruling that it would have been obvious to incorporate the "registration number" feature of Yoshizawa's horse-race betting application into the system of Barger.  (JA000019-21.)

Claims 41, 54, and 57 each recite "acknowledgement generator structure for providing a computer generated acknowledgement number to said individual callers."  The claim construction of this element is not presently at issue.[5]

The Board relied on Barger as the primary reference for the rejections, including the "credit verification structure" element as set forth above. (JA00006-13, 22-23.)  Barger does not disclose any acknowledgement generator structure or computer generated acknowledgement number. However, the Board ruled that it would have been obvious to modify Barger to

---

[5] In the *Katz Interactive* appeal, this Court construed "acknowledgement number" to mean "a number that can be used by a caller to identify a transaction."  *In re Katz*, 639 F.3d at 1324.

include the registration number feature disclosed by Yoshizawa. (JA000019-21.)[6]

Yoshizawa describes that "[s]ince horse entries are occasionally canceled, consideration is given so that the bettor may cancel his bet even after completing all inputs." (JA000516 (Yoshizawa at 216).) The system accordingly provides the caller with a "registration number" when the caller places a bet. (JA000517 (Yoshizawa at 217) ("Please enter the registration number").) The caller enters the registration number into the system as part of completing the bet. (*Id*.) In the event that horse entries are later canceled, the bettor can call again and enter the registration number to quickly cancel the bet. (*Id*. (depicting sequence of interactions for "canceling a bet," including "Registration number, please. ... This bet will be canceled").) Thus, Yoshizawa expressly teaches that since horse entries—the horses that will run in a particular race—may be cancelled, the bettor may accordingly cancel a bet before the race begins.

---

[6] This Court in *Katz Interactive* affirmed a combination of Yoshizawa's registration number with a reference to Szlam. *In re Katz*, 639 F.3d at 1321. However, although the Examiner cited the *Katz Interactive* opinion in the Examiner's Answer submitted to the Board, the Board's decision in this case did not cite the *Katz Interactive* opinion and did not rely on the Court's analysis.

In view of Yoshizawa's description, the Board ruled that it would have been obvious to incorporate a "registration number" feature of Yoshizawa into the Barger system to enable automated order cancellation.  (JA000019-21.) The Board did not find that Yoshizawa expressly suggest any broader applicability of the registration number to contexts outside of the horse-race betting context.  The Board ruled that "given that Yoshizawa discloses the registration number and its use in cancellation in the horse-race betting application, it would be natural to apply such processes to other applications, if applicable."  (JA000020-21.)  The Board "agree[d] with the Examiner that the use of the registration number to facilitate cancellation would be useful in the system of Barger."  (JA000021.)  The Board further stated that "as disclosed in Barger, automated and live operator responses can provide a more responsive and cost-effective system."  (*Id.*)

The Board erred because incorporating Yoshizawa's registration number for automated order cancellation in Barger would have directly undermined Barger's complementary objectives of (1) achieving sales and (2) providing high-touch customer service for any purchase-related problems or issues.

The primary purpose of Barger's system is to market goods or services, such as music recordings, for the ultimate objective of completing sales of

28.

those goods or services. (*See*, *e.g.*, JA000528 (Barger col. 1:65-2:4) (object of the invention of "permitting a customer to place orders" and "arrange for payment"); *Id.* (Barger col. 2:33-50) (summarizing sales process); JA000525 (Barger Figs. 3A-3B) and JA000532 (Barger col. 10:62-11:10 (live operator-facilitated purchase process); JA000526 (Barger Fig. 4) and JA00533 (Barger col. 11:27-32) (push-button interface purchase process).) Consistent with this overarching objective, Barger does not describe any process or functionality for canceling purchases after they have been completed. Barger is concerned with increasing sales, not reducing or reversing sales.

Barger's live operator customer service functions reinforce its objective of properly completing sales transactions. Barger teaches what may be called a "high-touch" type of customer service, where a customer service agent will engage in discussion with the caller to address any problems or issues that would impede successful purchase transactions. Consistent with this customer service objective, Barger describes that its system maintains "a complete record of all transactions" including "current inventory records for the purpose of accepting orders," which allows the system "to present to the customer service operator a very accurate and informative profile of a calling customer." (JA000528, 530 (Barger col. 2:5-9, 6:24-26).)

Barger's system is designed so that a caller in the automated push-button will be transferred to speak with a live operator if an issue arises that might impede the successful completion of a sale. In the push-button mode, "a check is made for potential delivery problems," and "[i]f there are any, the caller is transferred to an operator mode for discussion of the problem." (JA000533 (Barger col. 11:25-28).) Similarly, Barger's "free loader algorithm" in the push-button mode monitors callers to determine whether the caller has listened to too many demonstrations without completing a purchase. "For example, five selection requests over a short period of time (less than a day) without a purchase may indicate a free loader." (*Id.* at col. 11:44-46.) If the caller is determined to be a "free loader," "the call is transferred to an operator" who presumably would then engage in discussion with the caller. (*Id.* at col. 11:32-36).)

Similarly, in Barger's "first mode" where a live operator interacts the caller instead of the automated push-button interface, Barger's system is designed so that every time the caller listens to a music demonstration, the caller will then be connected to speak with a live operator—preferably the same operator who initially handled the call—who will determine whether the caller wishes to place an order. (JA000528, 532 (Barger col. 2:44-50,

10:55-11:6).) "[I]n the case of an unfruitful customer" who does not make purchases, the operator "may terminate the customer's call." (JA000528 (Barger col. 2:57-61).)

In sum, Barger's system is designed to complete sales and to have a customer service operator handle any problems or impediments. Barger does not describe any need or concern for cancelling orders at all. The Board's proposed modification of Barger, where the caller could cancel a previously-completed order through an automated interface using a registration number without speaking with a customer service operator, simply makes no sense in the context of Barger's design and objectives. Nothing about Barger would have prompted the skilled artisan to seek a modification that would have run contrary to Barger's objectives. "[I]t matters greatly whether anything the skilled artisan would be prompted by the prior art to do is *in fact* within the scope of the pending claim." *In re Kao*, 639 F.3d at 1066 (emphasis in original). The Board's obviousness rationale is not supported by Barger's teachings. Instead, "[t]he Board improperly relied on hindsight reasoning to piece together elements to arrive at the claimed invention." *In re NTP*, 654 F.3d at 1299.

In its decision, the Board recognized Barger's "stated goals of sales." (JA000021.)  The Board nevertheless ruled that it still would have been obvious to include "the extra provision of a facilitated cancellation," stating that "providing reputable practices need not run counter to high sales."  (*Id*.)  The Board apparently reasoned that providing an automated cancellation process in Barger would have been a "reputable" practice, as if it would have been disreputable for Barger not to provide for such order cancellation.

The Board erred because it ignored Barger's teachings that already take extensive measures to ensure that the caller's order will be satisfactory and final before the order is completed, so that there would be no need for a later cancellation.  A fundamental purpose of Barger's music recording marketing system is to provide callers with audio demonstrations of the items to be purchased, such as music recordings.  The title of the Barger patent is "Telephone System for Audio Demonstration and Marketing of Goods or Services."   Barger describes at length how the caller may listen to samples to confirm that he or she desires to purchase the item before making the purchase. (JA000528-533 (Barger col. 1:60-2:4, 2:39-50, 4:67-5:45, 10:41-11:32).) Because the caller is encouraged to listen to demonstrations before deciding whether to make the purchase, the caller would have little reason to return the

item later after completing the purchase.  By contrast, in Yoshizawa, horse entries may be cancelled so that the basis for the transaction (the horses that will be running in the race) has changed and the bet may be cancelled.

Furthermore, in both the live operator and push-button automated modes, Barger's system will check for "potential delivery problems" <u>before</u> the caller completes the order, again to ensure that the transaction can be properly fulfilled before it is completed.  In the live operator mode, "[b]efore a demonstration of the selection is played, the CPU determines if there is a potential delivery problem" (JA000532 (Barger col. 10:48-51)), and then again after "the operator enters the order ... the CPU can again inquire about potential delivery problems, etc. and indicate to the operator potential revisions in the information previously given." (JA000532-33 (Barger col. 10:67-11:3).) Similarly, in the automated push-button mode, "a check is made for potential delivery problems," and "[i]f there are any, the caller is transferred to an operator mode for discussion of the problem."  (JA000533 (Barger col. 11:25-28).)

Barger's system and process is thus entirely "reputable" in this regard, contrary to the Board's hindsight-based suggestion.  After the caller has listened to a demonstration and the system has confirmed there is no delivery

problem, the good to be purchased (e.g., the music recording) itself will not change. Thus in Barger, there is no reason to provide for cancellations, especially where cancellations would reduce sales and revenues, and particularly automated cancellations using a registration number where the caller would not speak with a customer service operator. Again, Barger's context and design are fundamentally different from those in Yoshizawa, where the basis for the transaction—the horses running in the race—can change. "[T]he record contain[s] no evidence that would have suggested to or motivated an ordinarily skilled artisan" to modify Barger in view of Yoshizawa to achieve the claimed invention. *Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1339 (Fed. Cir. 2010).

The Board further stated that "we do not take the provision of live operators as requiring those operators to address all issues of callers." (JA000021.) Again, this reasoning misses the mark. The point is not whether live operators are required to address all "issues" of callers. Barger contemplates that many functions do not require a live operator; for example, callers may listen to demonstrations and make purchases in an automated push-button mode without requiring an operator. The point is also not whether Barger *could have* been modified, in hindsight, to include an automated

34.

cancellation process, as opposed to "requiring" live operator intervention.  The dispositive point is that it *would not have been obvious* to modify Barger's system in the way the Board proposed, because the proposed modification would have run directly contrary to Barger's design and objectives.  Barger consistently teaches that its goal is to facilitate successful purchase transactions, and where any potential impediment to a successfully completed transaction arises—a "delivery problem," a "free loader," an "unfruitful" caller—a customer service operator will handle the problem.  In view of Barger's design and objectives, in contrast with the very different context and objectives of Yoshizawa, the references provide no "apparent *reason* to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (emphasis added).  The Board's obviousness ruling is erroneous and should be reversed.

### 4.    The Board erred in ruling that Barger discloses or renders obvious limiting use with respect to a dollar amount.

As an additional, independent basis for reversing the rejection of dependent claim 57, the Board erred in finding that Barger discloses or renders obvious the limitation of limiting a caller's use "with respect to a dollar amount."  (JA000023.)

Claim 54 recites the system of claim 41, further comprising "qualification structure coupled to said record structure to qualify said individual callers based upon a limit on use." Claim 57 recites the system of claim 54, "wherein said limit on use is with respect to a dollar amount." The '762 patent discloses a limit on use based on a dollar amount, for example, where a person might be entitled to use a telephonic system or service "a limited number of times or to the extent of a limited dollar value" (JA000054 ('762 col. 12:22-24)), with the system updating a file "as to current use or dollar value remaining for the caller's use." (*Id.* at col. 12:60-63.) The disclosed exemplary embodiment limits the caller's use of a service or system based on a limited dollar amount.

The Examiner and Board relied on Barger as the primary reference for the rejections. (JA000006-12 (FF 1-10).) The Board found that Barger discloses the recited limit on use with respect to a dollar amount. The Board further found that Yoshizawa discloses the limit on use with respect to a dollar amount, and ruled that it would have been obvious to modify Barger's disclosure to include the limit disclosed by Yoshizawa. The Board erred in both rulings.

36.

a.    **The Board erred in finding that Barger discloses limiting use with respect to a dollar amount.**

Barger describes a "free loader algorithm" that checks whether the caller has made "five selection requests over a short period of time (less than a day) without a purchase." (JA000533 (Barger col. 11:44-45).) If the caller has not made a purchase within the defined period, the caller is deemed to be a "free loader" and is transferred from the automated interface to a live operator. (JA000533 (Barger col. 11:32-46).)

The Board found that Barger's free loader algorithm discloses limiting a caller's use "with respect to a dollar amount." (JA000023-24.) The Board erred because Barger does not disclose or suggest any limit on use <u>with respect to a dollar amount</u>. Claim 57 does not recite a limit on use "with respect to a purchase" or the like. The claim language expressly requires a limit on use "with respect to a dollar amount." This requirement is consistent with the '762 patent's exemplary embodiments, where a caller's use might be limited based on "the extent of a limited dollar value" (JA000054 ('762 col. 12:22-24)) or "dollar value remaining for the caller's use" (*Id.* at col. 12:60-63).

The free loader algorithm in Barger does not record any dollar amount, evaluate any dollar amount, or do anything else with respect to any dollar amount or other monetary value. It only checks whether the caller has made

any purchase within a set period of time and/or number of selection requests. In fact, Barger does not contain any reference to "dollars" at all. The alleged limit on use in Barger is not "with respect to a dollar amount" as the claim expressly requires. Barger's limit is only based on the "yes or no" question of whether the caller has made any purchase. The Board's finding to the contrary is not supported by substantial evidence.

The Board nevertheless reasoned that Barger's check for the lack of a purchase effectively discloses a check for "zero dollars," and that "zero dollars is still an amount, as a opposed to a lack of an amount." (JA000023-24.) The Board's reasoning is unfounded. The invention of claim 57 is not directed to limits on use solely with respect to whether or not a purchase is made. The invention is expressly directed toward a limit on use "with respect to a dollar amount." Barger does not disclose any limit on use with respect to a dollar amount. The free loader algorithm in Barger does <u>not</u> check if the caller has spent "zero dollars" or any other dollar amount—it checks only whether the caller has exceeded use in time period "without a purchase." (JA000533 (Barger col. 11:44-45).) This does not disclose the invention. The Board's finding is not supported by substantial evidence and should be reversed.

        **b.    The Board erred in finding that Yoshizawa renders obvious modifying Barger to use a limit on use with respect to a dollar amount.**

As an alternative ground of rejection for claim 57, the Board ruled that it would have been obvious to modify Barger to include a limit on use with respect to a dollar amount as allegedly disclosed by Yoshizawa.

Yoshizawa describes that horse-race bets are limited to a "daily maximum of ¥100,000." (JA000519 (Yoshizawa at 219).)  Each time a bet is placed, a new purchase limit is set "by deducting the bet amount from the daily maximum of ¥100,000." (*Id*.)  "The newly set limit is the maximum amount that can be used in the next bet of the day." (*Id*.)

The Board ruled that it would have been obvious to modify Barger's purchase operations in view of Yoshizawa's horse-race betting limit.  The Board acknowledged that "Barger's purpose is to facilitate purchases and limit them, per Yoshizawa." (JA000024.)  Nevertheless, the Board ruled that "Yoshizawa has a similar purpose, to facilitate bets, but that does not negate the disclosure of a limit, as discussed in Yoshizawa," and ruled that "one of ordinary skill in the art would have been compelled to add such limits, based on purchases in view of Yoshizawa, into the system of Barger for the same or similar reasons specified." (*Id*.)

The Board's obviousness ruling is erroneous and should be reversed. Yoshizawa's horse-race betting limit would not have prompted a skilled artisan to modify Barger's music purchasing system to include the betting limit. By contrast with Yoshizawa's automated horse-race betting system, the Barger system is an operator-assisted music demonstration and purchase system with a completely different transaction context. As discussed above, a primary objective of Barger's system is to facilitate and complete the sales of goods or services. (*See*, *e.g.*, JA000528 (Barger col. 1:65-2:4) (object of the invention of "permitting a customer to place orders" and "arrange for payment").) Barger's description reinforces this objective. For example, "in the case of an unfruitful customer" who does not make purchases, the operator "may terminate the customer's call." (*Id.* at col. 2:57-61).) Similarly, if a caller listens to too many music demonstrations without making a purchase, Barger's free loader algorithm will transfer a caller to a live operator. (JA000533 (Barger col. 11:32-36).)

Barger's teachings and objectives are therefore directly contrary to the betting limit described in Yoshizawa. Where Yoshizawa imposes a limit on the amount of money callers can bet, Barger imposes the opposite type of limit through its free loader algorithm—a caller's access in Barger is limited only if

the caller does <u>not</u> make any purchase.  In view of these teachings, a POSITA would not have been prompted, much less "compelled" as the Board ruled, to modify Barger to add the betting limit from Yoshizawa.

The Board did not cite any teaching of either Yoshizawa or Barger that would have suggested any applicability of Yoshizawa's betting limit to the Barger system, any need in Barger that would have been resolved by Yoshizawa's description, or any other teaching of the references that would have given the skilled artisan a reason to combine these disclosures.  Again, only by improperly using the claim language as a template, and using hindsight to reconstruct the invention in the 35-year-old prior art, would one have a reason to add Yoshizawa's betting limit into the Barger system.  *In re Kao*, 639 F.3d at 1066;  *In re NTP*, 654 F.3d at 1299.

Rather than cite any evidence supporting the obviousness combination, the Board (like the Examiner) only speculated that a skilled artisan would have been motivated to add Yoshizawa's betting limit into the Barger system "for the same or similar reasons specified," presumably referring to reasons specified in Yoshizawa.  (JA000024.)  But Yoshizawa does not describe why it imposes the limit on betting.  Nothing in Yoshizawa's disclosure suggests that its horse-race betting limit should be applicable to other systems or applications

such as the very different system and context of Barger.  To the contrary, there are any number of reasons Yoshizawa might limit the amount a horse-race bettor can bet, all of which would not apply to Barger's sales system, such as: (1) legal regulations on gambling; (2) gambling-related contracts between the betting organization and the banks supplying funds for betting (*see* JA000516 (Yoshizawa at 216) (the betting member must open an account "with a specified bank")); (3) a policy to avoid and discourage addictive and excessive gambling; (4) limiting the maximum potential house payouts for potential winners, given that a winner's payout could be many times larger than the bet, especially for a bet on a "long shot" horse; and the like.  None of these considerations or objectives apply to Barger.  Barger's considerations and objectives are precisely the opposite of imposing the type of limit Yoshizawa imposes—Barger's raison d'être is to facilitate and encourage sales.

In view of the directly contrary teachings and objectives, and the lack of evidence supporting a reason to combine the references as the Board asserted, the Board's obviousness ruling is erroneous and should be reversed.

**CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

Katz requests that this Court reverse the Board's decision and confirm the patentability of claims 41, 54, and 57 of U.S. Patent No. 5,898,762.


Dated:        August 28, 2013              COOLEY LLP

                                            By: /s/ Frank V. Pietrantonio
                                                    Frank V. Pietrantonio

                                            Attorneys for Plaintiff
                                            Ronald A. Katz Technology
                                            Licensing LP

# ADDENDUM



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/011,438 | 01/17/2011 | 5898762 | 6646-300  (762) | 7501 |

58249          7590          02/25/2013
COOLEY LLP
ATTN: Patent Group
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004

| EXAMINER |
|---|
| MENEFEE, JAMES A |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 02/25/2013 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

JA000001

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

*Ex parte* RONALD A. KATZ TECHNOLOGY LICENSING L.P.[1],
Appellant and Patent Owner

————————

Appeal 2012-008644
Reexamination Control No. 90/011,438
Patent 5,898,762
Technology Center 3900

————————

Before KARL D. EASTHOM, KEVIN F. TURNER, and
JONI Y. CHANG, *Administrative Patent Judges*.

TURNER, *Administrative Patent Judge*.


DECISION ON APPEAL

Ronald A. Katz Technology Licensing L.P., Appellant, appeals under
35 U.S.C. §§ 134(b) and 306 from a final rejection of claims 41, 54, and 57.
We have jurisdiction under 35 U.S.C. §§ 134(b) and 306.

We AFFIRM.

———————————

[1] Ronald A. Katz Technology Licensing L.P. is the Patent Owner and the
real party in interest (App. Br. 3).

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

## STATEMENT OF THE CASE[2]

This proceeding arose from a request for *ex parte* reexamination filed
on behalf of United States Cellular Corp. on January 17, 2011, of United
States Patent 5,898,762 (the '762 Patent). The '762 patent, entitled
"Telephonic-Interface Statistical Analysis System," issued April 27, 1999, to
Ronald A. Katz, and has several patent applications upon which it claims
priority, listed on the face of the '762 Patent. The '762 Patent is said to have
expired on December 20, 2005, by virtue of a terminal disclaimer (App. Br.
4).

The '762 Patent is or has been involved in numerous litigations, as
summarized in the Related Proceedings Appendix (App. Br. 37-67).

## CLAIMED INVENTION

Appellant's invention relates to a system that interfaces with a
multiplicity of individual terminals of a telephone network, where callers are
prompted by voice-generated instructions to provide data, and where the
data provided are used to select a group or subset of callers who can be
readily identified and reliably confirmed, as well as producing statistics
relating to the formats for which the system is being utilized (Abs.).

Independent claim 41, along with dependent claims 54 and 57, are

---

[2] Our decision will make reference to the Appellant's Second Amended
Appeal Brief ("App. Br.," filed February 13, 2012) and Reply Brief ("Reply
Br.," filed May 7, 2012), and the Examiner's Answer ("Ans.," mailed March
7, 2012).

2

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

subject to reexamination, with original claims 1-40, 42-53, 55, 56, and 58-70

not being subject to reexamination.

Claim 41 is reproduced below:

41. An analysis control system for use in a mail order
facility or the like, said analysis control system for use with a
communication facility including remote terminals for
individual callers, wherein each of said remote terminals
comprises voice communication means and digital input means
in the form of an array of buttons for providing data,
comprising:

interface structure coupled to said communication
facility to interface said remote terminals for voice and digital
communication and including means to provide answer data
signals provided by said individual callers from said remote
terminals including signals indicative of an individual caller's
customer number;

credit verification structure to verify on-line said
individual caller's customer number to determine said
individual caller's credit;

record structure including memory and control means
connected to said interface structure to receive and store data
provided by said individual callers;

acknowledgement generator structure for providing a
computer generated acknowledgement number to said
individual callers;

switching structure for transferring certain of said
individual callers to a live operator; and

central processing station coupled to said record
structure to receive accumulated data on said individual callers.

(App. Br. 31, Claims App'x.).

3

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

PRIOR ART REJECTION

The prior art references relied upon by the Examiner in rejecting
claims 41, 54, and 57 are listed as follows:

Barger, Jr. et al. ("Barger")        4,071,698        Jan. 31, 1978

Kanichiro Yoshizawa et al., *Voice Response System for Telephone Betting*,
26 HITACHI REV. 215-220 (1977) (hereinafter "Yoshizawa").

The Examiner maintained a rejection of the claims on the following
basis:

- Claims 41, 54, and 57 under 35 U.S.C. § 103(a) as being unpatentable
  over Barger and Yoshizawa (Ans. 4).

ISSUE

Appellant has asserted numerous arguments as to whether the
Examiner erred in proffering the above-cited rejection, which we detail in
the analysis section below.  We have considered in this decision only those
arguments that Appellant actually raised in the Briefs.  Arguments which
Appellant could have made but chose not to make in the Briefs are deemed
to be waived.  *See 37* C.F.R. § 41.37(c)(1)(vii).

Did the Examiner err in finding that Barger and Yoshizawa render
obvious the subject matter of claims 41, 54, and 57?

4

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

FINDINGS OF FACT

1.   Barger describes "a system for marketing merchandise or services
     capable of being demonstrated to prospective customers over
     telephone lines, such as phonograph records or tapes (cartridges or
     cassettes), books, plays, and tours, and for immediately accepting
     orders of selected merchandise or services" (Col. 1, ll. 8-13).  One
     object of the invention "is to provide a telephone system which
     enables a customer shopping for merchandise or services
     susceptible of audio demonstration to request that a particular
     demonstration be played over the telephone" (Col. 1, ll. 60-64).
     Another object is to "provide a telephone system for customer
     selected audio demonstrations without human intervention in
     operation" (Col. 2, ll. 13-15).

2.   The system includes three modes of operation (Col. 2, ll. 34-37;
     col. 3, ll. 3-5, 8-10).  "In the first mode, the operator elicits
     required information from the customer, such as name and account
     number, demonstrations desired, and orders for the merchandise or
     services demonstrated" (Col. 2, ll. 34-37).  In the second mode, the
     "automatic telephone service . . . causes the data processor to
     communicate with the customer through prerecorded messages
     played to the customer through the audio repeating means and
     codes entered by the customer through his telephone keyboard"
     (Col. 2, l. 66 to col. 3, l. 3).  To access the second mode, the

5

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

operator can transfer a customer's call (col. 2, ll. 65-67). "An alternative way of entering this second mode of service is through the customer calling a distinct telephone number for a line which the data processor recognizes as being from a customer who has a push-button telephone and wishes automatic telephone service" (col. 3, ll. 3-8). In the third mode, a modified automatic telephone service is provided to "customers of a licensed retailer of merchandise or services through the equivalent of push-button telephones" (Col. 3, ll. 8-11). In the third mode, the customer may purchase the merchandise or services directly from the licensed retailer (Col. 3, ll. 12-14). In either the second or third mode, a data processor responds to codes entered by the customer using a push button phone without intervention from a human operator (Col. 3, ll. 14-17).

3.      As illustrated in Figure 1, the basic telephone system includes a data processor 10 of a telephone record marketing store, an automatic answering device 11, a public telephone system 12 with telephone couplers 13 (also referred to as "data couplers" (*see, e.g.,* col. 3, ll. 64-65)) and telephones 14, a switching system 16, an audio program repeater 17 and a customer service operator 18 (Col. 3, ll. 41-55). The telephones 14 can be a dial or push-button type (Col. 3, ll. 45-46). "The address information generated by the dial pulses, or push-button tones, establishes the basis for

6

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

subsequent operations of the telephone system to connect a calling subscriber with the data processor 10 at a telephone record marketing store" (Col. 3, ll. 46-51). The customer service operator 18 communicates with the data processor 10 through a video terminal 19, a type-writer keyboard and a numeric keyboard (Col. 3, ll. 55-60). The customer service operator 18 communicates with a customer through the switching system 16 and the telephone couplers 13 (Col. 3, ll. 54-56).

4.  When a customer calls the telephone number of the telephone record marketing store, the transmitting and receiving equipment of the store is connected to the telephone system 12 by one of the data couplers 13 (Col. 3, ll. 61-65). Figures 3A and 3B illustrate flow charts for an operator attended mode (Col. 3, ll. 29-30). "The data processor 10 is programmed with an interrupt routine to respond to each signal received from the automatic answering device 11 and automatically connect the customer's telephone line via a [data] coupler 13 to a predetermined one of a plurality of audio-program repeater [17] channels which plays a 'hello' message explaining that a customer service operator will be with the customer in a moment" (Col. 4, ll. 10-17; "GO OFF-HOOK & CONNECT TO „HELLO" MSG.," Fig. 3a). A customer service operator 18 is placed in communication with the customer through the switching system 16 (Col. 4, ll. 57-59). "The operator then

7

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

greets the customer and elicits from the customer identification
data such as name, address, and account or credit card number"
(Col. 4, ll. 61-64; "CONNECT TO OPER.; TAKE INITIAL
INFO.," Fig. 3a). The data processor 10 can display the calling
customer's "historical and credit verification data" from memory
using the customer's account number or credit card number (Col.
5, ll. 32-36).

5.    To request a demonstration, the customer can provide to the
customer service operator 18 "a directory number assigned to the
requested demonstration and published in a catalog by the
telephone record store" (col. 5, ll. 4-7) or "the operator may search
for it through the data processor in which cross-indexing tables are
stored for the labels, titles and recording artists" (col. 5, ll. 9-11).
("OPERATOR ENTERED SEL./DATA" and "SEL.
REQUESTED?," Fig. 3b). "While the requested demonstration is
playing . . . the customer service operator [18] is available to
service other customers" (Col. 5, ll. 20-22; "PLAY SELECTION,"
Fig. 3b). "When the requested demonstration has been completed,
the data processor [10] is interrupted by the audio program repeater
[17]" (Col. 5, ll. 23-25; "OUTGOING MSG./SEL.," Fig. 3b). The
data processor 10 then disconnects the audio program repeater 17
from the customer's line and switches that line back to the
customer service operator 18  (Col. 5, ll. 25-29; "CONNECT TO

8

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

PREV. OPERATOR," Fig. 3b). If the customer wishes to hear other demonstrations, the previously described procedure is repeated (Col. 5, ll. 42-45; Fig. 3b). If the customer places an order, the "data processor [10] . . . transfers the order to an order processing system 20 with the name, address, and any other information required to fill the order, such as the account or credit card number" (Col. 5, ll. 50-53).

6.    As illustrated in Figure 2, which is described as a preferred embodiment (col. 3, ll. 27-28), the telephone system for the telephone record marketing system includes a data processor (col. 7, ll. 33-34), a dial telephone 24 or a push-button telephone 25, telephone data couplers 26, an automatic answering device 27 (col. 7, ll. 38-44), an audio program repeater 28 and a switching matrix 29 (col. 7, ll. 49-51). The data processor includes a central processing unit (CPU) 21, a bus 22 and a random access memory 23 (Col. 7, ll. 33-37). The CPU 21 communicates with other units (e.g., the random access memory 23) via the bus 22 (Col. 7, ll. 35-37).

7.    In the first mode of operation, the dial telephone 24 or the push-button telephone 25 is coupled to the CPU 21 with telephone data couplers 26 and the automatic answering device 27 (Col. 7, ll. 38-44). "The CPU [21] responds to an incoming call with a command to an audio program repeater 28 to play a 'hello' message to the

9

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

customer through a switching matrix 29" (Col. 7, ll. 49-51).

"[T]here is a credit verification function (CVF) 45 which the CPU

[21] accesses under control of a programmed subroutine for credit

verification" (Col. 8, ll. 60-64).

8.  For the Figure 2 embodiment, Barger also describes that "a

customer having a push-button telephone communicates with the

telephone record marketing system through the keypad of the

telephone" (Col. 9, ll. 22-24).  For access to this automatic

telephone service, a customer first establishes communication with

the telephone data coupler 26 followed by entering "an established

account number having a code reserved for push-button telephone

customers" (Col. 9, ll. 36-42).  "If the credit verification function

cannot validate the automatic push-button telephone customer,

operator assistance is automatically initiated by the CPU" (Col. 9,

ll. 42-45).

9.  "Otherwise the CPU will command the audio program repeater to

play a prerecorded message to communicate with the customer as

necessary.  In that manner the transaction is carried out by the CPU

without operator assistance.  At each step, any entry required is

made by the customer through his telephone keyboard in response

to a message played by the audio program repeater under control

of the CPU" (Col. 9, ll. 45-53).

10

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

10.    Figure 4 illustrates a flow chart for the automatic push-button
       telephone mode (Col. 3, ll. 31-32; col. 11, ll. 18-19).  "The first
       part of the routine is similar to receiving a call in the operator
       attended mode for playing the 'hello' message, except that the
       message is one which concludes with an instruction for the
       customer to enter his account number" (Col. 11, ll. 19-23; "GO
       OFF-HOOK & CONNECT TO 'HELLO & INSTR MSG.
       COMPL.," Fig. 4).  When the customer enters a selection number
       (col. 11, ll. 25-26; "CUSTOMER ENTERS SEL. NO.," Fig. 4),
       "an excerpt of the selection is played as a demonstration and an
       audio message is transmitted to the customer asking him if he
       wishes to buy the selection" (col. 11, ll. 28-31; "PLAY
       SELECTION" and "DO YOU WISH TO BUY?," Fig. 4).  "If yes,
       an audio confirming message is transmitted to the customer, and if
       not, the routine branches back to ask again for a selection number .
       . ." (Col. 11, ll. 32-34; "CONFIRM ORDER," Fig. 4).

11.    Yoshizawa describes a telephone betting system that uses an
       automated voice response unit to sell parimutuel tickets (P. 215,
       col. 1, ¶ 4).  The telephone betting system includes a public
       telephone network, the voice response unit and a central processing
       unit (P. 215, col. 2, ¶ 6; Fig. 1).

12.    After opening an account with a specified bank, a "subscriber can
       make bets through any push-button telephone set" by calling a

11

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

telephone betting center and inputting "account number, password
number and the desired parimutuel tickets" (P. 216, col. 1, ¶ 1).
"The voice response unit transmits these inputs to the central
processing unit through the data communication lines" (P. 216, col.
1, ¶ 1). "Acceptance of the bet is completed as the input data are
entered in the account file" (P. 216, col. 1, ¶ 1).

13.    During the process of placing a bet, a "Voice output to push-button
telephone" provides a "Registration time" (Table 1, "(a) When
making a bet," Item 5) and a "Registration number" (Table 1, "(a)
When making a bet," Items 5, 6). Similarly, during the process of
cancelling a bet, the "Voice output to push-button telephone"
requests the subscriber to enter the previously assigned
"Registration number (number assigned when bet was made)"
(Table 1, "(b) When canceling a bet," Item 2).

## PRINCIPLES OF LAW
### *Interpretation of Expired Patent Claims*

Patent claims in a reexamination proceeding in the USPTO are
ordinarily given their broadest reasonable interpretation consistent with the
patent disclosure. *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1364
(Fed. Cir. 2004). When the patent has not expired, construing claims of an
unexpired patent broadly is not unfair to the patentee because the patentee
has the opportunity to amend the claims to obtain more precise claim
coverage. *See id*. However, patent claims of an expired patent may not be

12

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

amended.  37 C.F.R. § 1.530(j).

The standard of claim construction for the claims of an expired patent

in reexamination was addressed in *Ex parte Papst-Motoren*, 1 USPQ2d 1655

(BPAI 1986).  The Board noted that *In re Yamamoto*, 740 F.2d 1569 (Fed.

Cir. 1984), held that claims in a reexamination proceeding should be given

their broadest reasonable interpretation, consistent with the specification,

because applicants had the right to amend, whereas in a district court,

"claims should be so construed, if possible, as to sustain their validity."

*Yamamoto*, 740 F.2d at 1571 n.* (citing *ACH Hosp. Systems, Inc. v.*

*Montefiore Hosp.*, 732 F.2d 1572, 1577 (Fed. Cir. 1984)).  The Board held

as follows:

> [I]n reexamination proceedings in which the PTO is
> considering the patentability of claims of an expired patent
> which are not subject to amendment, a policy of liberal claim
> construction may properly and should be applied.  Such a
> policy favors a construction of a patent claim that will render it
> valid, i.e., a narrow construction, over a broad construction that
> would render it invalid.

*Papst-Motoren*, 1 USPQ2d at 1656; *Ex parte Bowles*, 23 USPQ2d 1015,

1017 (BPAI 1991) (both nonprecedential[3]).  The Board also held in both

*Papst-Motoren* and *Bowles* that it would be error to read "inferential

limitations" into the claims.  *Papst-Motoren*, 1 USPQ2d at 1657; *Bowles*,

---

[3]  Although *Papst-Motoren* is not designated as precedential, it was decided
by an expanded panel of the Board of Patent Appeals and Interferences,
including the Commissioner, the Deputy Commissioner, the Chairman of the
Board, and an Examiner-in-Chief.

13

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

23 USPQ2d at 1017.

 *Papst-Motoren*'s holding that "claims should be so construed, if possible, as to sustain their validity" is another way of saying that the USPTO does not apply the "broadest reasonable interpretation" in construing the claims of an expired patent in a reexamination proceeding. The policy reason is that the claims in an expired patent cannot be amended. However, the maxim that "claims should be so construed, if possible, as to sustain their validity" is sometimes misunderstood and the Federal Circuit has clarified the maxim since *Papst-Motoren*. In accordance with those cases, it is clear that any claim construction must be in accord with the rules of claim construction and claims may not be redrafted. *See Generation II Orthotics Inc. v. Med. Tech. Inc.*, 263 F.3d 1356, 1365 (Fed. Cir. 2001) ("[C]laims can only be construed to preserve their validity where the proposed claim construction is 'practicable,' is based on sound claim construction principles, and does not revise or ignore the explicit language of the claims."); *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215-16 (Fed. Cir. 2008) ("This court has repeatedly held that courts may not redraft claims to cure a drafting error made by the patentee, whether to make them operable or to sustain their validity . . . . To do so 'would unduly interfere with the function of claims in putting competitors on notice of the scope of the claimed invention.'") (citations and footnote omitted). The maxim is limited "to cases in which 'the court concludes, after applying all the available tools of claim construction, that

14

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

the claim is still ambiguous.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1327
(Fed. Cir. 2005) (*en banc*) (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898, 911 (Fed. Cir. 2004)).  Importantly, it is "error . . . to use the
possible invalidity of those claims, if broadly construed, as a basis for
construing them narrowly." *The Saunders Group, Inc. v. ComforTrac, Inc.*,
492 F.3d 1326, 1335 (Fed. Cir. 2007); *Tate Access Floors, Inc. v. Interface
Architectural Resources, Inc.*, 279 F.3d 1357, 1367 (Fed. Cir. 2002)
("Fairness and the public notice function of the patent law require courts to
afford patentees the full breadth of clear claim language, and bind them to it
as well.  Consequently, where such claim language clearly reads on prior art,
the patent is invalid."); *Phillips*, 415 F.3d at 1327 ("[W]e have certainly not
endorsed a regime in which validity analysis is a regular component of claim
construction."); *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999)
("[I]f the only claim construction that is consistent with the claim's language
and the written description renders the claim invalid, then the axiom does
not apply and the claim is simply invalid.").

    The maxim does not mean that claims should be construed more
narrowly than is required by the rules of claim construction, as is sometimes
misunderstood from cases such as *In re Prater*, 415 F.2d 1393, 1404 n.30
(CCPA 1969) ("By construing a claim as covering only patentable subject
matter, courts are able, in appropriate cases, to hold claims valid in order to
protect the inventive concept or the inventor's contribution to the art.  The
patentee *at that time* usually may not amend the claims to obtain protection

15

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

commensurate with his actual contribution to the art.") and *Yamamoto*, 740 F.2d at 1572 ("District courts may find it necessary to interpret claims to protect only that which constitutes patentable subject matter to do justice between the parties.").

*Papst-Motoren* does not describe what sources of claim construction can be used. We assume for this appeal that a patentee is entitled to rely on any of the various intrinsic and extrinsic sources of claim meaning discussed in *Phillips*. It is patentee's burden to show how an argued claim construction is supported by the evidence.

*Papst-Motoren* also does not state what methodology of claim construction should be used, e.g., whether the USPTO should consider all sources of evidence considered by district courts. Nevertheless, the USPTO always considers the specification. *See In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997) ("[I]t would be unreasonable for the PTO to ignore any interpretive guidance afforded by the applicant's written description . . . ."). For purposes of this appeal, we assume that any type of evidence of claim meaning identified by *Phillips*, including prosecution history of the original patent, can be considered since patentee may not amend.

*Obviousness Rejections*

A finite number of solutions within the skill and understanding of ordinarily skilled artisans can be indicative of obviousness:

16

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

> When there is a design need or market pressure to solve a
> problem and there are a finite number of identified, predictable
> solutions, a person of ordinary skill has good reason to pursue
> the known options within his or her technical grasp.  If this
> leads to the anticipated success, it is likely the product not of
> innovation but of ordinary skill and common sense.

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Nonobviousness cannot be established by attacking the references

individually when the rejection is predicated upon a combination of prior art

disclosures.  *See In re Merck & Co. Inc.*, 800 F.2d 1091, 1097 (Fed. Cir.

1986).


ANALYSIS

Our standard for claim interpretation of expired patent claims is

provided above.  That is the standard we apply to claims 41, 54, and 57 in

the analysis below.

Appellant argues that there is no proper motivation to combine

specific elements of Barger and Yoshizawa (App. Br. 13-19; Reply Br. 2-7).

The Examiner finds sufficient and proper motivation to combine the

references (Ans. 5-11).  Both the Examiner and Appellant acknowledge that

we have addressed these issues in a decision (dated July 5, 2011) on a prior

appeal, namely Appeal No. 2010-008287 (Control No. 90/010,045) (Ans. 6-

7, 11; App. Br. 14-15, 18-19).  We note that Appellant has not provided

persuasive arguments that would lead us to disturb our earlier judgment.

17

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

More specifically, Appellant argues that there was no motivation to combine Yoshizawa's registration number with Barger (App. Br. 13-17; Reply Br. 2-6), and that here was no motivation to combine Yoshizawa with live operators (App. Br. 17-19; Reply Br. 6-7). The Examiner finds support for the combination of Yoshizawa and Barger in response to Appellant's arguments (Ans. 5-11).

Barger describes a telephone system for marketing merchandise or services (e.g., phonograph records, tapes, books, plays, and tours) (FF 1). In one mode of operation, an automatic telephone service communicates with the customer through prerecorded messages (FF 2) and requests required information (i.e., account number) from a customer and places orders (FF 8, 10). Yoshizawa describes a telephone betting system using voice response unit technology (FF 11) in which a subscriber calls a telephone betting center to place a bet (FF 12). After placing the bet, the telephone betting system provides the subscriber with a registration number (FF 13). If the subscriber elects to cancel the bet, the telephone betting system prompts the subscriber to enter the registration number (FF 13).

A person of ordinary skill in the art would have recognized that incorporating the registration number of Yoshizawa (FF 13) with the telephone system of Barger provides the customer with a reference of the transaction and facilitates the customer's ability to cancel an order. *See KSR*, 550 U.S. at 417. Thus, we agree with the Examiner (Ans. 5-10) that

18

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

modifying Barger to include the registration number of Yoshizawa would have been obvious.

Similarly, a person of ordinary skill in the art would have recognized that incorporating the use of live operators, per Barger, into the system of Yoshizawa would allow for the benefits explicitly recited in Barger, namely to allow for correction if there is a problem or to otherwise help if a customer needs assistance (FF 2-3). Thus, we agree with the Examiner (Ans. 10-11) that modifying Yoshizaw to include the live operators of Barger would have been obvious.

Appellant also argues, with respect to the above findings, that Yoshizawa's registration number serves a specific purpose within that context and there is nothing to suggest its incorporation into the system of Barger, because Barger already has a confirmation process, and thus there would be no need to provide for order cancellation, and because Barger already provides for live operators to address cancellations (App. Br. 13-17). We do not agree.

Rather, we agree with the points made by the Examiner in defending the combination (Ans. 5-10). Appellant disagrees with the Examiner's finding that the cancellation process in the horserace betting context could be applied to other applications of the same system (Reply Br. 2-3), arguing that it would not have been obvious to use a registration number in the other applications discussed in brief in Yoshizawa. However, given that Yoshizawa discloses the registration number and its use in cancellation in

19

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

the horserace betting application, it would be natural to apply such processes to other applications, if applicable.  We agree with the Examiner that the use of the registration number to facilitate cancellation would be useful in the system of Barger, even with other methods of cancellation provided for therein (Ans. 6-7).  We also do not find the extra provision of a facilitated cancellation to run counter to Barger's stated goals of sales (Reply Br. 4-5), as providing reputable practices need not run counter to high sales.  Like the Examiner (Ans. 9-10), we do not take the provision of live operators as requiring those operators to address all issues of callers, and agree that, as disclosed in Barger, automated and live operator responses can provide a more responsive and cost-effective system (*id*.).

With respect to the incorporation of live operators into Yoshizawa, Appellant also disagrees with the above findings, arguing that that such an incorporation would not be obvious and that Yoshizawa teaches away from the use of live operators, stating that a primary objective of Yoshizawa was to avoid live operators (App. Br. 17-19; Reply Br. 6-7).  However, we agree with the Examiner that the fact that "Yoshizawa merely operates differently" is not sufficient to provide a negative teaching that would discourage ordinarily skilled artisans from incorporating the use of operators into the system of Yoshizawa.  We disagree that the elimination of live operators was a primary objective of Yoshizawa and, thus, we do find Appellant's arguments to be persuasive.

20

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

Appellant also argues that the references do not disclose the required credit verification structure, arguing that the Examiner's claim interpretation is flawed because it ignores the Specification, and that under the proper interpretation, Yoshizawa and Barger do not teach or suggest the limitations recited in claim 41 (App. Br. 19-22; Reply Br. 7-9). The Examiner disagrees with Appellant and restates the Examiner's analysis (Ans. 12-13).

We find most salient to the instant discussion the Examiner's finding that the limitations in question, including "signals indicative of an individual caller's customer number" and "to verify on-line said individual caller's customer number," per claim 41, recite "signals" and the "customer number" separately, so that the system recited in claim 41 need not directly utilize the signals to perform the credit verification (Ans. 12-13). From this the Examiner finds that the system of claim 41 does not require that it is the entry by the caller that initiates the verification, or that the verification must be based on the caller's entry (Ans. 13).

Appellant argues that this position is flawed and runs afoul of *Phillips* (Reply Br. 8), since it ignores the Specification. We do not agree. The Examiner's analysis follows the clear claim language; if the drafter of claim 41 wanted to allow only the interpretation now ascribed, the credit verification could have been made on the basis of the "signals indicative of an individual caller's customer number." The fact that Appellant's Specification only cites to such direct credit verification does not rewrite the claim to Appellant's inclinations. "That claims are interpreted in light of the

21

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

specification does not mean that everything in the specification must be read into the claims." *Raytheon Co. v. Roper Corp.,* 724 F.2d 951, 957 (Fed. Cir. 1983), *cert. denied,* 469 U.S. 835 (1984). The scope of claim 41 allows for the credit verification to be performed on the customer number, and not on signals entered by the customer, which is commensurate with the Examiner's analysis. As Appellant's other arguments rely upon Appellant's alternate interpretation of claim 41 (App. Br. 21-22), we need not reach those arguments to affirm the Examiner's rejection.

In addition, Appellant argues that Barger does not disclose a limit on use based on a dollar amount, and that it would not have been obvious to modify Barger to use the same disclosed in Yoshizawa (App. Br. 22-23; Reply Br. 9-10). The Examiner finds that Barger's limit on use occurs when no purchase is made over time, i.e. zero dollars, an implicit dollar amount (Ans. 16-17), and that Yoshizawa's currency limit would have been obvious to apply to Barger (Ans. 17-18). We agree with the Examiner.

While Appellant argues that the free loader algorithm in Barger "does not check any dollar amount or do anything with respect to any dollar amount" (App. Br. 23), one general purpose of the system in Barger is to facilitate purchases (FF 1, 10). A lack of a purchase implicitly connotes a lack of some amount being spent. The fact that Barger's system does not provide the limitations found in the "'dollar amount' limitations described in the '762 patent's exemplary embodiments" does not mean that Barger cannot render the dollar amount limitation in claim 57 obvious. While

22

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

Appellant appears to argue that Barger limits its users based on purchase, and not a dollar amount (Reply Br. 9-10), we concur with the Examiner that zero dollars is still an amount, as opposed to a lack of an amount.

Similarly, Appellant argues that Barger's purpose is to facilitate purchases and not limit them, per Yoshizawa, such that there would have been no motivation to combine the references as found by the Examiner (App. Br. 23). Again, we agree with the Examiner (Ans. 17-18) that Yoshizawa has a similar purpose, to facilitate bets, but that does not negate the disclosure of a limit, as discussed in Yoshizawa. While Appellant argues that the system of Yoshizawa is fundamentally different in its objectives from Barger and lists reasons why the imposition of limits in Yoshizawa would not apply to Barger (Reply Br. 10), we still find that one of ordinary skill in the art would have been compelled to add such limits, based on purchases in view of Yoshizawa, into the system of Barger for the same or similar reasons specified. As such, we do not find Appellant's arguments to be persuasive.

Accordingly, we sustain the rejection of claims 41, 54, and 57 under 35 U.S.C. § 103(a).

CONCLUSION

We conclude that the Examiner did not err in finding that Barger and Yoshizawa render the subject matter of claims 41, 54, and 57 obvious.

23

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

DECISION

We affirm the Examiner's rejection of claims 41, 54, and 57.

Requests for extensions of time in this *ex parte* reexamination

proceeding are governed by 37 C.F.R. § 1.550(c).  *See* 37 C.F.R. § 41.50(f).


<u>AFFIRMED</u>

24

Appeal 2012-008644
Reexamination Control No. 90/011,438
United States Patent 5,898,762

cc:

FOR PATENT OWNER:

COOLEY LLP
ATTN: PATENT GROUP
1299 PENNSYLVANIA AVENUE, NW
SUITE 700
WASHINGTON DC 20004

FOR THE THIRD PARTY REQUESTORS:

LEYDIG VOIT & MAYER, LTD
TWO PRUDENTIAL PLAZA
180 NORTH STETSON AVENUE
SUITE 4900
CHICAGO, IL 60601-6731

25

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.      : 5,898,762                                    Page 1 of 5
DATED           : April 27, 1999
INVENTOR(S)     : Ronald A. Katz

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

<u>Title page,</u>
Item [56], **References Cited,**
FOREIGN PATENT DOCUMENTS,
Please delete "2009937" and replace with the following: -- 2009937-2 --

U.S. PATENT DOCUMENTS,
Please insert the following omitted patents:

| | | |
|---|---|---|
| -- 3,544,769 | 12/1970 | Hedin |
| 3,571,799 | 3/1971 | Coker, Jr., et al. |
| 3,594,004 | 7/1971 | Barr |
| 3,617,638 | 11/1971 | Jochimsen, et al. |
| 3,696,335 | 10/1972 | Lemelson |
| 3,800,283 | 3/1974 | Gropper |
| 3,998,465 | 12/1976 | Mascola |
| 4,017,835 | 4/1977 | Randolph |
| 4,121,052 | 10/1978 | Richard |
| 4,562,342 | 12/1985 | Solo |
| 4,586,707 | 5/1986 | McNeight et al. |
| 4,663,777 | 5/1987 | Szeto |
| 4,716,583 | 12/1987 | Groner et al. |
| 4,766,604 | 8/1988 | Axberg |
| 4,776,655 | 9/1988 | Kollin, et al. |
| 4,781,377 | 11/1988 | McVean et al. -- |

After "3,881,160  4/1975" please delete "Rose" and insert the following: -- Ross --

After "4,009,342  2/1977" please delete "Fagrenschon" and replace with the following: -- Fahrenschon --

After "4,654,482  3/1987" delete "DeAnglelis" and replace with the following: -- DeAngelis --

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   : 5,898,762                          Page 2 of 5
DATED        : April 27, 1999
INVENTOR(S)  : Ronald A. Katz

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

FOREIGN PATENT DOCUMENTS,
Please insert the following omitted patent:
-- 0 120 322    2/1984    European Patent Office --

Please delete "0 229 170" and replace with the following: -- 0 229 170A --

Please delete "0 568 114" and replace with the following: -- 0 568 114A --

Please delete "0 620 669" and replace with the following: -- 0 620 669A --

Please delete "292416" and replace with the following: -- OS 2929416 --

Please delete "3726366" and replace with the following: -- OS 3726366 --

Please delete "4005365 A1" and replace with the following: -- DE 4005365 A1 --

Please delete "2184327" and replace with the following: -- 2184327 A --

Please delete "2 230 403" and replace with the following: -- 2 230 403 A --

OTHER PUBLICATIONS,
In the entry which begins "Takahashi, K., et al.," after "U.D.C." please insert the following: -- (Article in Japanese). --

In the entry which begins "Oka, Y., et al.," please delete "Articles" and replace with the following: -- Article --

In the line which begins "1, 3, 5, 6-8-" please delete "ArRticle" and replace with the following: -- Article --

Please delete the following duplicative entry, which is the final entry in the column: "Lacter, Mark," At Megaphone, It's Always Show Time", San Francisco Chronicle, Jun. 9, 1986, Year No. 123, (different perspective)."

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 5,898,762                                    Page 3 of 5
DATED         : April 27, 1999
INVENTOR(S)   : Ronald A. Katz

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

OTHER PUBLICATIONS cont'd.
In the entry which begins  "Keep up with…" please delete "costa" and replace with the following: -- Costa --

In the entry which begins "Du Brow, Rick," please delete "1984.…" and replace with the following: -- 1984. --

In the entry which begins "Martin, James, 'Future Developments'…" please delete "pp. 149-105," and replace with the following: -- pp. 149-150, --

In the entry which begins "Flanagan, J.L.," please delete "45–9–45–10–" and replace with the following -- 45-9 - 45-10 --

In the entry which begins "Honeywell Communications…" please delete "3–1–3–7" and replace with the follwing: -- 3-1 - 3-7 --

In the entry which begins "Unlock…" please delete "reporting." and replace with the following: -- reporting --

In the entry which begins "The Voice…" please delete "Turnes" and replace with the following: -- Turns --

In the entry which begins "Finnigan, Paul F," please delete "F," and replace with the following: -- F., --

In the entry which begins "Look Ma,…" please delete "doesmany" and replace with the following: -- does many --

In the entry which begins "Moosemiller, J.P.," please delete "I" and replace with the following: -- 1 --

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   : 5,898,762                                    Page 4 of 5
DATED        : April 27, 1999
INVENTOR(S)  : Ronald A. Katz

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

OTHER PUBLICATIONS cont'd.
In the entry which begins "Kaiserman, D.B.," please delete "Paleis" and replace with the
following: -- Palais --

Column 1,
Line 15, please delete "5,792,968" and replace with the following: -- 4,792,968 --

Column 3,
Please delete "Ti" and replace with the following: -- T1 --

Column 4,
Line 19, please delete "know" and replace with the following: -- known --

Column 5,
Line 11, please delete "callers" and replace with the following: -- caller's --

Column 8,
Line 60, please delete "transaction-is" and replace with the following:
-- transaction is --

Column 17,
Line 4, after "however," please insert the following: -- it --
Line 5, please delete "broad-cast" and replace with the following: -- broadcast --

Column 20,
Line 29, please delete "ti" and replace with the following: -- t1 --

Column 22,
Line 47, please delete "callers" and replace with the following: -- caller's --
Line 50, please delete "callers" and replace with the following: -- caller's --
Line 53, please delete "callers" and replace with the following: -- caller's --

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.   : 5,898,762                                    Page 5 of 5
DATED        : April 27, 1999
INVENTOR(S)  : Ronald A. Katz

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Column 26,
Line 18, please delete "76" and replace with the following: -- 60 --
Line 41, delete "53" and replace with the following: -- 67 --



Attest:

Signed and Sealed this

Twenty-fourth Day of September, 2002

Brenda Moore

*Attesting Officer*

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

US005898762A

# United States Patent [19]

## Katz

[11] **Patent Number:** 5,898,762

[45] **Date of Patent:** *Apr. 27, 1999

[54] **TELEPHONIC-INTERFACE STATISTICAL ANALYSIS SYSTEM**

[75] Inventor: **Ronald A. Katz**, Los Angeles, Calif.

[73] Assignee: **Ronald A. Katz Technology Licensing, L.P.**, Beverly Hills, Calif.

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **08/471,420**

[22] Filed: **Jun. 6, 1995**

### Related U.S. Application Data

[62] Division of application No. 07/335,923, Apr. 10, 1989, which is a continuation of application No. 07/194,258, May 16, 1988, Pat. No. 4,845,739, which is a continuation-in-part of application No. 07/018,244, Feb. 24, 1987, Pat. No. 4,792,968, which is a continuation-in-part of application No. 06/753,299, Jul. 10, 1985, abandoned.

[51] Int. Cl.$^6$ ................................................ **H04M 11/00**

[52] U.S. Cl. ...................................... **379/93.12;** 379/91.01

[58] Field of Search ................................. 379/92, 91, 94, 379/93, 96, 97, 98, 88, 89, 91.01, 91.02, 92.01, 93.01, 93.12, 93.13, 93.26

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2,902,541 | 9/1959 | Singleton . |
| 2,941,161 | 6/1960 | Scantlin . |
| 3,060,275 | 10/1962 | Meacham et al. . |
| 3,076,059 | 1/1963 | Meacham et al. . |
| 3,082,402 | 3/1963 | Scantlin . |
| 3,128,349 | 4/1964 | Boesch et al. . |
| 3,159,818 | 12/1964 | Scantlin . |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 66113 | 7/1981 | Australia . |
| 1022674 | 12/1977 | Canada . |
| 1025118 | 1/1978 | Canada . |
| 1056500 | 6/1979 | Canada . |
| 1059621 | 7/1979 | Canada . |
| 1162336 | 2/1984 | Canada . |
| 1225759 | 8/1987 | Canada . |
| 2009937 | 8/1990 | Canada . |

(List continued on next page.)

### OTHER PUBLICATIONS

Lanzeter, Ygal, "Automatic Number Identification System For Step–By–Step Exchanges", *The Ninth Convention of Electrical and Electronics Engineers In Israel*, Apr. 1975—(Paper).

Flanagan, J.L., et al., "Speech Synthesis", Chapters 1, 39, 42, 45 and 46—(Chapter from a Book).

"Bell Atlantic's Bolger Wants To Be Free", *Telephony*, Jul. 14, 1986—(Article).

"Advanced New Cable TV Technology Developed For Impulse–Pay–Per–View", Jun. 3, 1985—(Search).

(List continued on next page.)

*Primary Examiner*—Stella Woo
*Attorney, Agent, or Firm*—Lyon & Lyon LLP

[57] **ABSTRACT**

A system D interfaces with a multiplicity of individual terminals T1–Tn of a telephone network facility C, at the terminals callers are prompted by voice-generated instructions to provide digital data that is identified for positive association with a caller and is stored for processing. The caller's identification data is confirmed using various techniques and callers may be ranked and accounted for on the basis of entitlement, sequence or demographics. Callers are assigned random designations that are stored along with statistical and identification data. A break-off control circuit may terminate the computer interface aborting to a terminal for direct communication with an operator. Real-time operation processing is an alternative to stored data. The accumulation of stored data (statistical, calling order sequence, etc.) is variously processed and correlated as with developed or established data to isolate a select group or subset of callers who can be readily identified and reliably confirmed. Different program formats variously control the processing of statistical data as for auction sales, contests, lotteries, polls, commercials and so on.

**70 Claims, 6 Drawing Sheets**



**5,898,762**
Page 2

---

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,246,082 | 4/1966 | Levy . |
| 3,249,919 | 5/1966 | Scantlin . |
| 3,299,210 | 1/1967 | Bandy . |
| 3,337,847 | 8/1967 | Olsson et al. . |
| 3,347,988 | 10/1967 | Marill et al. . |
| 3,371,162 | 2/1968 | Scantlin . |
| 3,381,276 | 4/1968 | James . |
| 3,393,272 | 7/1968 | Hanson . |
| 3,394,246 | 7/1968 | Goldman . |
| 3,482,057 | 12/1969 | Abbott et al. . |
| 3,515,814 | 6/1970 | Morgan . |
| 3,556,530 | 1/1971 | Barr . |
| 3,557,311 | 1/1971 | Goldstein . |
| 3,568,157 | 3/1971 | Downing et al. . |
| 3,569,939 | 3/1971 | Doblmaier et al. . |
| 3,573,747 | 4/1971 | Adams et al. . |
| 3,581,072 | 5/1971 | Nymeyer . |
| 3,618,038 | 11/1971 | Stein . |
| 3,624,292 | 11/1971 | Guzak, Jr. . |
| 3,644,675 | 2/1972 | Waltington . |
| 3,647,973 | 3/1972 | James et al. . |
| 3,651,480 | 3/1972 | Downing et al. . |
| 3,656,113 | 4/1972 | Lince . |
| 3,665,107 | 5/1972 | Kopec et al. . |
| 3,675,513 | 7/1972 | Flanagan et al. . |
| 3,688,126 | 8/1972 | Klein . |
| 3,697,702 | 10/1972 | Buonsante et al. . |
| 3,781,810 | 12/1973 | Downing . |
| 3,792,446 | 2/1974 | McFiggins et al. . |
| 3,794,774 | 2/1974 | Kemmerly et al. . |
| 3,858,032 | 12/1974 | Scantlin . |
| 3,870,821 | 3/1975 | Steury . |
| 3,881,160 | 4/1975 | Rose . |
| 3,889,050 | 6/1975 | Thompson . |
| 3,909,553 | 9/1975 | Marshall . |
| 3,912,874 | 10/1975 | Botterell et al. . |
| 3,914,747 | 10/1975 | Barnes et al. . |
| 3,918,174 | 11/1975 | Miller et al. . |
| 3,920,908 | 11/1975 | Kraus . |
| 3,928,724 | 12/1975 | Byram et al. . |
| 3,934,095 | 1/1976 | Matthews et al. . |
| 3,947,972 | 4/1976 | Freeman . |
| 3,950,618 | 4/1976 | Bloisi . |
| 3,974,338 | 8/1976 | Luzier et al. . |
| 3,982,103 | 9/1976 | Goldman . |
| 3,989,899 | 11/1976 | Norwich . |
| 3,991,406 | 11/1976 | Downing et al. . |
| 4,009,342 | 2/1977 | Fagrenschon et al. . |
| 4,012,599 | 3/1977 | Meyer . |
| 4,024,345 | 5/1977 | Kochem . |
| 4,054,756 | 10/1977 | Comella et al. . |
| 4,071,698 | 1/1978 | Barger Jr. et al. . |
| 4,078,316 | 3/1978 | Freeman . |
| 4,088,838 | 5/1978 | Nakata et al. . |
| 4,090,038 | 5/1978 | Biggs . |
| 4,108,361 | 8/1978 | Krause . |
| 4,117,278 | 9/1978 | Ehrlich et al. . |
| 4,145,578 | 3/1979 | Orriss . |
| 4,150,255 | 4/1979 | Theis et al. . |
| 4,152,547 | 5/1979 | Theis . |
| 4,160,125 | 7/1979 | Bower et al. . |
| 4,162,377 | 7/1979 | Mearns . |
| 4,187,498 | 2/1980 | Creekmore . |
| 4,191,376 | 3/1980 | Goldman . |
| 4,191,860 | 3/1980 | Weber . |
| 4,194,089 | 3/1980 | Hashimoto . |
| 4,200,770 | 4/1980 | Hellman et al. . |
| 4,201,887 | 5/1980 | Burns . |
| 4,223,183 | 9/1980 | Peters, Jr. . |
| 4,232,199 | 11/1980 | Boatwright et al. . |
| 4,241,942 | 12/1980 | Bachman . |
| 4,242,539 | 12/1980 | Hashimoto . |
| 4,243,844 | 1/1981 | Waldman . |
| 4,255,618 | 3/1981 | Danner et al. . |
| 4,260,854 | 4/1981 | Kolodny et al. . |
| 4,264,924 | 4/1981 | Freeman . |
| 4,264,925 | 4/1981 | Freeman et al. . |
| 4,270,024 | 5/1981 | Theis et al. . |
| 4,277,649 | 7/1981 | Sheinbein . |
| 4,290,141 | 9/1981 | Anderson et al. . |
| 4,299,637 | 11/1981 | Oberdeck et al. . |
| 4,302,810 | 11/1981 | Bouricius et al. . |
| 4,303,804 | 12/1981 | Johnson et al. . |
| 4,307,266 | 12/1981 | Messina . |
| 4,314,103 | 2/1982 | Wilson . |
| 4,317,961 | 3/1982 | Johnson . |
| 4,320,256 | 3/1982 | Freeman . |
| 4,323,770 | 4/1982 | Dieulot et al. . |
| 4,328,396 | 5/1982 | Theis . |
| 4,338,494 | 7/1982 | Theis . |
| 4,339,798 | 7/1982 | Hedges et al. . |
| 4,345,315 | 8/1982 | Cadotte et al. . |
| 4,348,554 | 9/1982 | Asmuth . |
| 4,355,207 | 10/1982 | Curtin . |
| 4,355,372 | 10/1982 | Johnson et al. . |
| 4,360,827 | 11/1982 | Braun . |
| 4,371,752 | 2/1983 | Matthews et al. . |
| 4,376,875 | 3/1983 | Beirne . |
| 4,389,546 | 6/1983 | Glisson et al. . |
| 4,393,277 | 7/1983 | Besen et al. . |
| 4,398,708 | 8/1983 | Goldman et al. . |
| 4,405,829 | 9/1983 | Rivest et al. . |
| 4,420,656 | 12/1983 | Freeman . |
| 4,427,848 | 1/1984 | Tsakanikas . |
| 4,439,635 | 3/1984 | Theis et al. . |
| 4,439,636 | 3/1984 | Newkirk et al. . |
| 4,451,700 | 5/1984 | Kempner et al. . |
| 4,468,528 | 8/1984 | Reece et al. . |
| 4,475,189 | 10/1984 | Herr et al. . |
| 4,489,438 | 12/1984 | Hughes . |
| 4,490,583 | 12/1984 | Bednarz et al. . |
| 4,494,197 | 1/1985 | Troy et al. . |
| 4,511,764 | 4/1985 | Nakayama et al. . |
| 4,517,410 | 5/1985 | Williams et al. . |
| 4,518,827 | 5/1985 | Sagara . |
| 4,521,643 | 6/1985 | Dupuis et al. . |
| 4,523,055 | 6/1985 | Hohl et al. . |
| 4,532,378 | 7/1985 | Nakayama et al. . |
| 4,539,435 | 9/1985 | Eckmann . |
| 4,539,436 | 9/1985 | Theis . |
| 4,541,087 | 9/1985 | Comstock . |
| 4,544,804 | 10/1985 | Herr et al. . |
| 4,547,851 | 10/1985 | Kurland . |
| 4,549,047 | 10/1985 | Brian et al. . |
| 4,555,594 | 11/1985 | Friedes et al. . |
| 4,559,415 | 12/1985 | Bernard et al. . |
| 4,559,416 | 12/1985 | Theis et al. . |
| 4,566,030 | 1/1986 | Nickerson et al. . |
| 4,567,359 | 1/1986 | Lockwood . |
| 4,570,930 | 2/1986 | Matheson . |
| 4,577,062 | 3/1986 | Hilleary et al. . |
| 4,577,067 | 3/1986 | Levy et al. . |
| 4,578,700 | 3/1986 | Roberts et al. . |
| 4,580,012 | 4/1986 | Matthews et al. . |
| 4,582,956 | 4/1986 | Doughty . |
| 4,584,602 | 4/1986 | Nakagawa . |
| 4,585,906 | 4/1986 | Matthews et al. . |
| 4,587,379 | 5/1986 | Masuda . |
| 4,591,190 | 5/1986 | Clark . |
| 4,591,664 | 5/1986 | Freeman . |
| 4,592,546 | 6/1986 | Fascenda et al. . |
| 4,594,476 | 6/1986 | Freeman . |

**5,898,762**
Page 3

| | | |
|---|---|---|
| 4,598,367 | 7/1986 | DeFrancesco et al. . |
| 4,603,232 | 7/1986 | Kurland et al. . |
| 4,611,094 | 9/1986 | Asmuth et al. . |
| 4,614,367 | 9/1986 | Breen . |
| 4,625,079 | 11/1986 | Castro et al. . |
| 4,625,276 | 11/1986 | Benton et al. . |
| 4,630,200 | 12/1986 | Ohmae et al. . |
| 4,630,201 | 12/1986 | White . |
| 4,634,809 | 1/1987 | Paulsson et al. . |
| 4,635,251 | 1/1987 | Stanley et al. . |
| 4,645,873 | 2/1987 | Chomet . |
| 4,649,563 | 3/1987 | Riskin . |
| 4,652,998 | 3/1987 | Koza . |
| 4,654,482 | 3/1987 | DeAngelis . |
| 4,658,417 | 4/1987 | Hashimoto et al. . |
| 4,665,502 | 5/1987 | Kreisner . |
| 4,669,730 | 6/1987 | Small . |
| 4,671,512 | 6/1987 | Bachman et al. . |
| 4,674,044 | 6/1987 | Kalmus et al. . |
| 4,677,552 | 6/1987 | Sibley, Jr. . |
| 4,677,553 | 6/1987 | Roberts et al. . |
| 4,685,123 | 8/1987 | Hsia et al. . |
| 4,688,170 | 8/1987 | Waite et al. . |
| 4,692,817 | 9/1987 | Theis . |
| 4,694,490 | 9/1987 | Harvey et al. . |
| 4,696,028 | 9/1987 | Morganstein et al. . |
| 4,696,029 | 9/1987 | Cohen . |
| 4,697,282 | 9/1987 | Winter et al. . |
| 4,704,725 | 11/1987 | Harvey et al. . |
| 4,706,275 | 11/1987 | Kamil . |
| 4,715,061 | 12/1987 | Norwich . |
| 4,719,647 | 1/1988 | Theis et al. . |
| 4,722,526 | 2/1988 | Tovar et al. . |
| 4,745,468 | 5/1988 | Von Kohorn . |
| 4,748,668 | 5/1988 | Shamir et al. . |
| 4,756,020 | 7/1988 | Fodale . |
| 4,757,267 | 7/1988 | Riskin . |
| 4,761,684 | 8/1988 | Clark et al. . |
| 4,763,191 | 8/1988 | Gordon et al. . |
| 4,764,666 | 8/1988 | Bergeron . |
| 4,782,510 | 11/1988 | Szlam . |
| 4,783,796 | 11/1988 | Ladd . |
| 4,783,800 | 11/1988 | Levine . |
| 4,785,408 | 11/1988 | Britton et al. . |
| 4,788,682 | 11/1988 | Vij et al. . |
| 4,788,715 | 11/1988 | Lee . |
| 4,788,716 | 11/1988 | Zebe . |
| 4,788,718 | 11/1988 | McNabb et al. . |
| 4,789,928 | 12/1988 | Fujisaki . |
| 4,791,664 | 12/1988 | Lutz et al. . |
| 4,792,968 | 12/1988 | Katz ......................................... 379/92 |
| 4,796,293 | 1/1989 | Blinken et al. . |
| 4,797,910 | 1/1989 | Daudelin . |
| 4,797,911 | 1/1989 | Szlam et al. . |
| 4,799,156 | 1/1989 | Shavit et al. . |
| 4,800,583 | 1/1989 | Theis . |
| 4,805,209 | 2/1989 | Baker, Jr. et al. . |
| 4,812,843 | 3/1989 | Champion III et al. . |
| 4,815,031 | 3/1989 | Furukawa . |
| 4,815,121 | 3/1989 | Yoshida . |
| 4,815,741 | 3/1989 | Small . |
| 4,827,500 | 5/1989 | Binkerd et al. . |
| 4,842,278 | 6/1989 | Markowicz . |
| 4,845,739 | 7/1989 | Katz . |
| 4,847,890 | 7/1989 | Solomon et al. . |
| 4,852,154 | 7/1989 | Lewis et al. . |
| 4,853,882 | 8/1989 | Marshall . |
| 4,856,050 | 8/1989 | Theis et al. . |
| 4,866,756 | 9/1989 | Crane et al. . |
| 4,876,592 | 10/1989 | Von Kohorn . |
| 4,876,717 | 10/1989 | Barron et al. . |
| 4,882,473 | 11/1989 | Bergeron et al. . |

| | | |
|---|---|---|
| 4,893,328 | 1/1990 | Peacock . |
| 4,893,330 | 1/1990 | Franco . |
| 4,894,857 | 1/1990 | Szlam et al. . |
| 4,896,345 | 1/1990 | Thorne . |
| 4,897,867 | 1/1990 | Foster et al. . |
| 4,899,375 | 2/1990 | Bauer et al. . |
| 4,907,079 | 3/1990 | Turner et al. . |
| 4,908,761 | 3/1990 | Tai . |
| 4,922,520 | 5/1990 | Bernard et al. . |
| 4,922,522 | 5/1990 | Scanlon . |
| 4,937,853 | 6/1990 | Brule et al. . |
| 4,942,598 | 7/1990 | Davis . |
| 4,942,599 | 7/1990 | Gordon et al. . |
| 4,942,616 | 7/1990 | Linstroth et al. . |
| 4,943,995 | 7/1990 | Dandelin et al. . |
| 4,955,047 | 9/1990 | Morganstein et al. . |
| 4,959,783 | 9/1990 | Scott et al. . |
| 4,961,217 | 10/1990 | Akiyama . |
| 4,964,157 | 10/1990 | Aoshima . |
| 4,965,825 | 10/1990 | Harvey et al. . |
| 4,969,183 | 11/1990 | Reese . |
| 4,969,185 | 11/1990 | Dorst et al. . |
| 4,972,461 | 11/1990 | Brown et al. . |
| 4,974,252 | 11/1990 | Osborne . |
| 4,975,945 | 12/1990 | Carbullido . |
| 4,989,233 | 1/1991 | Schakowsky et al. . |
| 4,992,940 | 2/1991 | Dworkin . |
| 4,996,705 | 2/1991 | Entenmann et al. . |
| 5,001,710 | 3/1991 | Gawrys et al. . |
| 5,003,574 | 3/1991 | Denq et al. . |
| 5,014,298 | 5/1991 | Katz . |
| 5,017,917 | 5/1991 | Fisher et al. . |
| 5,018,736 | 5/1991 | Pearson et al. . |
| 5,023,904 | 6/1991 | Kaplan et al. . |
| 5,046,183 | 9/1991 | Dorst et al. . |
| 5,083,272 | 1/1992 | Walker et al. . |
| 5,097,528 | 3/1992 | Gursahaney et al. . |
| 5,109,414 | 4/1992 | Harvey et al. . |
| 5,127,003 | 6/1992 | Doll, Jr. et al. . |
| 5,146,491 | 9/1992 | Silver et al. . |
| 5,181,238 | 1/1993 | Medamana et al. . |
| 5,233,654 | 8/1993 | Harvey et al. . |
| 5,255,183 | 10/1993 | Katz . |
| 5,263,723 | 11/1993 | Pearson et al. . |
| 5,333,185 | 7/1994 | Burke et al. . |
| 5,335,277 | 8/1994 | Harvey et al. . |
| 5,351,276 | 9/1994 | Doll, Jr., et al. . |
| 5,353,335 | 10/1994 | D'Urso et al. . |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0 229 170 | 7/1987 | European Pat. Off. . |
| 0 249 575 | 12/1987 | European Pat. Off. . |
| 0 295 837 | 12/1988 | European Pat. Off. . |
| 0 342 295 | 11/1989 | European Pat. Off. . |
| 0 434 181 | 6/1991 | European Pat. Off. . |
| 0 568 114 | 11/1993 | European Pat. Off. . |
| 0 620 669 | 10/1994 | European Pat. Off. . |
| 9002131 | 8/1990 | France . |
| 2929416 | 2/1981 | Germany . |
| 3726366 | 2/1988 | Germany . |
| 4005365 A1 | 8/1990 | Germany . |
| 52-17740 | 9/1977 | Japan . |
| 56-152365 | 11/1981 | Japan . |
| 62-239757 | 10/1987 | Japan . |
| 500138 | 1/1988 | Japan . |
| 298158 | 12/1990 | Japan . |
| 41855 | 2/1991 | Japan . |
| 2184327 | 6/1987 | United Kingdom . |
| 2 230 403 | 10/1990 | United Kingdom . |
| WO 87/00375 | 1/1987 | WIPO . |
| WO88/02966 | 4/1988 | WIPO . |
| WO88/05985 | 8/1988 | WIPO . |

**5,898,762**

Page 4

| WO89/02139 | 3/1989 | WIPO . |
| WO89/09530 | 10/1989 | WIPO . |
| WO93/05483 | 3/1993 | WIPO . |

OTHER PUBLICATIONS

Noll, M.A., "Introduction to Telephones & Telephone Systems", Second Edition, Chapter 9—(Chapter from a Book).

"Proposal for Kome Mediavoice Interactive Phone/Database Marketing System", "Mediavoice Startup Software Package For Kome" "Optional Mediavoice Software Packages For Kome" "Why ATI Mediavoice Is The Choice For Success"—(Proposal).

Meade, Jim, Dec., 29, 1992—(Letter).

"All About Voice Response", *Datapro Research Corporation,* Delran, N.J., Mar. 1972 and Sep. 1974—(Article).

"Voice Response in Banking Applications", *Datapro Research Corporation,* Delran, N.J., Oct. 1974 and Feb. 1983—(Article).

Schiller, T.R., "Field Craft Technician Communication With A Host Computer Synthesized Voice", *Proceedings AVIOS '86 Voice I/O Systems Applications Conference,* Sep. 16–18, 1986.

Rabin, Richard, "Telephone Access Applications: The Growth Market For Voice Processing", *Proceedings AVIOS '86 Voice I/O Systems Applications Conference,* Oct. 6–8, 1987.

Schuster, E.R., "B.R.U.T.U.S. Better Registration Using Touch–Tone phones for University Students", *Proceedings AVIOS '86 Voice I/O Systems Applications Conference,* Oct. 4–6, 1988.

"Exxon's Next Prey. IBM and Xerox", *Business Week,* Apr. 28, 1980, pp. 92–96 and 103—(Article).

Weinstein, S.B., "Emerging Telecommunications Needs of the Card Industry", *IEEE Communications Magazine,* Jul. 1984, vol. 22, No. 7, pp. 26–31—(Article).

"Riding Gain", *Broadcasting,* Mar. 7, 1983—(Article).

Pickup, Mike, "Bank from home, by screen or by phone", *Building Society Gazette,* Jul. 1988—(Article).

Pickup, Mike, "Voice Response", *Computer Systems,* Sep. 1986—(Article).

Rabiner, L.R., et al., "Isolated and Connected Word Recognition—Theory and Selected Applications", *IEEE Transaction Communications,* May 1981, Com. 29, No. 5, pp. 621, 622, 633, 644–646, 655–659—(Article).

Takahashi, K., et al., "The Audio Response System for Telephone Reservation", *U.D.C.*

Oka, Y., et al., "Development of Ventilating Equipment for Shinkansan Train", *U.D.C.*—(Articles in Japanese).

Pagones, M.J., et al., "New services follow increased digitization on the long–haul transmission network", *AT&T Bell Laboratories Record,* 1983, vol. 61, pp. 25–33—(Article).

"New phone service tells customer who's calling", *Bell Laboratories Record,* 1984, vol. 62, p. 9—(Article).

Hirschman, C.B., et al., "LASS: Putting the telephone customer in charge", *Bell Laboratories Record,* 1985, vol. 63, pp. 10–16—(Article).

"AT&T building communications network for Defense Department" and "AT&T inaugurates pay–per–view TV", *Bell Laboratories Record,* 1986, vol. 64, p. 2—(Article).

"Power To . . . ", *Dialogic Corporation,* Littleton Road,—(unidentifiable Article).

"Representative Customer List For Interface Technology's Total Entry System", "Toes Solutions—Pharmaceutical Manufacturer", "The Voice Response Solution For Answering Customer/Sales Calls", "Toes Solutions—Orthopedic Equipment" and "Toes Solutions –Convenience Store"—(Articles).

Lummis, R.C., "Speaker Verification: A Step Toward the "Checkless" Society", *Bell Laboratories Record,* pp. 254–259—(Article).

Flanagan, J.L., et al., "Synthetic voices for computers", *IEEE Spectrum,* Oct. 1970, vol. 7, No. 10, pp. 22–45—(Article).

Rabiner, L.R., et al., "Computer Synthesis of Speech by Concatenation of Formant–Coded Words", *The Bell System Technical Journal,* May/Jun. 1971, pp. 1541–1558—(Chapter from a Book).

Flanagan, J.L., et al., "Wiring Telephone Apparatus from Computer–Generated Speech", *The Bell System Technical Journal,* Feb. 1972, pp. 391–397—(Chapter from a Book).

Hornsby, Jr., Thomas G., "Voice Response Systems", *Modern Data,* Nov. 1972, pp. 46–50—(Article).

Diffie, W., et al., "New Directions in Cryptography", *IEEE Transactions On Information Theory,* Nov. 1976, vol. IT–22, No. 6, pp. 644–654—(Article).

Rosenthal, L.H., et al., "Automatic voice response: interfacing man with machine", *IEEE Spectrum,* Jul. 1974, vol. 11, No. 7—(Article).

Rosenthal, L.H., et al., "A Multiline Computer Voice Response System Utilizing ADPCM Coded Speech", *IEEE Transactions on Acoustics, Speech, and Signal Processing,* Oct. 1974, vol. ASSP–22, No. 5, pp. 339–352—(Article).

Flanagan, James L., "Computers that Talk and Listen: Man–Machine Communication by Voice", *Proceedings for the IEEE,* Apr. 1976, vol. 64, No. 4, pp. 405–415—(Article).

Maisel, Ivan, "To Put Your Baseball Savvy On The Line, Pick Up The Phone And Call", *Sports Illustrated,* Sep. 3, 1984—(Script).

Brown, Merrill, "Hollywood Saga: Who Bought J.R.?", *The Washington Post,* Final Edition, Oct. 14, 1984—(Script).

"Special–Olympics; Teams with baseball trivia expert Brad Curtis", *Business Wire,* Sep. 30, 1985—(Script).

Lucas, W.A., et al., "The Spartanburg Interactive Cable Experiments In Home Education", *Rand Corp.,* U.S. Department of Commerce, National Technical Information Service, Feb., 1979—(Publication).

Martin, James, "Viewdata And The Information Society",—(Book).

Gawrys, G.W., "Ushering In The Era Of ISDN", *AT&T Technology,* 1986, vol. 1, No. 1, pp. 2–9—(Article).

Cummings, J.L., et al., "AT&T Network Architecture Evolution", *AT&T Technical Journal,* May/Jun. 1987, vol. 66, Issue 3, pp. 2–12—(Article).

Yates, C.E., "Telemarketing And Technology: Perfect Business Partners", *AT&T Technology,* 1987, vol. 1, No. 3, pp. 48–55—(Article).

Herr, T.J., "ISDN Applications In Public Switched Networks", *AT&T Technology,* 1987, vol. 2, No. 3, pp. 56–65—(Article).

"Only the best. Only from Florafax", *Florafax*—(Advertisement).

Aldefeld, B., et al., "Automated Directory Listing Retrieval System Based on Isolated Word Recognition", *Proceedings of the IEEE,* Nov. 1980, vol. 68, No. 11, pp. 1364–1379—(Article).

Rabiner, L.R., et al., "On the Application of Embedded Training to Connected Letter Recognition for Directory Listing Retrieval", *AT&T Bell Laboratories Technical Journal,* Mar. 1984, vol. 63, No. 3, pp. 459–477—(Chapter from a Book).

Rosenberg, A.E., et al., "Recognition of Spoken Spelled Names for Directory Assistance Using Speaker–Independent Templates", *The Bell System Technical Journal,* Apr. 1980, vol. 59, No. 4, pp. 571–592—(Chapter from a Book).

"The Voicestar Series By Periphonics", *Periphonics,* Jan. 1986—(Publication).

"Bank–From–Home system by Periphonics Corporation".

"Bill Payment Success Story", *Periphonics Corporation.*

"A History of Imagination", *Periphonics.*

"Banking Success Story", *Periphonics Corporation.*

"DataVoice and the PDT II", *Periphonics Corporation.*

"Banking Success Story", *Periphonics Corporation*—(Brochures).

Schulman, Roger, "TeleLearning: The Computer Brings the Classroom Home", *Family Computing,* Sep. 1984, pp. 50–53—(Article).

"ICS launches new ?–home interactive video service package", *Cable Vision,* Sep. 3, 1984, pp. 71/73—(Article).

"The Remarketing of Prestel", *Which Computer?,* Aug. 1984, pp. 106, 107 and ?—(Article).

"Four–Line TeleClerk Calls, Answers, Stores, Surveys", *Hardcopy,* Jan. 1985, vol. 14, No. 1—(Article).

"Peripheral Speaks On Phone", *Hardcopy,* Dec. 1984—(Article).

Page from *What's new in Computing,* Apr. 1985—(Article).

Page from *Today,* A Compuserve Publication, Jun. 1985—(Article).

Page from *Computer Communications,* Feb. 1984, vol. 7, No. 1—(Article).

Gits, Victoria, "Interactive device doesn't interrupt telephone calls", *Cable Vision,* Jun. 17, 1985, p. 20—(Article).

Cuilwik, Tony, "Reach Out & Touch The Unix System", *Unix Review,* Jun. 1985, pp. 50, 52, 53, 56—(Article).

Blackwell, Gerry, "Dial–a–Quote: first Canadian commercial audiotex service", *Computing Canada*—(Article).

Applebaum, Simon, "Two–way television" *Cable Vision,* Aug. 8, 1983, p. 66—(Article).

Sw??ne, Michael, "Fiber–optic TV network lets viewers talk back", *Info World*—(Article).

Morrill, C.S., et al., "User Input Mode and Computer–Aided Instruction", *Human Factors,* 1968, 10(3), pp. 225–232—(Chapter from a Book).

Results of Lexis Search Request for "Dial Info or Dialinfo", Date of Search Apr. 13, 1992, pp. 1–38.

Results of Lexis Search Request for "Phone Programs or International Information Network", Date of Search Apr. 15, 1992, pp. 1–35.

Van Gieson, Jr. W.D., et al., "Machine–Generated Speech For Use With Computers, and the problem of fitting a spoken word into one half second", *Computers and Automation,* Nov. 1968, pp. 31–34—(Article).

Patel, Jay, "Utility of voice response system depends on its flexibility", *Bank Systems & Equipment,* Dec. 1988, pp. 101/103—(Article).

Buron, R.H., "Generation of a 1000–Word Vocabulary for a Pulse–Excited Vocoder Operating as an Audio Response Unit", *IEEE Transactions On Audio And Electroacoustics,* Mar. 1986, vol. AU–16, No. 1, pp. 21–25—(Article).

Gaines, B.R., et al., "Some Experience in Interactive System Development and Application", *Proceedings of the IEEE,* Jun. 1975, vol. 63, No. 6, pp. 894–911—(Article).

"Application For Registration Of Equipment To Be Connected To The Telephone Network", *Federal Communication Commission,* FCC Form 730.

Dudley, Homer, "The Vocoder", Circuit Research Department, Dec. 1939, pp. 122–128—(Chapter from a Book).

"Voice Response System Order Entry, Inventory Control".

"Vendor Index", *Audiotex Directory & Buyer's Guide,* Fall/Winter 1989/90, pp. 114–156.

Francas, M., et al., "Input Devices For Public Videotex Services", *Human–Computer Interaction—Interact '84,* 1985, pp. 171–175—(Paper).

Labrador, C., et al., "Experiments In Speech Interaction With Conventional Data Services", *Human–Computer Interaction—Interact '84,* 1985, pp. 225–229—(Paper).

Long, J., et al., "Transaction Processing Using Videotex or: Shopping on Prestel", *Human–Computer Interaction—Interact '84,* 1985, pp. 251–255—(Paper).

*Electrical Communication,* 1981, vol. 56, Nos. 1–4, pp. 1–110—(Paper).

Conway, R.W., et al., "Tele–CUPL: A Telephone Time Sharing System", *Communication of the ACM,* Sep. 1967, vol. 10, No. 9, pp. 538–542—(Article).

Marill, T., et al., "Data–Dial: Two–Way Communication with Computers From Ordinary Dial Telephones", *Communications of the ACM,* Oct. 1963, vol. 6, No. 10, pp. 622–624—(Article).

Witten, I.H., "Communicating With Microcomputers", pp. 121–158—(Chapter from a Book).

"Call–It–Co. Hangs Up On Dial–It In Four Markets", *The 976 Exchange,* 1984, vol. 2, pp. 1–6 (Article).

"DECtalk Help Boston's Shawmut Bank Cut Costs And Improve Service", *Digital*—(Article).

"VTK 81 Voice Computer", *Voicetek,* 1987 (Brochure).

"How a Computerized 'Voice' Answers Customers' Inquiries", *Bank Automation Newsletter,* Feb. 1985, vol. 19, No. 2 (Article).

Rickman, J., et al., "Speech Synthesizers—Communications Interface—Implementing A Touch Tone Telephone Talker With DECtalk", *The DEC Professional,* May 1985, pp. 38, 39, 42–44 (Article).

"DECtalk Delivers", *Digital Review,* Sep. 1985—(Article).

"DECtalk turns a telephone into a terminal",—"UNIX and Digital",—"Legal protection for semiconductor chips",—"Product safety",—*DECWorld,* Apr. 1985, vol. 9, No. 2, pp. 1, 3, 5, 6–8—(ArRticle).

"DECtalk: A New Text–to–Speech Product" *Digital Guideline,* Mar. 1984, vol. 8, No. 3, pp. 1–8—(Article).

*Straight Talk,* A Newsletter about the DECtalk Speech Synthesizer from Digital Equipment Corporation, vol. 1, No. 1, pp. 1–6.

*Straight Talk,* A Newsletter about the DECtalk Speech Synthesizer from Digital Equipment Corporation, vol. 1, No. 2, pp. 1–7.

*Straight Talk,* A Newsletter about the DECtalk Speech Synthesizer from Digital Equipment Corporation, vol. 1, No. 3, pp. 1–8.

*Straight Talk,* A Newsletter about the DECtalk Speech Synthesizer from Digital Equipment Corporation, vol. 1, No. 4, pp. 1–8.

*Straight Talk,* A Newsletter about the DECtalk Speech Synthesizer from Digital Equipment Corporation, vol. 2, No. 2, pp. 1–8.

*Straight Talk,* A Newsletter about the DECtalk Speech Synthesizer from Digital Equipment Corporation, vol. 2, No. 4, pp. 1–8.

Various References/Articles attached with a letter from Smithwin Associates, dated Apr. 22, 1992: Riley, A.A., "Latest: 2–way communication by computer and tele- phone".

??evens, W.?., "Computer Helps Children to Add", *The New York Times,* Apr. 20, 1970.

Harvey, R.W., *Times,* The Kiplinger Magazine "A Comput- erized System ???", Nov. 23, 1970, p. 14, (unidentifiable Article).

"Hardware for the 'cashless society'", *Electronic Design 3,* Feb. 4, 1971, p. 26.

Tennant, R.P., "Advanced credit system smooths operation and hastens payout", *Data Processing Magazine,* Jun. 1971, vol. 13, No. 6, pp. 34–35.

"Computers that talk back to you", *Business Week,* Date ??.

Smith, Gene, "Chatting Via Computer", *New York Times,* Sep. 12, 1971.

*EDP Weekly,* (unidentifiable Article).

"Did Anybody Here Call a Computer", *Data Management,* Feb. 196?.

Skala, Martin, "Straight talk from a computer", *Christian Science Monitor,* Jun. 14, 1973.

"Computer for Watergate Probe", *Science,* Jun. 15, 1973.

"Tapping AT&T for a $50–million refund", *Business Week,* Jun. 9, 1973.

"Distrust of computer kills home service plan".

Scherer, Ron, "Chitchat with a computer", *Christian Science Monitor,* Apr. 16, 1975, p. 2.

"Trying Out the Pay–by–Phone Service", *Technology Review,* Mar./Apr. 1976, p. 15.

"Pentagon seeks more control", *Electronics,* Apr. 5, 1976, p. 39.

"Everyman's Computer Terminal", *Industrial Research,* Mar./Apr. 1976, p. 14.

"DOD could save on test equipment".

"Talking computer speeds Ford parts", Apr. 25, 1976.

"Customers of Ten Banks Paying Bills by Phone", *Computer World,* 1976, p. 12.

"FAA to test computerized voice response to queries from pilots", *Electronics,* Nov. 25, 1976, p. 43.

Miller, F.W., "Voice Response Comes to Life with Order Entry", *Infosystems,* Oct. 1981, pp. 62/64.

Suppes, Patrick, "University–Level Computer–Assisted Instruction At Stanford: 1968–1980", *Institute for Math- ematical Studies In The Social Sciences, Stanford Univer- sity,* 1981, pp. 589–716.

Lerner, E.J., "Products that talk", *IEEE spectrum,* Jul. 1982, pp. 32–37.

Carlsen, Clifford, "Megaphone plans to blare message on national scale", *Times,* Mar. 2, 1987.

Michelson, Marlene, "All kinds of information at your fingertips by phone", *Business Times,* Sep. 8, 1986, vol. 3, No. 19.

Lacter, Mark, "At Megaphone, It's Always Show Time", *San Francisco Chronicle,* Jun. 9, 1986.

Table of Contents, *Megaphone Press Book,* pp. 1–3.

"Miss Simpson, will you dial–a–joke for me please?", Cartoon.

Lacter, Mark, "At Megaphone, It's Always Show Time", *San Francisco Chronicle,* Jun. 9, 1986, Year No. 123, (different perspective).

Lacter, Mark, "Narrating Fantasy Messages—It's No Dream Job", *San Francisco Chronicle,* Jun. 9, 1986.

"Megaphone Serves High–Tech Showbiz", *San Francisco Chronicle,* Jun. 9, 1986.

"Megaphone Reaches Unique Market", *San Francisco Chronicle,* Jun. 9, 1986.

Feuer, Jack, "Asher/Gould: Megaphone Dials–a–Shop", *Adweek,* May 12, 1986.

Symanovich, Steve, "Novelty over for phone porn vendors", and continuation "Big firms breathing down necks of small phone porn outfits" *San Francisco Business Journal,* May 5, 1986.

Wilke, John, "A 'Dream' Business That's Just A Phone Call Away", *Information Processing.*

Ketcham, D.E., "Dial–a–You–Name–It", *San Francisco Chronicle,* 1986.

Carter, Alan, "What? You didn't know Erica was engaged again?", *Daily News,* Mar. 12, 1986.

"Firm plugs into sales with time, temp lines", *Crain's New York Business,* Mar. 3, 1986, vol. II, No. 9.

Pitts, Gail, "Phone–in trivia games ring up profits", *The Denver Post,* Feb. 3, 1986.

"Merge Towards Success" IIN and Megaphone, *The 976 Exchange,* Winter 19?6, vol. 4.

Nelson, David, "From dating to soap operas, 976 numbers come on line", *San Jose Business Journal Magazine,* Jan. 27, 1986.

Greengard, Samuel, "Dial–A–Deluge", *Business,* Nov. 1985.

"Numbers, Please", *Business,* Nov. 1985.

"The 976 Telelease Co.", *Business Opportunities Journal,* Dec. 1985.

"One–time refund for '976' charges", *San Francisco Exam- iner,* Nov. 7, 1985.

Kent, Debra, "Interactive phone network stretches for calls", *Advertising Age,* Oct. 17, 198?.

"Making Your Phone Talk To Computers", *U.S. News,* Sep. 23, 1985.

Mulqueen, John, "Int'l Information Network Eyes Contact With British Telecom", *Communications Week,* Sep.??.

Moorhead, Derrol, "Humor, romance: just a call away", *Rocky Mountain Collegian,* Sep. 19, 1985, vol. 94, Iss. 32.

Keppel, James, "Move Under Way to Curb Abuse of Popular Dial–It Service", *Los Angeles Times,* Sep. 1, 1985.

"Dial–a–stock", *Forbes,* Aug. 1985.

Sowa, Tom, "Games people play now include phone trivia", *Spokesman–Review,* Jul. 1985.

Dougherty, P.H., "Advertising Telephone Is Growing As Medium", *The New York Times,* Jul. 17, 1985.

Larson, Judy, "976 numbers entice adults—and kids", *Fre- mont Argas,* Jul. 8, 1985.

Barbieri, Richard, "Prime Time for the Telephone", *Chan- nels,* May/Jun. 1985, pp. 54–55.

"Bank Provides Financial Fuel To Fast Track Company", *The Financial Center Bank,* First Quarter 1985, vol. II, No. 1.

"Don't Phone Santa", *San Francisco Chronicle,* Letters to the Editor, Mar. 29, 1985.

Carvalho, Deborah, "Will Hillary find happiness with Bob?", *Contra Costa Times,* Mar. 15, 1985.

Murphy, Win, "Dial–a–romance", Mar. 13–19, 1985.

?, Martha, "Love, laughs, luck: Just a phone call away", *Burlington County Times,* Feb. 17, 1985.

Robinett, Stephen, "Blood From A Rock", *Venture,* Jan. 1985, pp. 38–41, 44–45.

Du Brow, Rick, "Lates hot lines for instant trivia pursuit", *Los Angeles Herald Examiner*, Dec. 6, 1984.

"Keep up with your favorite soap operas", *Contra costa Times*, Nov. 30, 1984.

Hanna, Barbara, "Inside Radio/TV".

Behr, Debra, "'Victory' makes and writes its own on–the–road news", and "Whose calling? Michael fans most likely . . . ", *Los Angeles Times*, Nov. 29, 1984.

"Newcomer Megaphone Has Magnanimous Goals", *The 976 Exchange*, Fall 1984, vol. 2.

"Phone Santa", *Vacaville Reporter*, Nov. 10, 1984.

"Dial 976 for Profits", *Time*, Sep. 3, 1984.

Pendleton, Mike, "For A Fee Your Phone Can Inform", *Burrelle's*, Jul. 19, 1984.

"Phone numbers to get details about soaps'", *Burrelle's*, Jul. 18, 1984.

Gansberg, A.L., "976 phone prefix as new entertainment fad", *The Hollywood Reporter*, Jun. 21, 1984.

Carvalho, Deborah, "Another 'GH' actor discontented with the soap", *Contra Costa Times*, May 26, 1984, p. 4.

"Keep up with your favorite soap operas", *San Francisco Examiner*.

Du Brow, Rick, "'Dial–a–soap' service offers daily TV summaries", *Los Angeles Herald Examiner*, Apr. 26, 1984 . . . .

News briefs, Feb. 1966.

Martin, J., et al., "The Computerized Society—An apprisal of the impact of computers on society over the next fifteen years", Chapter 10, pp. 211–226—(Chapter from a Book).

New products, *Datamation*, Jul. 1966, vol. 12, No. 7, pp. 7/89—(Article).

Meacham, L.A., et al., "Tone Ringing and Pushbutton Calling", *The Bell System Technical Journal*, 1958, pp. 339–360—(Book).

Suppes, Patrick, "The Uses of Computers in Education", *Scientific American*, Sep. 1966, vol. 215, No. 3, pp.—(Article).

Bruckert, E., et al., "Three–tiered software and VLSI aid developmental system to read text aloud", *Electronics*, Apr. 21, 1983, pp. 133–138—(Article).

Hochman, David, "Implementing Automatic Number Identification", *Telecommunications*, Dec., 1978, vol. 12, No. 12—(Article).

Martin, James, "Telecommunications and the Computer", 2nd Edition, Introduction, pp. 20–23, Chapter 5, pp. 94–95, Chapter 18—(Chapter from a Book).

Martin, James, "Telematic Society", Chapter 6, pp. 45–48, Chapter 9, pp. 67–69, Chapter 20, pp. 181–188—(Chapters from a Book).

Martin, James, "The Wired Society", pp. 53–55, 71–79, 99–100, 204–205, 229–231—(Chapters from a Book).

Martin, James, "Future Developments in Tele–Communications", 2nd Edition, Box A, Chapter 1, p. 5, Chapter 7, pp. 95–111, Chapter 9, pp. 149–105, Chapter 12, pp. 207–209, Chapter 18, pp. 310–311, Chapter 19, pp. 314–317, 320, Chapter 20, pp. 330, Chapter 23, pp. 379–401—(Chapters from a Book).

Ferrarini, E.M., "Infomania", pp. 59–61, 176–177, 191, 213–214, 223, 245, 250, 257, 285, 286—(Book).

Kimura, Y., et al., "Audio Response System", vol. 55, No. 10, pp. 49–54—(Article in Japanese).

Takano, H., "Characteristics of Multipair Exchange Area Telephone Cable with Cellular Polyethylene Insulation by Gas Injection Blouing", p. 55—(Article in Japanese).

Takahashi, T., et al., "SR–2000 Voice Processor and Its Application", *NEC Research and Development*, 1984, No. 73, pp. 98–105—(Paper).

"Concept Diagram Voicemail International System" "Voicemail Instruction Manual", *Televoice International*, Jun. 1981, Index.

Eckhouse, John, "Voice mail spells relief for phone frustration", *San Francisco Examiner*, Feb. 7, 1982—(Article).

Meade, Jim, "Throw away those pink Call–back slips", *InterOffice*, Jan./Feb. 1984, vol. 3, No. 1—(Article).

Welsh, Jack, "Everybody's Talking About Talking Bouquets", *Design for Profit*, Spring 1986, pp. 7–10—(Article).

Mosco, Vincent, "Pushbutton Fantasies", Contents, Chapter 3 and 4, pp. 67–118—(Chapters from a Book).

Bretz, Rudy, "Media for Interactive Communication", Chapter 5, pp. 110–116, Chapter 7, pp. 143–153—(Chapters from a Book).

Robinson, G., et al., ""Touch–Tone" Teletext A Combined Teletext–Viewdata System", *IEEE Transactions on Consumer Electronics*, Jul. 1979, vol. CE–25, No. 3, pp. 298–303—(Article).

Voice News, Mar. 1982.

Voice News, Jun. 1982, William W. Creitz.

Voice News, Oct. 1982, p. 5.

Voice News, Nov./Dec. 1983.

"Consultant Report 28?", *AIS American Bell Advanced Information Systems*, Apr. 1983, pp. 27, 118–119, 123–124—(Report).

"T–1 Board Sets Deliver High Performance All Digital T–1 Solutions", *NMS Natural MicroSystems*—(Product Bulletin).

"VBX Product Family Overview", *NMS Natural MicroSystems*, pp. 1–20—(Brochure).

"Machine Operation Manual", May 12, 1978, Issue 1, pp. 1–3, 9–10—(Manual).

Davey, J.P., "Dytel Western Region Sales Training Manual", 1985—(Manual).

Gutcho, Lynette, "DECtalk—A Year Later", *Speech Technology*, Aug./Sep. 1985, pp. 98–102—(Article).

Daniels, Richard, "Automating Customer Service", *Insurance Software Review*, Aug./Sep. 1989, pp. 60–62—(Article).

Golbey, S.B., "Fingertip Flight Service", Oct. 1985—(Article).

"ARO Goes Pushbutton", *Newsletter*, Nov. 1985, p. 9—(Article).

"ROLM Centralized Attendant Service", *ROLM Corporation*, 1979.

"AIS, Versatile Efficient Information Service", *Fujitsu Limited*, 1972, pp. 153–162—(Brochure).

Smith, S.L., et al., "Alphabetic Data Entry Via the Touch–Tone Pad: A Comment", *Human Factors*, 1971, 13(2), pp. 189–190—(Book).

Holtzman, Henry, "Still an Infant Technology Voice Mail", *Modern Office Technology*, Jun. 1985, pp. 78–80, 82, 84, 90—(Article).

Leander, Monica, "Voice Response—A Technology for Solving Management Problems", *Speech Technology*, Mar./Apr. 1986, pp. 50–52—(Article).

Stolker, Bud, "CompuCorder speech storage and output device. (evaluation)", *Creative Computing*, Jul. 1983, pp. 1–7.

Witten, I.H., et al., "The Telephone Enquiry Service: a man–machine system using synthetic speech", *Int. J. Man–Machine Studies*, Jul. 1977, 9, pp. 449–464—(Book).

**5,898,762**
Page 8

Gould, R.L., "Fidelity's Automated Voice Response System", *Telecommunications,* Jan. 1981, pp. 27–28—(Article).

"Fidelity Automated Service Telephone", *Fidelity Group,* 4 pages—(Manual).

"Data Set 407 Interface Specification", *Manager—Data Systems & Operations,* Jun. 1975, Issue 2, pp. 1–69 plus Table of Contents—(Manual).

Fitzwilliam, J.W., et al., "Transaction Network, Telephones, and Terminals", *The Bell System Technical Journal,* Dec. 1978, vol. 57, No. 10, pp. 3325–3537—(Book).

*Inbound Outbound,* May 1988, complete issue.

Koch, Helmut, "Concord Design Services, Inc. Corporate Description", *Exacom.*

Federal Communications Commission, FDC Form 484, Registration, Registrant: Concord Design Services, Inc. *Exacom Telecommunication Systems*—Brochure.

General Description Installation and Operation Manual for Direct Inward Dial (DID) Trunk Interface Unit, *Exacom. Telecommunication Systems,* Nov. 21, 1989, Issue 3—(Manual).

General Description Installation and Operation Manual for Answering Service Monitor System, *Concord Design Services, Inc.,* Dec. 19, 1986, Issue 1—Manual.

"Dialogic Voice Solutions", *Dialogic Corporation,* pp. 1–72.

"Why Is T–1 Important And How Can It Be Used", *Dialogic Corporation,* Application Note, pp. 1–6.

"Use of Dialogic T–1 For Telemarketing Applications", *Dialogic Corporation,* Application Note, pp. 1–6.

"Use of Dialogic T–1 In Operator Service Applications", *Dialogic Corporation,* Application Note, pp. 1–6.

"Use of Dialogic T–1 In Telephone Company Networks", *Dialogic Corporation,* Application Note, pp. 1–10.

"Use of Dialogic T–1 Equipment in CPE Gateways", *Dialogic Corporation,* Application Note, pp. 1–4.

"Integrating Analog Devices into Dialogic–Based T–1 Voice Processing Systems", *Dialogic Corporation,* Application Note, pp. 1–16.

"Use of Dialogic Components in Automatic Number Identification (ANI) Systems", *Dialogic Corporation,* Application Note, pp. 1–16.

"Dialogic Unit Pricing", pp. 1–6.

"Voice '92 Spring Conference & Exposition", 1992, pp. 1–24—(Brochure).

"Telecom Developers '92", Jan. 1992—(Advertisement).

Newton, Henry, "The Sheer Thrill Of It All", *Teleconnect,* May 1991.

"AFIPS Conference Proceedings", 1987 National Computer Conference, Jun. 15–18, 1987, Chicago, Illinois.

"Dynamic Network Allocation".

"Calling your computer is as easy as calling your broker, says AT&T", *Record,* Nov. 1985.

Singleton, L.A., "Telecommunications in the Information Age", Chapter 12, pp. 115–125—(Chapter from a Book).

Weitzen, H.S., "Telephone Magic", pp. 28–31, 38–39, 54–55, 62–67, 70–79, 82–85, 88–91, 106–115, 118–121, 126–127, 134–137, 176–177, Index—(Chapters from a Book).

Weitzen, H.S., et al., "Infopreneurs", pp. 18–19, 138–145, 206–209, Index—(Chapters from a Book).

Sullivan, Kathleen, "Paper firm relies on voice–based inventory system", *IDG Communications, Inc.,* Sep. 10, 1984—(Script).

"VTK Training Section" and "Disk Initialization Procedures for VTK–30/60", *Voicetek Corporation*—(Manual).

"VoiceStor Systems Integration Guide", *Voicetek Corporation,* May 2, 1983—(Manual).

"VTK 60 Voice Computer—Technical Description", *Voicetek Corporation,* Oct. 1986—(Manual).

"Voicetek VS–50 Telephone Interface System", Apr. 25, 1984, System Integration Guide—(Manual).

"VTK Voice System—Programmers Guide", *Voicetek*—(Manual).

"Disk Initialization Procedures for VTK–30/60", *Voicetek Corporation*—(Manual).

"VTK81 Voice Computer—Technical Description", *Voicetek Corporation,* Oct. 1986—(Manual).

"VTK Voice System—VTK/CE Guide", *Voicetek,* Jul. 6, 1987—(Manual).

Newton, Harry, "Newton's Telecom dictionary", *Telecom Library Inc.,* 1991—(Advertisement).

"1987 Buyers Guide", *Teleconnect,* Jul. 1987, pp. 194, 197–210—(Brochure).

Syntellect Inc.—Advertisements.

Various copies of Business cards.

Guncheon, M.C., "The Incredible Dial–A–Message Directory", *Contemporary Books, Inc.,* 1985—(Directory).

"Voice Box Maintenance Manual", *Periphonics,* 1986—(Manual).

"Voicepac Maintenance Manual", *Periphonics,* 1984—(Manual).

Dyer, Ellen, "Wichita Firm Sells 25% Share", Dec. 14, 1987, and "Spectrum Carving Role In Volatile Business", Jul. 7, 1986, Search Results.

"Don't Miss The Unique Gift Idea Of The Year", *Yam Educational Software,* 1987—(Advertisement).

"Welcome to the future of advertising.", *Teleline, Inc.,* 1990—(Presentation).

"Greeting Card Project", *Teleline, Inc.,* Nov. 7, 1988—(Flow Chart).

Sharkey, Betsy, "Dialing for Dollars and Data", *Adweek,* Nov. 16, 1987, pp. 6–8—(Article).

Gay, Verne, "CBS may tie rates to buying p?", 1988—(Article).

Flanagan, J.L., et al., "Synthetic Voices For Computers", *IEEE International Conference on Communications,* 1970, pp. 45–9–45–10—(Conference Record).

Rabiner, L.R., et al., "Computer Voice Response Using Low Bit Rate Synthetic Speech", *Digest IEEE 71 International Convention,* Mar. 22–25, 1971, pp. 1–2, Fig. 1–2—(Paper).

"DT1000 Digitalker Speech Synthesis Evaluation Board", *National Semiconductor Corp.,* Oct. 1980—(Manual).

"Data Set 407C Interface Specifications Nov. 1977", *Bell System Technical Reference,* Nov. 1977, pp. 1–50—(Paper).

Broomfield, R.A., et al., "Making a data terminal out of the Touch–Tone telephone", *Electronics,* Jul. 3, 1980, pp. 124–129—(Paper).

Godfrey, D., et al., "The Telidon Book—Designing and Using Videotex Systems", pp. 1–103—(Book).

"Industry Marketing Bulletin", *Honeywell EDP Wellesley Hills,* Aug. 9, 1967.

"Honeywell Communications Configuration Charts And Aids In Designing", *Data Communications,* pp. 3–1–3–7 and A.

"Burroughs Audio Response System", Reference Information for Sales Representatives, pp. 1–6 "New Product Announcement", *Burroughs Corporation,* Feb. 5, 1968.

"Stand–Alone Lockbox Application Voice Response (Slave) Communication System Functional Specification", *Cognitronics Corporation,* Feb. 19, 1982, p. 21.

**5,898,762**

"Unlock lockbox reporting. with Cognitronics Voice Response Communications System/Banking.", *Speech–maker a division of Cognitronics Corporation.*

"Voice Response for Banking", *Cognitronics Corporation* (Brochure).

"Voice response application brief", *Speech–maker*—(Brochure).

"Instant credit authorization is an easy touch when any telephone is a voice response computer terminal", *Speech–maker a division of Cognitronics Corporation*—(Article).

Slutsker, Gary, "Relationship marketing", *Forbes,* Apr. 3, 1989—(Article).

Finnigan, P.F., "To Our Shareholders", Jun. 1985, Apr. 7, 1986, Apr. 10, 1987—(Letters) "International Programs" (Voicemail).

Finnigan, P.F., "Our guest", *Radio–Schweiz AG Telekommunikation und Flugsicherung,* Jan. 1983, pp. 12–14—(Bulletin).

Finnigan, P.F., "Voice mail", *1983 National Computer Conference,* May 16–19, 1983, Anaheim, CA, pp. 375–377 and Abstract.

"Conversations in Your Mailbox", *Software News,* Jan. 1985—(Article).

Fredric, Paul, "Voicemail Int'l, Radio Page America To Offer A 'Pocket News Network'", *Communications Week,* Jul. 8, 1985—(Article).

"Voice–Messaging System: Use It While You're In, Not Out", *Information Week*—(Article).

"Corporate Performance—Companies To Watch", *Fortune,* Sep. 30, 1985—(Article).

"Dream Weaver", *Jon Lindy,* Aug. 1986, pp. 32–35, 37—(Article).

"Turn any telephone into a complete electronic message service", *Voicemail*—(Brochure).

Pages from Company Brochure, *Televoice International, Inc.*

"VMI Big Talker", *Voicemail International, Inc.*—(Newsletter).

"Newsline", *Voicemail International, Inc.,* Oct. 1984 and Nov. 1984, "Voiceletter No. 1", *Voicemail International, Inc.,* Dec. 1985.

"A New, More Productive Way to Use the Telephone", *Voicemail International, Inc.*—(Brochure).

"While You Were Out . . . "—(Brochure).

"?For People Who Can't Afford To Miss Messages", *Voicemail International, Inc.*—(Brochure).

"Voicemail The electronic news service saves time, money and nerves", *Radio–Suisse Ltd.,* (Voicemail Agent for Europe)—(Brochure).

"Are You Being Robbed of Your Time . . . ?", *Voicemail International, Inc.*—(Brochure).

"Voicemail Instruction Manual B—85", *Televoice International,* Nov. 1980—(Manual).

"Local Telephone Numbers" (for Voicemail) and "Televoice Is As Easy As 1, 2, 3 !", *Televoice International*—(Manual).

"Voicemail Instruction Manual C—25", *Televoice International,* Jun. 1981—(Manual).

"Telephone Numbers" (for Voicemail) and "How To Use Voicemail", *Televoice International*—(Manual).

"Message Receiving/Sending" (and others), *Voicemail International, Inc.*—(Manual).

"You Can Use Voicemail To Send And Receive Messages At Anytime Anywhere In The World", *Voicemail International, Inc.,* 1981—(Brochure).

"Advanced User Guide", *Voicemail International, Inc.*—(Manual).

"Voicemail's Basic User's Guide", *Voicemail International, Inc.*—(Manual).

"Welcome To Dowphone", *Dowphone,* Jan. 1986—(Manual).

"Telephone 1–800 Check–PDR", *Officers of Medical Economics Company, Inc.,* 1986—(Circulation/Brochure).

"Turn your telephone into an efficient electronic "mailbox"", *Western Union,* Jan. 1984,—(Brochure).

"Western Union Voice Message Service User's Guide", *Western Union,* Jul. 1984—(Brochure).

"PSA's 24 hour reservation system", *PSA,* Sep. 1986—(Brochure).

"To Better Serve Your Business, We're On Call Days, Nights and Weekends.", *Maryland Business Assistance Center*—(Brochure).

"Voice Response: Breaks Trough Call Blockage.", *Business Week,* Aug. 26, 1985—(Advertisement for Preception Technology Corporation).

"Tools for heavy hitters", *Forbes,* May 6, 1985.

"The Fidelity Automated Service Telephone", *Fidelity Group*—(Manual/Brochure).

"Stockquote Hotline", *Norwest Brokerage Services*—(Brochure).

"All You Need To Get The Stock Quotes And News You Want." *Dowphone,* 1984—(Advertisement).

"The Most Respected Name In Telemarketing", *West Interactive Corporation*—(2 Brochures).

"The AT&T Multi–Mode Voice Systems . . . " by S.D. Hester et al. Sep. 1985.

Kroemer, F., "Telebox", Unterrichtsblätter, year 38/1985, No. 4, pp. 131–141 (Article)—no translation.

Kroemer, F., "Telebox", Unterrichtsblätter, year 41/1988, No. 2, pp. 67–83 (Article)—no translation.

C.R. Newson, "Merlin Voice Mail VM600," British Telecommunications Engineering, vol. 4, Apr. 1985, pp. 32–35.

A.S. Yatagai, "Telephonic Voice Synthesis Systems," Telecommunications, Aug. 1985, pp. 56h–l, 68.

A.J. Waite, "Getting Personal With New Technologies For Telemarketers," DM News, Feb. 15, 1987 at 50.

"Shopping via a network is no longer just talk," Data Communications, Aug. 1981 at 43.

"Growth–Oriented Systems," Restaurant Technology, Nation's Restaurant News Newspaper, Jul. 1, 1985 at 51.

"Let your fingers do the tapping . . . and the computer the talking," Modern Office Tech., May 1984 at 80.

"American Software unveils systems for IBM mainframes," Computerworld, Mar. 26, 1984 at 59.

"Business Units Get Order Entry," Computerworld, Jul. 12, 1982 at 36.

Borison, V.S., "Transaction—telephone gets the fact at the point of sale", *Bell Laboratories Record,* Oct. 1975, pp. 377–383—(Article).

Demeautis, M., et al., "The TV 200 A Transactional Telephone", *Commutation & Transmission n° 5,* 1985, pp. 71–82—(Article).

Eriksson, G., et al., "Voice and Data Workstations and Services in the ISDN", *Ericsson Review.,* May 1984, pp. 14–19—(Article).

Schrage, Michael, "A Game Von Meister in Pursuit of Profits", *Washington Post,* Sep. 23, 1985—(Article).

Svigals, J., "Low Cost Point–Of–Sale Terminal", *IBM Technical Disclosure Bulletin,* Sep. 1982, vol. 25, No. 4, p. 1835.

Turbat, A., "Telepayment And Electronic Money The Smart Card", *Commutation & Transmission n° 5,* 1982, pp. 11–20—(Article).

"Voice Mail", *Sound & Communications,* Apr. 1983, vol. 28, No. 12, pp. 84–85—(Article).

Aso, Satoshi, "Trends and Applications of Voice Output Devices", *2209 J.E.E. Journal of Electronic Engineering,* Feb. 1982, vol. 19, No. 182, pp. 102–107—(Article).

Lexis Search Results (Great American Potato–Chip giveaway/Raisin Bran Game/Giants Baseball Trivia—Dial Info): "In The Chips" AdWeek, Jul. 22, 1985.

"San–Fran–Police–League", Business Wire, Aug. 2, 1985.

"Similar Campaigns", DM News, Dec. 15, 1985.

"Phone Offers Action At Push Of Button", Advertising Age, Feb. 6, 1986.

Boies, Stephen J., "A Computer Based Audio Communication System", *Computer Sciences Department,* Thomas J. Watson Research Center, Yorktown Heights, New York, USA, pp. 701–704—(Article) (Undated).

Winckelmann, W.A., "Automatic Intercept Service", *Bell Laboratories Record,* May 1968, vol. 46, No. 5, pp. 138–143—(Article).

"Proposed Agreement Between National Enterprises Board (N.E.B.) and Delphi", Jan. 30, 1979.

Voysey, Hedley, "Nexos wins rights to comms engine", *Computing,* Sep. 6, ??, vol. 7, No. 36—(Article).

"Appraisal Of The Fair Market Value Of Delphi Communications", Apr. 30, 1980—(Study) Delphi Communications—(Charts and Exhibits).

"Voice–Response System Improves Order Entry, Inventory Control", *Communication News,* Aug. 1976—(Article).

"Periphonics Voicepack"—(Brochure) (Undated).

"The Voice Response Peripheral That Turnes Every Touch–Tone Telephone Into A Computer Terminal", Periphonics Corporation—(Brochure) (Undated).

Rabin, Jeff, "Minorities Seek 30% Share of All Lottery Operations", *Sacramento Bee,* Apr. 12, 1985—(Article).

Advertisements (Dial Giants Baseball Trivia Game): *San Francisco Chronicle,* Jul. 3, 1984.

Curtis, Cathy, "976 numbers let you dial–a–whatever", *San Francisco Business Journal,* Nov. 26, 1984—(Article).

Ferrell, Jane, "Three little numbers for instant information", *San Francisco Chronicle,* Aug. 15, 1984—(Article).

"Dallas Telephone Call–In Game Uses Computer Voice Interface", Sep. 24, 1984—(Press Release).

Rivest, R.L., et al., "A Method for Obtaining Digital Signatures and Public–Key Cryptosystems", *Communications of the ACM,* Feb. 1978, vol. 21, No. 2, pp. 120–126—(Article).

Finnigan, Paul F, "Audiotex: The telephone as data–access equipment", *Data Communications,* 1987, pp. 155–161 (Article).

Ozawa, Y., et al., "Voice Response System and Its Applications", *Hitachi Review,* Dec. 1979, vol. 28, No. 6, pp. 301–305—(Article).

"AT&T 2: Reaches agreement with Rockwell (ROK)", Aug. 26, 1986—(Press Release).

"AT&T: Expands Computer speech system product line", Apr. 14, 1986—(Press Release).

Adams, Cynthia, "Conversing With Computers", *Computerworld on Communications,* May 18, 1983, vol. 17, No. 20A, pp. 36–44—(Article).

Davidson, Leon, "A Pushbutton Telephone For Alphanumeric Input", *Datamation,* Apr. 1966, pp. 27–30—(Article).

Advertisement: Cuervo Gold Beach Chair, VoiceMail Int'l, '83.

"Digital's All–In–1 Voice Messaging", *Digital*—(Brochure) (Undated).

"Access Voice and Mail Messages From One Familiar Source", *Insight,*—(Article) (Undated).

"Get The Message . . . !" "New VoiceMail Features", *Voicemail International, Inc.,* Oct. 1984—(Article).

Brochures (TWA Crew Scheduling/PSA's Reservation System/Universal Studios Program/Dow Phone): "AVIAR The communication system that keeps you flying", VoiceMail Int'l,—(Brochure) (Undated).

"TWA Voicemail, Flight Attendants Users Guide" Aug. 1986,—(Brochure).

Holtzman, Henry, "Voice Mail Soars At TWA", *Modern Office Technology* (Reprint), Mar. 1986,—(Article).

"Bid Results via Voicemail—Flight Deck Crew Members", May 1, 1985 (Script).

Borden, W.S., "Flight Attendant Self Input Of Monthly Bids Via Touch Tone Telephone", *In–Flight Services Bulletin,* Sep. 15, 1985—(Memo).

"Look Ma, no operators! Automatic voice system doesmany airline jobs", *Air Transport World,* Oct. 1986—(Article).

"1,000,000 Shares Common Stock" *Voicemail International, Inc.,,* Jan. 10, 1984—(Public Offering Summary).

Levinson, S.E., et al., "A Conversational–Mode Airline Information and Reservation System Using Speech Input and Output", *The Bell System Technical Journal,* Jan. 1980, vol. 59, No. 1, pp. 119–137.

Emerson, S.T., "Voice Response Systems—Technology to the Rescue for Business Users", *Speech Technology,* Jan./ Feb. '83, pp. 99–103—(Article).

Moslow, Jim, "Emergency reporting system for small communities", *Telephony,* Feb. 11, 1985, pp. 30–32, 34—(Article).

Rabiner, L.R., et al., "Digital Techniques for Computer Voice Response: Implementation and Applications", *Proceedings Of The IEEE,* Apr. 1976, vol. 64, No. 4, pp. 416–432—(Article).

Moosemiller, J.P., "AT&T's Conversant™ I Voice System" *Speech Technology,* Mar./Apr. 1986, pp. 88–93—(Article).

Frank, R.J., et al., "No. 4 ESS: Mass Announcement Capability", *The Bell System Technical Journal,* Jul./Aug. 1981, vol. 60, No. 6, Part 2, pp. 1049–1081—(Chapter from a Book).

"Chapter I General Description" *D.I.A.L. PRM/Release 3–Version 2* Mar. 1987 (Product Reference Manual).

"Announcing Release 3.3" *D–A–S–H– D.I.A.L. Application and Support Hints,* Jan./Feb. Mar. 1987, vol. 3, No. 1—(Brochure).

"D.I.A.L. Software Release 4", *OPCOM,* Jan. 1988, Version 1—(Product Reference Manual).

Brady, R.L., et al., "Telephone Identifier Interface", *IBM Technical Disclosure Bulletin,* Oct. 1976, vol. 19, No. 5, pp. 1569–1571—(Article).

Corbett, A.J., "Telephone Enquiry System Using Synthetic Speech", *University of Essex,* Dec. 1974, (Thesis).

Yoshizawa, K., et al., "Voice Response System for Telephone Betting", *Hitachi Review,* Jun. 1977, vol. 26, No. 6—(Article).

Sagawa, S., et al., "Automatic Seat Reservation By Touch–Tone Telephone", *Second USA Japan Computer Conference,* 1975, vol. 2, pp. 290–294—(Article).

**5,898,762**

Smith, S.L., "Computer–Generated Speech and Man–Computer Interaction", *Human Factors,* 1970, 12(2), pp. 215–223—(Article).

Newhouse, A., et al., "On The Use Of Very Low Cost Terminals", *University of Houston,* pp. 240–249—(Paper) (Undated).

Mullen, R.W., "Telephone—home's 'friendliest' Computer", *Inside Telephone Engineer And Management,* May 15, 1985, vol. 89, No. 10,—(Article).

"Telephone Computing Entering Service Bureau Business", *American Banker,* Jul. 5, 1979—(Article).

Kutler, Jeffrey, "Technology, System Sharing Improve Phone Banking Outlook", *American Banker,* Dec. 7, 1979, vol. CXLIV, No. 237—(Article).

Kutler, Jeffrey, "Phone Bill Paying Accessed by Pioneer", *American Banker,* Dec. 7, 1979, vol. CXLIV, No. 237—(Article).

"User's Guide", *Dowphone* (Undated).

"Audiotex Information From Dow Jones", *The Computer Review,* Nov. 1984, vol. 2, No. 1—(Article).

"Dow Phone Adds Innovest Systems' Technical Analysis Reports" *IDP Report,* Jan. 3, 1986—(Report).

Perdue, R.J., et al., "Conversant 1 Voice System: Architecture and Applications", *AT&T Technical Journal,* Sep./Oct. 1986—(Article).

Martin, James, "Design of Man–Computer Dialogues", *IBM System Research Institute,* Chapter 16, pp. 283–306—(Chapter from a Book) (Undated).

Kaiserman, D.B., "The Role Of Audio Response In Data Collection Systems", *Proceedings of the Technical Sessions,* Paleis des Expositions, Geneva, Switzerland, Jun. 17–19, 1980, pp. 247–251—(Article).

Boies, S.J., et al., "User Interface for Audio Communication System", *IBM Technical Disclosure Bulletin,* Dec. 1982, vol. 25, No. 7A, pp. 3371–3377—(Article).

Kramer, J.J., "Human Factors Problems in the Use of Pushbutton Telephones for Data Entry", *Bell Telephone Laboratories,* Holmdel, N.J., Apr. 74, pp. 241–258—(Paper).

Cox, Jr., Floyd, "Flora Fax", Jan. 22, 1986—(Letter and Advertisements).

Isayama, Tetsuya, "Automatic Response Processing Equipment as a Multi–media Communication Node", *Japan Telecommunications Review,* 1987, vol. 29, No. 1, pp. 29–36—(Article).

Imai, Y., et al., "Shared Audio Information System Using New Audio Response Unit" *Japan Telecommunications Review,* Oct. 1981, vol. 23, No. 4, pp. 383–390—(Article).

"Distrust of computer kills home service plan" (date and source missing).

"Automatic Call Distributor/Management Information System: Interface between 1/1AESS™ Switch Central Office and Customer Premises Equipment", *Bell Communications Research,* Dec. 1986, Technical Reference TR–TSY–000306, Issue 1—(Article).

"Comparison Of ACD Systems", *Connection,* Feb. 1990—(Chart).

"ACD Comparison", *Aspect,* Feb. 2, 1990—(Final Report).



FIG. 1



FIG. 2

| CALLER'S TELEPHONE NUMBER AND INITIALS | DATA: AGE. WEIGHT----PULSE | CALL RECORD SEQUENCE | ASSIGNED DESIGNATION | ACKNOWLEDGE DIGITS |
|---|---|---|---|---|
| 627-2222-53  47 | 176..........77 | 4951 | 4951/684 | 6173 |

53  C1  58  62  64  66

FIG. 5

| CARD TYPE | CARD # | CARD EXP. DATE | CUST. # | NAME ADDRESS DATA | ITEM 1 | COLOR SIZE CODE | ACKNOWLEDGE DIGITS |
|---|---|---|---|---|---|---|---|

130  132  134  136  138  140  142  144

104

FIG. 7

| CALLER'S TELEPHONE NUMBER | USES/ MONTH | TIME | I.D. DATA | DESIGNATION | QUESTION ANSWERS |
|---|---|---|---|---|---|

201  202  204  206  208  210

200



FIG.3



FIG. 4



FIG. 6



FIG. 8



FIG. 9

5,898,762

1

# TELEPHONIC-INTERFACE STATISTICAL ANALYSIS SYSTEM

## BACKGROUND AND SUMMARY OF THE INVENTION

This is a divisional application of application Ser. No. 07/335,923 filed Apr. 10, 1989, and entitled "Telephonic-Interface Statistical Analysis System", which was a continuation of application Ser. No. 07/194,258 filed May 16, 1988, and entitled "Telephonic-Interface Statistical Analysis System", now U.S. Pat. No. 4,845,739, which is a continuation-in-part of application Ser. No. 07/018,244 filed Feb. 24, 1987, and entitled "Statistical Analysis System For Use With Public Communication Facility", now U.S. Pat. No. 5,792,968, which was a continuation-in-part of application Ser. No. 06/753,299 filed Jul. 10, 1985, abandoned, and entitled "Statistical Analysis System For Use With Public Communication Facility".

Various forms of publicly accessible communication systems for providing access to a central station have been proposed, some involving telecommunications. However, sometimes a need for ancillary functions arise in that regard, e.g. it may be desirable to positively identify a large group of persons, as a demographically controlled group, or a specifically entitled group, then statistically analyze data from the group so as to accurately identify certain persons in the group and select a subset of at least one person. Specifically, it may be desirable to obtain medical data from an entitled group of people, to correlate such data, perhaps introduce external data, then identify a select subset of the group. In that regard, a need exists for an improved, effective, economical, and expedient system of telecommunication incorporating means for performing qualification, identification, analysis and selection of individual persons.

It has been proposed to interface persons at telephone calling stations directly with a computer facility. In accordance with such arrangements, recorded voice messages prompt callers to provide data by actuating the alphanumeric buttons that are conventionally employed for dialing from one telephone station to another. In one prior arrangement, a caller may actuate dialing buttons to selectively attain a communication channel or to address specific information in a computer. In another arrangement, dialing buttons may be actuated to specify a billing designation as for requested services. Generally, such systems are believed to have been somewhat limited in scope, often involving difficulties that are frustrating or confusing to a caller. Nevertheless, such techniques have been widely used to enhance and broaden communication.

In general, the present invention comprises a telephonic-interface system and related process for selectively utilizing both analog (voice) and digital telephonic communication in a variety of different interface formats or programs, as to select or qualify a set of callers, enable positive identification of at least certain of the callers in the set, acquire data from callers in the set, statistically analyze acquired data, as in combination and in association with external data (time independent), and accordingly to isolate a subset of the callers with verifiable identification. That is, the external data (separate from caller-provided data) may be introduced at any of a variety of different times in relation to the caller data.

For example, a voice origination apparatus may prompt individual callers who (after qualification) provide select digital data to develop a record for further processing either immediately, upon the evolution of a defined set of callers or

2

upon the establishment of select external data. Thus, following a qualification phase, the information acquisition phase may be concurrent or consecutive with respect to the processing phase. When appropriate, abort capability allows a caller to remain "off hook" and go to analog (vocal) communication. The caller then interfaces directly with an operator.

The system of the present invention may qualify an entitled set of callers, then receive answer data in the course of the call and develop identification or designation data, sequence data and statistical data. The system may then provide data cells for storing individual data while assigning confirmable identifications to the entitled set. From the set, a subset is defined. That is, in accordance with various formats, acquired data is processed in statistical relationship, or in relation to applied external data to accomplish such functional operating formats as an auction sale, a contest, a lottery, a poll, a merchandising operation, a game, and so on.

A variety of memory techniques are used to selectively activate the voice origination apparatus. Accordingly, statistical analysis and selection can be effectively and economically accomplished with respect to a substantial set of callers who are accommodated individual communication through a telephone system.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, which constitute a part of this specification, exemplary embodiments exhibiting various objectives and features hereof are set forth, specifically:

FIG. 1 is a block diagram of a system constructed in accordance with the present invention;

FIG. 2 is a fragmentary diagrammatic representation of a storage cell format as may be developed in the system of FIG. 1;

FIG. 3 is a flow diagram of one operating format of the system of FIG. 1;

FIG. 4 is a block diagram of a form of processor or function unit as may be employed in the system of FIG. 1;

FIG. 5 is a fragmentary diagrammatic representation of a storage cell format as may be developed in the system of FIG. 1 with the processor of FIG. 4;

FIG. 6 is a block diagram of elements in an operating function unit of FIG. 4;

FIG. 7 is a diagrammatic representation of a storage cell format as may be developed in the system of FIG. 4; and

FIG. 8 is a block diagram of elements in an operating function unit of FIG. 4.

FIG. 9 is a block diagram of the connections between the CPU and remote stations.

## DESCRIPTION OF THE ILLUSTRATIVE EMBODIMENTS

As required, detailed illustrative embodiments of the present invention are disclosed herein. However, physical communication systems, data formats, and operating structures in accordance with the present invention may be embodied in a wide variety of forms, some of which may be quite different from those of the disclosed embodiments. Consequently, the specific structural and functional details disclosed herein are merely representative; yet in that regard, they are deemed to afford the best embodiments for purposes of disclosure and to provide a basis for the claims herein which define the scope of the present invention.

Referring initially to FIG. 1, a series of remote telephone-instrument terminals T1 through Tn are represented (left).

5,898,762

3

The terminals are generally similar, and accordingly, only the terminal T1 is illustrated in detail.

In the disclosed embodiment, the remote terminals Ti through Tn represent the multitude of conventional telephone terminals that are coupled to a communication facility C which may take the form of a comprehensive public telephone system for interconnecting any associated terminals T1–Tn. In accordance with the present system, the terminals T1–Tn operate through the communication facility C to be coupled with a central station D, an embodiment of which is illustrated in some detail.

Generally in accordance with the present development, individual callers use the individual telephone stations T1 through Tn to interface the station D through the communication facility C. Callers may be screened or qualified. Also in accordance herewith, the data of individual callers may be collected, correlated and tested in the station D for processing in accordance with various programs and external data. As a consequence, various objectives are accomplished. For example, a select subset of the callers may be isolated and specifically identified, or related data may be processed, or transactions may be actuated. The possibilities for application of the system are substantial and varied as will be apparent from the exemplary structure and functions as described in detail below.

In one operating process format, the public might be polled with regard to locating the specific purchasers of a defective or dangerous product. Alternatively, the public might be polled with the objective of locating persons susceptible to a specific ailment or disease. Public auctions of unprecedented participation are possible. Legal lotteries are enabled that are interesting, effective and very economical on an individual participant basis. The system also might be employed in various game formats or to automate a promotion or mail-order system, even to the extent of including inventory control as detailed below.

In each functional operating format, the callers may be variously qualified on the basis of entitlement and may be identified for subsequent verification. The callers then may be prompted, either through the interface or externally, to provide appropriate data.

Considering the system of FIG. 1 in somewhat greater detail, it is to be understood that the communication facility C has multiplexing capability for individually coupling the terminals T1–Tn to the central station D on request. In the illustrative embodiment of the system, communication facility C comprises a public telephone network and the individual terminals T1–Tn take the various forms of existing traditional or conventional telephone instruments.

The exemplary telephone terminal T1 is represented in some detail to include a hand piece 10 (microphone and earphone) and a panel 12 provided with a rectangular array of push buttons 14 in the conventional configuration. Of course, the hand piece 10 accommodates analog signals while the panel 12 is a digital apparatus. Generally in accordance herewith, the hand piece 10 serves to manifest analog signals vocally to the caller.

In accordance with conventional telephone practice, alphabetic and numeric designations are provided on the buttons 14. For example, several of the buttons 14 carry three letters along with a decimal digit. Specifically, the button designated with the numeral "2" also carries the letters "A", "B" and "C". In that manner, the buttons 14 encompass the numerals "0–9", two symbols, and the alphabet except for the letters "Q" and "Z". Consequently, the buttons 14 accommodate the entry of decimal data, and to some extent alphabetic data.

4

The buttons 14 designated with symbols "*" and "#", along with the numeral "0", can be used by predetermined assignment to represent the letters "Q" and "Z" or any of a variety of other data or command components. Generally, in accordance herewith, the buttons 14 are employed to formulate digital data at the central station D in various formats determined by the instant specific use and operating format of the system.

Considering the central station D in somewhat greater detail, the communication facility C is coupled to interface a series of processing systems P1 through Pn (FIG. 1, left). Specifically, the communication facility C is connected to the processing systems P1–Pn through an associated series of automatic call distributors AC1 through ACn. Each of the automatic call distributors AC1–ACn accommodates one hundred lines from the communication facility C and accordingly, may accommodate and queue up to 100 calls.

Each of the automatic call distributors AC1–ACn may take various forms as well know in the prior art, functioning to queue incoming calls for connection to a lesser number of lines. In the disclosed embodiment, from each of the call distributors AC1–ACn, fifty lines are connected respectively to the individual data processing systems P1–Pn through an interface 20 and a switch 21. Thus, in the disclosed embodiment, each of the automatic call distributors AC1–ACn can accommodate one hundred lines, fifty of which may be active in association with one of the processing systems P.

The processing systems P1–Pn are similar, therefore, only the processing system P1 is shown in any detail. Collectively, the processing systems P1–Pn are interconnected with a command computer terminal CT, at least one interface terminal IT, at least one printer PR and an audio unit AD. The command terminal CT is separately coupled to the audio unit AD.

As represented, the processing systems P1 through Pn each contain a number of individual function units or processors PR1 through PRn. Although various other configurations and arrangements may be employed, the explanation is facilitated by including a plurality of individual function units as treated in detail below.

Considering the processing system P1, fifty lines from the automatic call distributor AC1 are connected to the interface 20, an exemplary form of which may be a commercially available Centrum 9000 unit. The interface 20 incorporates modems, tone decoders, switching mechanisms, DNIS and ANI capability (call data analyzer 20a) along with voice interface capability. Note that the interface may actually perform analysis on data. However, to preserve the disclosed embodiment manageable, major analysis is explained with reference to processors.

Generally, DNIS capability is a function of the communication facility C (composite telephone system) to provide called terminal digital data indicating the called number. ANI capability is a similar function whereby the digital data indicates the calling number with calling terminal digital signals. Both capabilities are available for use with equipment as the interface 20 and to provide control through the call data analyzer 20a.

Accommodating up to fifty independent calls on separate communication paths to the central station D, the interface 20 is capable of providing analog (voice) signals to prompt each caller. Also accommodated are digital signals including the DNIS and ANI signals. The system contemplates the possibility of utilizing sequences of lines in rotary as well as blocking sequences of lines, the numbers for which com-

5,898,762

5

mand a particular program or operation format of a function unit as disclosed in detail below.

The interface 20 provides the connection of the fifty lines to a switch 21 which is in turn coupled to fifty function units, or processors PR1–PRn. As indicated above, multiple function units, or processors, are described in the disclosed embodiment to facilitate the explanation. Of course, non-parallel techniques and multiplexed operations might well be employed as alternatives. For a similar reason, as disclosed herein, each of the processors PR1–PRn includes memory cells for each of the callers' individual data. Development and compilation of data in such cells according to various operating formats is described below. In the disclosed embodiment, the processors PR1–PRn are connected collectively to the command computer terminal CT (incorporating a CRT display), the interface terminal IT, and the printer PR. Note that the CRT display serves to visually display data regarding select subsets as explained in detail below.

Exemplary detailed structures for the processors PR1–PRn are described below; however, in general, the units may comprise a microcomputer, for example, programmed as suggested above and as disclosed in detail below to accomplish specific operating formats. As an integral part of such formats, a caller may be qualified as belonging to an entitled set of persons or to accommodate specific demographic objectives. Also, callers may be designated both with respect to their significance and their identification. For example, callers may have different significance in a format, depending on the time or sequence of their call. Also, the designation of a caller may be exceedingly important in relation to the caller eventually being isolated as part of a subset, the members of whom must be accurately verified. As described below, the designations may involve multiple elements which may include: random number assignments, encryption techniques, utilization of calling numbers, identification data, sequence of call and so on to facilitate reliable verification. Note that the communication facility C has a customer billing structure B that is interfaced by the system.

On the qualification and designation of callers, the system enters a data accumulation phase during which digital data (formatted at one of the telephone terminals T1–Tn) is processed by one of the processors PR1–PRn. In general, the processing evolves a subset (at least one caller) the members of which may be verified and confirmed.

Either during the data accumulation phase, or after the processing phase to isolate a subset, a distinct operation may involve actuating the interface terminal T1 for direct local communication between the caller and an operator at the terminal T1. Another distinct operation may involve actuation of the printer PR to provide documents in relation to the operating format, as for providing award certificates as for verifying members of an isolated subset. Also, charge slips may be generated containing at least part of the data of a particular transaction.

An appreciation of the philosophical operation of a system in accordance with the present invention may now be enhanced by considering an exemplary operation of the illustrative embodiment of FIG. 1 to isolate a subset of people who are susceptible to a particular disease or infirmity. The exemplary operation might involve a geographical area, as a large city or population center, in which a particular health problem is somewhat acute. For example, a major population center might be polled where coronary artery disease is a significant problem. Accordingly, persons

6

most susceptible to such disease could be identified for corrective recommendations.

People of the population center could be informed of the availability of a service for statistical health analysis. Accordingly, persons interested in their individual statistical situation would be motivated to utilize the service. Specifically, individual callers would use the remote terminals T1–Tn to contact the central station D through the communication facility C and thereby provide personal information that would enable a statistical analysis in relation to existing data so as to isolate and inform (either real time or batch basis) those persons statistically most likely to be in need of corrective measures. In such applications, it may be important that the caller's identity be subject to reliable verification. Other applications or programs also may present a critical need for positively verifiable identification to the extent that credit card numbers and/or personal identification numbers may be employed.

An exemplary operation of the system, with regard to a specific caller, will now be treated referring somewhat concurrently to FIGS. 1, 2 and 3. As indicated above, FIG. 2 indicates a data storage format for a memory cell in an exemplary processor PR and now will be considered with regard to an operating format in which data is composed for a caller. Pursuing the above example, assume the existence of a caller at the remote terminal T1 (telephone number (213) 627-2222) who wishes to pursue health-related information on the basis of statistical analysis. The caller lifts the hand piece 10 and in accordance with conventional techniques actuates the push buttons 14 to call for a select operating format, e.g. telephone number (213) 627-3333 and thereby establish communication through the facility C with a designated function unit in the central station D. Receiving the call signal, the automatic call distributor AC1 associates the called number ((213) 627-3333, rendered available using standard telephone DNIS techniques) through the interface 20 and the switch 21 to attain connection with the specific processor, e.g. the processor PR1 formatting the health-related program. Accordingly, the processor PR1 cooperates with the interface 20 to cue the interface 20 to operate as a voice generator.

The sequence of operations is represented to be initiated in FIG. 3 by the "enter" block 40 which is accordingly followed by a "cue voice generator" command block 42. If the ANI equipment is not employed, the voice generator in the interface 20 formulates speech, a representative form of which might be: "Thank you for participating in the coronary artery disease statistical analysis. Please give us your telephone number by actuating the call buttons on your telephone instrument."

Acting on the instructions, the caller would push the buttons 14 in sequence to indicate his telephone number, e.g. "(213) 627-2222". Alternatively, the interface 20 can accept the calling number ((213) 627-2222) according to its provision by standard ANI equipment of the communication facility C.

The resulting data signals are communicated from the interface unit 20 (FIG. 1) to the processor PR1 for testing the telephone number as valid or entitled. Essentially, the format of a proper number prompts production of a valid or "good" signal. The test is indicated by the block 44 (FIG. 3). If the response is not valid or entitled, for example contains an inappropriate number of digits or has been used to a point of excess, the operation of block 46 is initiated again cuing the voice generator 30 (FIG. 1). The voice generator accordingly instructs the caller, e.g.: "You have not entered a

7

proper telephone number. Please reenter your telephone number by pressing the appropriate call buttons." The caller is then allotted a predetermined period of time to make a proper entry with the consequence that the system moves to a test operation as indicated by the block **48** (FIG. 3). Specifically, block **48** poses the query: "Is the second try good?"

If the caller is again unsuccessful, the system purges the record as indicated by the block **50** and the call is terminated as indicated by the block **52**. In an alternative mode, the processor PR1 may abort the interface and couple the interface terminal IT for direct personal communication with the caller. The interchange would then proceed, person-to-person.

If the caller responds with a proper telephone number, the operation proceeds. Specifically, the system sequences to record the response of the proper telephone number as indicated by the block **45**. That is, the caller's telephone number is recorded in an assigned specific memory cell identified with the caller. The format of the cell C1 is indicated in FIG. 2. The first portion, section **53**, contains a form of identification data, i.e., the caller's telephone number, i.e. "(213) 627-2222".

Note that as explained above, if the second attempt to formulate a proper number is successful, as manifest by the block **48** (FIG. 3), the response is recorded at that stage. In either case, exiting from the block **54** (FIG. 3) invokes the next operation of again queuing the voice generator as indicated by the block **56**.

As an alternative format, if a selective-group polling operation is performed, or callers are otherwise to be cleared for entitlement as mentioned above, a caller may be qualified by providing a "one-time" key number. The processor PR1 may incorporate a look-up table for proper key numbers which numbers may be coded using any of a wide variety of techniques. As a simple illustrative example, the key may comprise a precise number of digits that always total a particular numerical value.

The system proceeds after the caller is qualified. Specifically, the cue to the voice generator of the interface **20** (FIG. 1) as represented by the block **56** produces a request for further information from the caller with further identification data and answer data. For example, the voice generator might request information by stating: "Please use the telephone buttons to indicate initials of your name."

The detailed operation is not represented in FIG. 3 as it is similar to the operation illustrated by the blocks **42** through **54**. However, again, a proper response is registered in the storage cell C1 as illustrated in FIG. 2 by the number "**53**" also registered in the first section **53** of the cell.

The cycle of obtaining digital information from the caller next is repeated with respect to answer data, i.e. specific health data. For example, as illustrated in FIG. 2, the next section **58** in the cell C1 receives an accumulation of health data, including the caller's age, weight, . . . , pulse rate, and so on. Representative digital numbers are illustrated in FIG. 2.

During the course of the telephonic communication, the processor PR1 formulates identification data for the caller specifically including: the chronological sequence of the call, the assigned designation of the call, and a set of acknowledgment digits for the call. Such data identification is registered in the caller's assigned cell C1 in accordance with the format of FIG. 2 being stored in sections **62**, **64** and **66**. Note that the data may be stored in a coded interrelationship. For example, the acknowledgment digits may be

8

related to the call record sequence. In the illustrative example, the chronological order number of the caller is 4951. The acknowledge digits may be derived from the sequence number. For example, as illustrated, a coded relationship may be established by adding "two" to each of the individual record sequence digits. Considering the example numerically:

|  |  |
|---|---|
|  | 4951 |
|  | 2222 |
| Adding without propagated carries: | 6173 |

Note that the confirmation data as acknowledgement digits can be extremely important, as to communicate with an isolated member of a subset. For example, identification could be published or circulated, as by a television broadcast, then respondents checked by use of confirmation data that may be confidential.

Continuing with the above example, the call chronological sequence registered for the caller is 4951 as represented in the section **62** while the acknowledge digits are 6173 as registered in the section **66**. Additionally, the processor PR1 develops an assigned designation number, e.g. designation "4951684", which is registered in the section **64**, the acknowledge code or digits, e.g. 6173, being registered in the section **66**. These values are formulated in accordance with conventional number techniques during the data acquisition phase. With the exemplary numerals formulated, the operation proceeds.

The processor PR1 (FIG. 1) cues the internal memory. That operation is indicated by the block **68** (FIG. 3). Thus, the processor PR1 fetches the call record sequence number, assigns a designation (if not previously assigned), and encodes the sequence number as the acknowledgment digits (if not previously accomplished). These operations are indicated by the block **70** (FIG. 3).

Next, the processor PR1 (FIG. 1) cues the voice generator in the interface **20**, as indicated by the block **72** (FIG. 3) to provide information to the caller. Specifically, for example, the voice generator in the interface **20** (FIG. 1) might signal: "This transaction has been designated by the number 4951684, and is further identified by the acknowledgment digits 6173. Please make a record of these numbers as they will be repeated. Specifically, the designation number is 4951684. The acknowledgment digits are 6173. Please acknowledge this transaction by pressing your telephone buttons to indicate the acknowledge digits 6173." In various applications as those involving security, the order and acknowledgment of callers may be very important. Therefore, data for confirmation associated with the order is important.

The system next proceeds to the test mode as indicated by the block **76** (FIG. 3). If the caller provides the correct acknowledgment digits, the data is confirmed in the record as indicated by the block **80** and is registered in the cell C1 (FIG. 2). Additionally, the voice generator is sequenced as indicated by the block **82** (FIG. 3) to indicate the close of the communication and that the transaction-is terminated as represented by the exit block **84**.

In the event that a caller cannot confirm his acknowledgment digits, as indicated by the block **76**, a repeat operation is performed as indicated respectively by the blocks **86** and **88**. Specifically, the voice generator is queued for a second instructional message. In the event that the second attempt also fails, the data is purged and the call discounted as

9

indicated by block **90** and an exit block **92**. If the second try is successful (test block **88**), as indicated by the block **80**, the record is perfected as indicated above.

As a result of the likelihood of a large number of calls, as described above, data cells in the processors PR1–PRn (FIG. 1) are developed with specific information indicative of a statistical sampling of the populace of concern. The data of that statistical sampling may be self-generating of specific conclusions with respect to a subset of individuals, and/or supplemental data to clearly manifest a significant subset. For example, the data may indicate a significant departure from an assumed normal characteristic. Such data, accumulated from the polling may be considered by logic comparisons in the computer **22** to select the subset of persons who should be isolated.

In addition to the self-generating conclusions available from the received data, the system may involve the introduction of external data. In the physical fitness example, such external data might take the form of national statistical data. In any event, the processing operation usually involves comparison testing which compares caller data from individual memory cells of the processors P1–Pn (FIG. 1) with test data that is supplied through the command terminal CT.

In the above example, members of the public in general were invited to use the service. A number of alternatives exist which might well impact on the statistical analysis. For example, a list may be preserved by a use-rate calculator to implement a consumable key operation. That is, a user is qualified to a specific limited number of uses during a defined interval.

As another example, callers might be restricted to the purchasers of a specific product as a medical apparatus for measuring blood pressures, heart rates, or so on. In such situations, it will be apparent that the statistical data will be somewhat distorted from an average or normal sampling. Clearly, the processors P1–Pn can be programmed to take into account such considerations. In that regard, the processors might also verify identification data proffered by a caller. Such data might take the form of a credit card number or a personal identification number. Methods for verification of such numbers using computer techniques are discussed below.

As indicated above and detailed below, the system can be programmed or formatted for use in a variety of applications. Preliminary to considering exemplary forms of such applications, reference will now be made to FIG. **4** showing an exemplary structural form for the processors PR1–PRn. From the switch **21** (FIG. 1) a pair of communication lines **90** and **91** are indicated in FIG. **4** (top left). The line **90** provides signals from a processing unit **92** while the line **91** provides signals to the processing unit **92** along with other components as represented in FIG. **4**. The separate lines **90** and **92** facilitate explanation.

The processing unit **92** may take the form of a mini-computer programmed to accommodate the functions of various applications, as disclosed in detail below. As indicated above, the system may utilize a plurality of independent function units or processing units, e.g., processing unit **92**, operating in a somewhat parallel configuration, or alternatively, a limited number of processors may be driven sequentially to accommodate the functional operations as described.

The input line **91** (upper left) is connected specifically to a qualification unit **93**, a sequencer **94** and a designation unit **96**, as well as the processing unit **92** as indicated above. The qualification unit qualifies access from a remote terminal

10

T1–Tn to the processing unit **92** as described in detail below. In accordance with various applications or operating formats, the qualification unit **93**, the sequencer **94** and the designation unit **96** operate preliminarily with respect to individual callers. Generally, these units qualify or test callers for entitlement, develop a sequence-of-calls record and provide forms of designations for callers that may be authenticated. As described in detail below, the units function in sequence to accomplish such operations and accordingly are each individually connected to the processing unit **92** and a buffer storage **97**. Essentially, the buffer storage **97** is illustrated separately from the processing unit **92** along with the unit **93**, sequencer **94**, unit **96**, and so on, again in order to facilitate the explanation. Similarly illustrated are a memory **98** (with cells C1–Cn), a look-up table **103** and a clock **105**.

Considering the processor of FIG. **4** in further detail, the qualification unit **93** (upper left) is connected to a look-up table **99** and a use-rate calculator **100**. The designation unit **96** (top center) is connected to a random number generator **101** and an encryptor **102**.

In view of the above structural description of the system, consideration will now be given to certain specific applications in relation to the operation of the system. In that regard, the operation of the system will next be considered to automate a mail-order facility.

Assume that a caller at a terminal T1 (FIG. 1) dials a specific number to identify a mail order interface with the system of FIG. 1. For example, assume the telephone number "(213) 627-4444" for such an interface. Accordingly the caller dials the number at the remote terminal T1. As a result, the communication facility C couples the terminal T1 through the automatic call distributor AC1, the interface **20** and the switch **21** to a select processor PR1 identified and programmed for a mail-order operating format. Note that the communication facility C provides the dialed number ("(213) 627-4444") to the processing system P1 through well known telephonic equipment DNIS. Accordingly, a program is selected to execute the mail order interface.

As a preliminary action, a voice responder in the interface **20** might be cued by the processing unit to identify the mail-order house and indicate that the order will be taken by computer. Either before or after qualification, the caller might be advised that if he prefers to communicate directly with a person, or needs such contact at any point in the communication, he may accomplish it simply by pushing the asterisk button (*) at the terminal T1. Such action forms an abort signal that is detected by the processing unit **92** to transfer the communication to the interface terminal IT (FIG. 1). Alternatively, the customer may be asked (by voice cue) to provide detailed information as name, address, etc. which is recorded for later processing.

After the preliminary information is supplied to a caller, the qualification phase is initiated. For example, the interface **20** might actuate the terminal T1 to announce: "Please indicate the type of credit card you will use for your purchase by pushing the button number 'one' for Mastercharge, 'two' for . . .

The caller's response, indicating a specific credit card, will be stored in a data cell; however, the data is developed initially in the buffer **97**. The format and data for the present example (in the buffer **97**) will be explained with reference to a storage block format **104** as illustrated in FIG. **5**. The first data block **130** accordingly registers a digit to indicate the card that will be used to support the caller's purchase.

Using voice prompt, the interface **20** next instructs the caller to use the telephone buttons to indicate his credit card

5,898,762

11

number and the expiration date of the card. That data is stored in the register **104**, specifically in the blocks **132** and **134** as illustrated in FIG. **5**.

Next, the caller is asked for his customer number, as it may appear on his catalog. That number is stored in a block **136** of the block format register **104**. Note that the caller may not be identified in the files of the mail-order house and in that event, the operation may be shifted to a manual operation to be continued through the interface terminal IT (FIG. **1**) as explained above. For a television-initiated mail-order transaction, other numerical codes might be employed as to key into broadcast schedules. For example, a code might be used to indicate program times and thereby enable evaluation of the productivity of such program times. Such operation may be performed during the designation phase as described below.

To continue with the explanation of the automated format, assume that the customer has a file customer number and that it is stored in the block format register **104** along with his credit card number and expiration date. From that location, the data is checked by the qualification unit **93** (FIG. **4**) for propriety as part of the test or qualification phase of operation. The check or test is in two stages and both are performed during an interval designated t**1**, the qualification unit **93** operating under control of the processing unit **92**.

First, the data is verified as representing valid and proper data formats for the customer's number, the credit card number and expiration date. The second operation involves consulting a so-called negative list to assure that the identified card and customer's number have not been cancelled, as for example in the case of credit cards that have been lost or stolen. Detailed structure for such tests is described in the parent case from which this case continues and may be incorporated in the qualification unit **93**.

With the successful completion and verification of the preliminary data in the block format register **104**, the qualification phase of operation is concluded and the system next interfaces with the caller to acquire and process data for a specific order of merchandise. Note that in the mail-order operating format, the sequence of the call is not normally significant. However, the sequencer **94** may log the time during a period t**2** if deemed worthwhile.

Somewhat as described above in relation to the initial operating format (health poll), the voice generator in the interface **20** prompts the caller through a series of exchanges that load the storage block format register **104** with a merchandise order. Thus, as purchase items are confirmed, the register **104** is loaded as exemplified by the blocks **140** and **142**. The interchange continues until the customer indicates he does not wish to order any additional items. The system then operates the designation unit **96** (FIG. **4**) during the interval t**3** to develop and announce the acknowledgement digits as stored in the block **144** (FIG. **5**). The acknowledgement digits serve to identify the order both for the caller and the mail-order house. Accordingly, tracing is facilitated. The data (FIG. **5**) is then transferred from the buffer **97** (FIG. **4**) to a select memory cell C**1**–Cn.

During the next interval t**4**, the processing unit **92** (FIG. **4**) isolates data of the cells C**1**–Cn to facilitate the mail-order process. In that regard, the processor **92** may incorporate structure and processing techniques as disclosed in the parent case.

Of the wide variety of other operating formats and applications in accordance herewith, further examples will now be described with reference to the systems of FIGS. **1** and **4**. However, from a consideration of the operating formats

12

treated below, it will be apparent that certain structural elements have reoccurring significance in the combination. Specifically, such elements include the structures: (1) utilizing the called number to select a specific operating format, (2) for screening or selecting callers who will be accepted based on various criteria, (3) for designating callers in a manner to enable subsequent positive identification and (4) various processing aspects of the data manipulations including the provision of at least a portion of certain ID data provided directly from the telephone apparatus. With respect to the data processing, distinctive elemental features include the utilization of external data not available during the interval of gathering data, the utilization of an interrelationship between the composite data collected during a data acquisition period, and the operation of utilizing time or sequence of callers to accomplish a subset.

As the next illustrative operating format, an instant lottery system will be described. Accordingly, assume the existence of a legalized state lottery accommodated by the telephone system utilizing a pay-to-dial number ("(213) 976-xxxx") and restricted to a limited number of uses for defined intervals of time. For example, a person might be entitled to play the lottery a limited number of times or to the extent of a limited dollar value during a predetermined interval.

From the terminal T**1** (FIG. **1**) the caller would actuate the push buttons **14** to establish contact with the processing system P**1** coupling would be through the communication facility C, the automatic call distributor AC**1**, the interface **20** and the switch **21** as described in detail above. The initial operation then involves qualification of the caller to participate in the instant winner lottery. Again, ANI or caller interface techniques may be employed. If the caller is involved, the interface **20** is actuated by the qualification unit **93** during the operating interval t**1** to instruct the caller: "Please key in your telephone calling number". As indicated above, an alternative involves the system simply registering the calling number on the basis of its provision by ANI equipment.

In any event, after the caller's telephone number is registered, the instruction is given: "Participation in instant winner lottery is for persons over twenty-one years of age. Accordingly, please key in the year of your birth". A driver's license or credit card number may be similarly registered to confirm age. Alternatively, the combination of telephone number and date of birth could be used. In any event, the caller's data is registered and the qualification unit **93** then functions to test the data as provided. Specifically, the caller's telephone number is checked in a look-up table **99** to determine whether or not it is a proper and currently valid number for use in the lottery. Concurrently, the number is checked by the use-rate calculator to determine the number of times it has been used in excess of a predetermined number of calls or dollar value to participate in the lottery during a current interval of monitoring.

If the data indicates a qualified caller, the system proceeds to the next phase of designating the transaction. Note that the sequence is not significant in this operating format with the consequence that the interval t**2** and the operation of the sequencer **94** may be bypassed. Rather, the designation unit **96** operates during the interval t**3** to provide the caller with a designation for the current transaction and if applicable, updates the file as to current use or dollar value remaining for the caller's use. As explained above, the random generator **101** with or without the encryptor **102** may be employed to create an identification number which may include an encrypted form of the caller's telephone number. Accordingly, data for the transaction is established in the

5,898,762

13

buffer 97 then set in a cell of the memory 98 (FIG. 4). Specifically, the completed data cell format might be as follows: Telephone No.—Birth Year—Designation—Random No.

The system next functions to generate the random number as indicated above which will then be tested against a series of other numbers to determine whether or not the caller is a winner. In that regard, elements in the processing unit 92 which accomplish the operation are illustrated in FIG. 6 which will now be considered in detail.

A random number generator 160 functions on command to provide a three-digit number. With the consummation of a call, the random number generator 160 is actuated to provide the caller's random number in a selected caller cell 162. From that location, the caller's random number is compared with numbers from a register 164 by a comparator 166. The numbers in the register 164 were previously passed through a gate 174 from the generator 160. In the event of coincidence, the comparator provides an output "yes" signal to a line 168. Conversely, the failure of coincidence prompts the comparator 166 to provide a "no" output to a line 170. Essentially, a "yes" indicates a win while a "no" indicates the caller has lost.

The elements of FIG. 6 provide a random operating format to determine winners on a somewhat statistical basis; however, the system increases the probability with the passage of time when no win occurs. In that regard, at the outset of an operating cycle, the random number generator 160 provides a random number that is passed through the gate 174 to the register 164. In the exemplary format, a three-digit number would be provided. At that stage, the caller's random number, from the cell 162, would be compared with the single number in the register 164 by the comparator 166. However, with the passage of time, calls are tallied or time is metered by a counter 178. Accordingly, upon the attainment of a predetermined count, the gate 174 is again qualified to enter another number in the register 164. Accordingly, an increasing set of numbers are held in the register 164 for comparison with each caller's number. Of course, the more numbers in the register 164, the higher probability of a caller winning and that relationship depends upon the duration or number of calls since the last winner.

Either a win or a loss as indicated within the processing unit 92 (FIG. 4) prompts the interface to respond appropriately to the caller announcing his results. If there is a win, the designation may be reinforced and additional identification may be taken as explained above. Of course, if the prize simply involves a credit on the caller's telephone bill or his credit account, identification and designation become less critical considerations.

In the event of substantial awards to be claimed, the processing system P1 (FIG. 1) may actuate the printer PR to produce a positive identification of the winner, which document may be redeemed only by the caller providing the assigned designation along with confirmation of his identification data.

Generally in relation to awards, the processing unit 92 may also utilize a random number format for determining the significance of awards. That is, a random number may be actuated to provide numerals from one through twenty, for example, the magnitude of the number generated for a caller indicating the significance of his award. Normally such information would be provided to the caller and registered in his memory cell.

With respect to memory cells generally, it is to be noted that actuated memory cells may be cleared for callers who

14

are not winners. Accordingly, a limited number of memory cells store the subset of winners for subsequent confirmation processing and so on.

As another operating process format in accordance with the present invention, consider an auction sale. As disclosed herein, the auction format is associated with television as, for example, in the form of a cable channel for dedicated use during an interval of an auction sale.

Preliminarily, in accordance with the disclosed exemplary format, persons wishing to participate in the auction sale would make preliminary arrangements involving utilization of the system to establish authorization data for qualified bidders in cells C1–Cn of the memory 98 (FIG. 4). In an alternative format, the bidders could simply be qualified immediately before bidding, as on the basis of a charge-card number or other identification.

Generally, it is contemplated that callers are coupled into the system only during the bidding on specific items of merchandise. Accordingly, some prequalification may be desirable to facilitate the rapid accumulation of a bidding group with the introduction of a unit of merchandise.

In accordance with the disclosed format, an auctioneer conducts the sale in a somewhat traditional manner, recognizing that he is interfacing a relatively large audience through the system of the present invention and with a television connection. Specifically, the auctioneer is cued as to audience reaction by a monitor incorporated in the command computer terminal CT (FIG. 1). Essentially, the auctioneer is given an abstract or summary of the relative bidding as the auction progresses. In one format, the caller sees the auction on a television receiver. That is, the monitor may be covered by a television camera to inform the audience and particularly interested bidders. Consider the detailed steps of the operation.

As the auctioneer announces the next item for sale, it is televised to potentially interested bidders. In addition to being informed of the merchandise, potential bidders might also be reminded of the telephone number for participating in the auction. Accordingly, any interested person at a remote terminal T1–Tn may dial the auction number and obtain access to the processing systems P1–Pn. The caller would have a television set available, tuned for example to a cable channel.

Any preliminary qualification as indicated above will then be performed along with any appropriate designation. With regard to the designation, unless callers are identified as part of the qualification step, the designation unit 96 (FIG. 4) assigns a limited-digit number to individual callers for use by the auctioneer interfacing the command computer and terminal CT. Further designation and sequencing as disclosed herein also constitute part of the process. To the extent that qualification and designation operations may be performed, the operations are performed as described above with reference to FIG. 4 by the qualification unit 93 and the designation unit 96. Of course, any of the safeguards and limitations as described herein may be employed as deemed appropriate for an auction format.

After the preliminaries, the auctioneer initiates the bidding with respect to a particular item that is observed by the callers on a television receiver as through a cable channel. Note that the audio may be variously coordinated through the telephone communication facility C and the audio channel of the caller's television. In a simple format, after an introductory phase, communication to callers with respect to the bidding is provided through the television link. Alternatively, the audio unit AD (FIG. 1) may be employed.

5,898,762

15

Essentially, the auctioneer initiates the bidding by stating an initial value for the opening bid. Callers are invited to bid by actuating the push buttons **14** (FIG. **1**). For example, the auctioneer may invite an initial bid of one hundred dollars asking callers to so bid by entering an asterisk (*) by punching the button so designated. In accordance with one operating format, cells in the memory **98** (FIG. **4**) are actuated to register the bidding number in identified relationship with several calls. Note that although a record may be desirable, it is not usually necessary to record all bids, particularly at initial bidding figures. In any event, the individual processing units, e.g. unit **92** in individual processors PR1–PRn are interconnected (FIG. **1**) and operate to select the final and key bids.

After attaining the initial bid, the auctioneer may invite further bidding by seeking a bid of two hundred dollars or any bid. Such a bid might be accomplished either by punching the asterisk button to attain the solicited bid, or by using number buttons to enter a different bid, e.g. two hundred fifty by buttons "2", 5"and "0". Again, cells of the memory **98** are actuated to record select bids (sequence) at the higher value.

The status of the bidding is presented to the auctioneer by the monitor of the command computer terminal CT (FIG. **1**). Specifically, the auctioneer is provided an indication of the number of bidders at each level. If a sizeable number of callers bid at a specific value, the auctioneer may wish to advance the price significantly for the next round of bidding. Thus, the auctioneer proceeds until a small group of remaining callers are addressed. Note that the display of the command terminal CT (FIG. **1**) may also inform the auctioneer of fresh bidders.

As the selection process proceeds, signals from the clock CL (FIG. **1**) are introduced to indicate the sequence of bidders. For example, assume the bidding has proceeded to a stage where only three bidders remain active. The auctioneer is informed by the command terminal CT of the order in which the callers made their bids. The sequence is also of record in the cells of the memory **78** (FIG. **4**) to indicate the sequence in the event that the final bid involves more than one caller. Of course, the first caller to respond with a bid would have priority in the purchase.

Normally at the conclusion of the bidding on a particular item, the contents of the cells in the memory **98** would be purged with only the final bidders being held in general memory within the processing unit **92**. Of course, it is important to maintain a record of back-up bidders in the event the sale is not consummated with respect to the first of the highest bidders. That is, a subset of the highest bidders is preserved for each item of merchandise in the event that the highest bidder fails to qualify or the sale otherwise cannot be consummated. Of course, a distinct advantage of the system is the ability to accommodate a vast auction participation group for items of substantial value and as a consequence the distillation of a subset of callers is exceedingly valuable information.

To consider another operating format in association with the television media, a system will now be described whereby television viewers participate on a real-time basis in a game show for prizes. The ability to involve television viewers in a program has the potential of expanding program interest along with the expanded participation.

Game shows in accordance herewith may take any of a wide variety of forms as several well known programs in which studio contestants compete for prizes. In utilizing the system of the present invention to involve remote

16

participants, it may be desirable to preliminarily qualify and designate callers as explained above. Specifically, prior to participating in an actual game show, interested participants interface the system as depicted in FIG. **1**, and in the course of an exchange as described above, the qualification unit **93** and the designation unit **96** cooperate with the processing unit **92** to accomplish preliminary data on potential participants in cells of the memory **96**.

Various games will involve different screening processes and clearances. For example, a child's television game format may require parental clearance and in that regard written communication may be required for approvals. Such approval may require the assignment of a personal identification number to the child player as qualifying identification data.

As explained above, clearances may be perfected through the look-up table **99** (FIG. **4**) in association with the qualification unit **93** or approvals through a consumable key step may be extended to incorporate functions of the processing unit **92** in association with the memory **98**. For example, if qualification simply involves a check-off operation, the look-up table **99** will normally be employed. However, in the case of preregistration for a participant, as in the case of the auction sale, the memory **98** is involved with the qualification unit **93** through the processing unit **92** to establish a data cell C1–Cn for each qualified participant. Thus, each potential participant to be qualified interfaces with the processing unit **92** during a preliminary interval of operation to provide data in one of the cells Cl-CN to facilitate qualification for participation during a real-time game show.

At the time of the show, callers are qualified simply by reference to their assigned memory cell data for a verification. Thereafter, the caller's exchange information to supplement their data as with respect to the play which follows. Specifically for example, a caller might select a studio audience participant with whom the caller is to be allied. The interface operation may be essentially as described above wherein a voice generator in the interface **20** (FIG. **1**) provides signals which activate the remote telephone unit to speak the instruction: "If you wish to play with Player No. 1, please push button No. 1; if you wish to play with Player No. 2, please push button No. 2 . . . and so on". The caller may also be instructed to indicate the extent of a wager. For example, "Push the number button indicating the points you wish to risk".

The participant data is stored in an assigned cell of the memory **98** (FIG. **4**) for the caller and as the game proceeds, the processing unit **92** tallies the caller's score. Scores are interrelated between individual processing units to actuate the terminal CT. Thus, individual accounting occurs for each of the calling participants on an on-line basis dependent upon the success of the studio players and their association with the callers. On-going accounting data may be provided at intervals or real time by the recorded voice to each contestant.

According to the described format, after an interval of play, the processing units, as the unit **92** (FIG. **4**), operate to isolate a subset of caller-players who have amassed the highest scores. Of course, various arrangements may be provided for awarding prizes to the select subset of winning callers.

The above format involves a real-time game show with an on-line operating format. A somewhat similar format involves nonreal-time operation and in that sense, callers may interface with the system of the present invention

5,898,762

| 17 | 18 |

before and after the show; however, not primarily during the show. Such a show might involve a quiz for callers based on their ability to perceive and remember occurrences within the show. Preregistration may be employed, however, is not essential. Rather, callers may call after the broad-cast of a program. In that event, sequence or time clocking may be very important to limit or control individual interfaces to a specific time or geographic "window". That is, as suggested above, allocation-routing equipment and techniques may be employed in various of the formats to window callers. With the system, callers are screened or qualified at the time of a call, identified in a particular calling sequence, designated for identification and quiz answers are given for subsequent processing. Alternatively, players could participate by providing their credit card for billing or be billed through the "pay-to-dial" network. Consider an exemplary format.

A key to participation in the game show may involve the purchase of a particular product. For example, a person desiring to participate may purchase a product which carries a concealed key number. The number serves as a caller's key to participation in the game show.

In accordance with the disclosed operating format, after watching the broadcast of a television show (possibly a serial episode) the participant actuates the push buttons 14 at one of the remote terminals T1–Tn to accomplish an interface communication with the select operating format. For example, the caller may actuate the buttons 14 for the station number "277-7777" which identifies the game format of current description.

Assume responsive operation of the communication facil-ity C to couple the caller through the automatic call distributor AC1 to the interface 20. Upon establishing a connection, the interface 20 receives the caller's telephone number through ANI equipment and a data cell in the memory 98 (FIG. 4) is assigned to the caller. Specifically, for example, associative coupling is provided for the caller through the switch 21 (FIG. 1) to the processor PR1 containing the memory 98 (FIG. 4) and a cell C2 assigned to the caller. A block format 200 is illustrated in FIG. 7 indicating the data that is developed in the cell C2. At the outset, the caller's telephone number is stored in a section 201 followed by uses/month in section 202.

Next, the caller is greeted and requested to give the key number entitling him to participate in the game show. The instruction constitutes an initial action to take place in an interval of qualification during the time t1. The caller actuates the buttons 14 providing digital representations to the qualification unit 93 (FIG. 4) and the look-up table 99 is consulted. Note that the table 99 may be a large, shared unit that tabulates each of the key numbers and accounts for their use. If the caller has identified a proper key number, the process proceeds and the key number is accounted, i.e. incremented or decremented to the limit of use if any. Alternatively, a repeat information operation may be requested as described in detail above.

As a further check during the qualification stage, the use-rate calculator 100 may function to determine whether or not an excessive number of calls have originated from the designated number. Thus, consideration involves calls or value with reference to a predetermined period of time. Again, a shared calculator may be used or addressing may obtain selectivity on the basis of calling numbers. If a large number of calls have originated from a single telephone terminal, a fraudulent situation may be suggested. Assuming no such indication occurs, the number of uses is registered in a section 200 (FIG. 7) and the operation proceeds from the interval t1 to interval t2.

During the interval t2, the sequencer 94 registers the precise time of the call in the buffer storage 97, specifically in a section 204 as illustrated in FIG. 7. With the entry of such data, the system passes from the operating interval t2 to t3.

The caller is next asked to identify himself in some specific manner. For example, the caller may simply be asked to provide the year of his birth. Alternatively, somewhat comprehensive information may be taken as in form of drivers' license numbers, social security numbers and so on. Of course, such data may be employed for subsequent identification of the caller and, accordingly, is registered in the buffer storage 97 (FIG. 4). Specifically, identification information is registered in section 206 of the block 200 as shown in FIG. 7.

In addition to receiving identification information from a caller, the system assigns a designation to the caller. Specifically, the random number generator 101 (FIG. 4) provides a number which may be encrypted along with other identification data as the caller's personal identification to provide a numerical designation that is registered in the storage 97. Specifically, the designation is stored in a section 208 as illustrated in FIG. 7. With the designation operation complete, the interval t3 terminates initiating the data accumulation phase which occurs during an operating interval t4.

At this juncture, operating elements within the processing unit 92 will be considered in relation to an explanation of the manner in which select questions are provided to a caller and his answers received and recorded for subsequent processing to determine winners.

Preliminarily, reference will be made to FIG. 8 showing elements involved in the operating format which are contained in the processing unit 92 (FIG. 4) in association with the memory 98. To avoid confusion, the elements identified in FIG. 8 are designated by fresh numerals.

To accommodate the exemplary operating format, a dramatic program might be recorded preparatory to the television broadcast. A substantial number of questions would then be formulated based on the dramatic program. For example, "How many people were present when the will was read?"

It is contemplated that the dramatic program would be broadcast to different geographical segments of the country during different time intervals. To accommodate the different time intervals, it is proposed to utilize different questions for each geographic segment. That is, the basic format can remain the same, only the questions change by time zone to avoid study and collaboration on questions as a result of time shifts. A question propounded to a Chicago caller should not be repeated to a Los Angeles caller. In any event, callers might be given three questions randomly drawn from a pool serving one geographic segment and three questions drawn from a different pool serving another geographic segment.

The signals for prompting a voice generator are registered in memory sections MS1 through MSn. Each of the memory sections MS1–MSn is served by an address input AI1–AIn respectively. Similarly, the address inputs AI1–AIn are instructed by random number generators NG1–NGn, in turn actuated by decoders DE1–DEn. Consider the operating sequence of the memory MS1 as an example.

The decoder DE1 is responsive to telephone calling numbers (provided by ANI equipment) indicative of a particular geographic area. Note, for example, that area code numbers afford an effective geographic classification of callers which is very useful in many formats or processes of statistical analysis in accordance herewith. Note that geo-

5,898,762

19    20

graphic (or other) classification in accordance herewith is also accomplished by the called numbers provided. Each of several television stations would solicit calls for different numbers as a result, either by DNIS or call channeling. Select processors would be reached through the interface units, e.g. interface 20 FIG. 1. In operation, the decoder DE1 determines a call is from a specific geographic area and accordingly provides a signal to actuate the random number generator NG1. As a consequence, the random number generator NG1 provides a series of three random numbers in the form of addresses for the memory MS1. That is, the addresses may simply comprise three alphanumeric bits supplied to the address input AI1 to prompt the provision of three sets of voice generator signals for announcing the three questions in sequence. For example, the first question might be as suggested above: "Push the button on your telephone for the number of persons present in the room when the will was read".

The voice generator signals are supplied from the memory MS1 (within the processing unit 92, FIG. 4) to the interface 20 (FIG. 1) which generates audio signals to actuate the caller's hand piece 10. Accordingly, the caller is instructed to answer three questions, the responses being recorded in a section 210 of the data block 200 (FIG. 7). Note that the clock 105 (FIG. 4) may be utilized to limit the response period allowed each caller.

As indicated above, to accommodate broadcast of the program in a different time slot for a different geographic area, the decoder DEn (FIG. 8) actuates the random number generator NGn to address the memory MSn to provide three different questions as a result of a random selection. Accordingly, within a time or times (perhaps limited and offset) after the conclusion of the program, a substantial number of callers are accounted for in cells of the memory 98 and similar units of the composite system. The cells indicate sequences of calling and also may contain billing data where appropriate. That is, pay-to-dial operations avoid the need for billing, yet it may still be made of record.

Subsequent to the data accumulation phase of operation, the processing unit 92 (and its equivalents) is actuated during an off-line processing interval to isolate the subset of callers correctly responding to the questions. In accordance with one format, the subset of successful callers may be reduced to a sub-subset as by a random number "draw" to define a group of significant winners. That is, a random number generator may be employed as explained above.

As an alternative to subsequent processing, the system may inform callers of their success during the course of the interface telephone call. That is, callers might simply be informed by cuing the voice generator: "Your answers are correct and in accordance with the program game, you will now be entered in the sweepstakes draw for the prize . . . " Thus, the format defines a subset then further selects a sub-subset of winners. In any of the various formats, the status of the analysis can be televised by selecting a camera focused on the interface terminal IT.

Still another operating format for the system takes the form of polling operations to determine opinion or facts. An illustrative form of the format is disclosed below again in association with a television broadcast.

Generally, the illustrative polling format is contemplated in association with a television broadcast addressing a matter of current interest as, for example, a political issue or election. A master of ceremonies propounds questions to a viewing audience, many of whom are on-line through an interface of a system of the present invention. The master of

ceremonies or commentator instructs the callers who are regulated and controlled by the system of the present invention to provide digital data which the system processes to inform the commentator as with regard to subsets of callers. For example, the commentator may be statistically informed as to the numbers of callers holding specific views. Consider a specific exemplary operating format.

Assume the existence of a system in accordance with the present invention installed for use in association with a television broadcasting facility. Of course, various previous arrangements could be involved; however, according to one arrangement a commentator simply invites members of the viewing audience to call a specific number and express their views with respect to a specific issue. Callers located at terminals T1–Tn (FIG. 1) activate the terminals to accomplish an interface with one of the processing systems P1–Pn as explained above. Note that the processor (or the interface 20 may involve operation of the qualification unit 93 (FIG. 4) to prevent callers from loading the poll. That is, to prevent multiple calls from a single terminal that would distort a poll, the qualification unit 93 registers calls in association with the use-rate calculator 100. Interfacing a specific processor, callers are screened by the qualification unit 93 (FIG. 4). In such a poll, it may be important to control the sampling group on a statistical basis. For example, it may be desirable to limit callers from each of several geographic areas. Accordingly, by the use of ANI equipment, the caller's telephone number is provided to the qualification unit 93 during the preliminary interval ti, and a determination is performed with regard to the number of involved callers from the geographic area using the look-up table 99. On attaining a full quota from a specific area, a subsequent caller may be informed that the lines are full. Alternatively, the caller may be requested to provide his telephone number for screening in the event ANI equipment is not available.

The caller may be requested to provide additional information so as to poll a balanced group. For example, a caller might be asked questions concerning age, political registration and so on by prompting the interface unit 20 to pose audio questions and testing the digital results through the qualification unit 93 as with reference to the look-up table 99.

As indicated above, in the event that the broadcast television program is one of a series, it may be desirable to limit the extent of participation over a period of several programs. Accordingly, the use-rate calculator 100 (FIG. 4) may be employed in association with the qualification unit 93. That is, if a calling number has participated in a prior poll, it may be denied access for a subsequent poll or its data not counted. Such operation would involve the use-rate calculator 100 in association with the qualification unit 93 performing logic tests to actuate the voice generator of the interface 20 for providing an appropriate interchange with a caller.

With the screening or qualification of a select group of callers, the sequencer 94 (FIG. 4) may or may not be involved to identify the order of callers. Also, the designation unit 96 may or may not be involved in view of the fact that for many polls there is little interest in subsequently identifying callers.

In the poll-format operation of the system, it is important to provide a capability of defining select intervals during which callers may provide data. In one arrangement, with the consummation of a communication interface between a caller and a processor unit, the audio of the television broadcast is keyed from the audio unit AD through the switch 21 (FIG. 1) for communication to the caller.

5,898,762

## 21

With a multiplicity of callers in interface relationship with the processors PR1–PRn as function units, a polling question is stated, for example: "If you favor expanded trade with . . . at the tone press button one; if you do not, press button two".

To control the interval of polling, the command computer terminal CT (FIG. 1) is actuated to enable the callers timely access to the processors.

At the expiration of a polling interval, the interfaces may be terminated or additional questions may be propounded. In any event, subsequent to the data-gathering phase, the bulk data is supplied to the command computer terminal CT incorporating computing facility to isolate subsets for communication by the broadcast. Accordingly, an effective on-line poll can be conducted with statistical sampling control and prompt display of responses.

As explained above, the arrangement of the function unit (or units) may be variously embodied in a single processor or many processors, depending on various considerations as time sharing, multiplexing, paralleling and so on. The systems as described above embody the components bulked together in one location. However, components of the system could be spaced apart geographically, using dedicated lines or polling techniques. An illustrative embodiment is shown in FIG. 9.

Call distributors CD1–CDn are at different geographic locations along with associated interface units IA1–IAn and IB1–IBn. Each of the interface units, as unit IA1 is coupled to a central processor 251 as indicated by lines 252, 254, 256 and 258. Each of the lines may take the form of a dedicated telephone line or a polling telephonic coupling.

In the operation of the system of FIG. 9, the call distributors CD are coupled to a telephonic communication system and accordingly allow the interface units I to provide interface communication between the central processing unit 251 and a multitude of remote terminals T1–Tn as illustrated in FIG. 1. With data accumulated in the cells, it may be variously down loaded as to a central processing station. Thus, the distributed-component system is capable of executing the various formats as explained above with reference to the illustrative structure.

In view of the above explanation of exemplary systems, it will be appreciated that other embodiments of the present invention may be employed in many applications to accumulate statistical data, process such data, and define subsets of callers of concern. While certain exemplary operations have been stated herein, and certain detailed structures have been disclosed, the appropriate scope hereof is deemed to be in accordance with the claims as set forth below.

What is claimed is:

1. An analysis control system for use with a communication facility including remote terminals for individual callers, wherein each of said remote terminals comprises voice communication means and digital input means in the form of an array of buttons for providing data, said analysis control system comprising:

an interface structure coupled to said communication facility to interface said remote terminals for voice and digital communication, and including means to provide caller data signals representative of data relating to said individual callers developed by said remote terminals;

voice generator structure coupled through said interface structure for actuating said remote terminals as to provide vocal operating instructions to said individual callers;

record structure, including memory and control means, connected to receive said caller data signals from said

## 22

interface structure for accessing a file and storing digital caller data relating to said individual callers including said individual callers' credit card numbers provided from said digital input means through said interface structure;

credit verification structure to verify on-line said credit card numbers; and

qualification structure controlled by said record structure for testing said caller data signals provided by said individual callers to specify a consumable participation key for restricting the extent of access to said system by said individual callers to limit data stored for said individual callers on the basis of entitlement.

2. An analysis control system according to claim 1, wherein said qualification structure restricts said extent of access by each of said individual callers to a single use entitlement.

3. An analysis control system according to claim 1, wherein said consumable participation key includes a check digit wherein said check digit is tested by said qualification structure.

4. An analysis control system according to claim 1, wherein said communication facility further provides called terminal DNIS signals to identify a specific operating format from a plurality of operating formats.

5. An analysis control system according to claim 4, wherein said plurality of formats includes at least two formats which differ only in that in one format winners are selected during the course of the interface telephone call and in the other format winners are selected during an off-line interval after the telephone call.

6. An analysis control system according to claim 4, wherein said plurality of formats includes at least two merchandising formats which differ only in that one format includes testing by the qualification structure of a personal identification number (PIN) for restricting the extent of access to the system.

7. An analysis control system according to claim 4, wherein said plurality of formats includes at least two merchandising formats which differ only in that in one format caller data includes credit card data for billing and in the other format said system is accessed by a pay to dial network.

8. An analysis control system according to claim 4, wherein at least one of said formats receives caller data signals including personal identifying information.

9. An analysis control system according to claim 8, wherein said personal identifying data includes the callers age.

10. An analysis control system according to claim 8, wherein said personal identifying data includes the callers weight.

11. An analysis control system according to claim 8, wherein said personal identifying data includes the callers telephone number.

12. An analysis control system for use with a communication facility according to claim 1, wherein said specific individual caller digitally enters a type of credit card used.

13. An analysis control system for use with a communication facility according to claim 1, wherein said specific individual caller digitally enters an expiration date of said credit card.

14. An analysis control system for use with a communication facility according to claim 1, wherein said qualification structure includes check-off means for restricting said extent of access to at least a portion of said system by said respective one of said individual callers to a specific number of accesses.

23

**15**. An analysis control system for use with a communication facility according to claim **1** wherein said interface structure receives calling digital data automatically provided by said communication facility indicative of a caller's telephone number.

**16**. An analysis control system for use with a communication facility according to claim **15** wherein the calling digital data controls at least certain aspects of said interface based on at least a portion of said caller's telephone number.

**17**. An analysis control system for use in a mail order facility or the like, said analysis control system for use with a communication facility including remote terminals for individual callers, wherein each of said remote terminals comprises voice communication means and digital input means in the form of an array of buttons for providing data, comprising:

interface structure coupled to said communication facility to interface said remote terminals for voice and digital communication and including means to provide answer data signals provided by said individual callers from said remote terminals including signals indicative of an individual caller's customer number and credit card number;

credit verification structure to verify said individual caller's customer number and credit card number to determine said individual caller's credit;

record structure including memory and control means connected to said interface structure to receive and store data provided by said individual callers;

acknowledgment generator structure for providing a computer generated acknowledgement number to said individual callers;

switching structure for transferring certain of said individual callers to a live operator; and

central processing station coupled to said record structure to receive data on said individual callers.

**18**. An analysis control system according to claim **17**, further comprising:

consumable key test structure for qualifying said individual callers with respect to said customer number, said customer number indicative of a consumable key number.

**19**. An analysis control system according to claim **18**, wherein said consumable key number is limited to a one time use only.

**20**. An analysis control system according to claim **17**, wherein an individual caller provides an expiration date for said credit card number.

**21**. An analysis control system according to claim **20**, wherein said credit verification structure verifies said expiration date.

**22**. An analysis control system according to claim **17**, further comprising:

a sequencer for developing sequence data signals as identification data to indicate the calling order sequence of said individual callers.

**23**. An analysis control system according to claim **17**, wherein said credit verification structure verifies said individual caller's customer number and credit card number online.

**24**. An analysis control system according to claim **17**, wherein said data stored in said record structure includes at least audio data indicative of a name or address for an individual caller for subsequent processing.

**25**. An analysis control system according to claim **17**, wherein said answer data signals include signals indicative of merchandise order data.

24

**26**. An analysis control system according to claim **25**, wherein said merchandise order data is indicative of an item number.

**27**. An analysis control system according to claim **26**, wherein said merchandise order data is indicative of further data related to said item number.

**28**. An analysis control system according to claim **25**, wherein said merchandise order data is indicative of color and size of an item.

**29**. An analysis control system according to claim **17**, further comprising:

a call distributor for receiving a plurality of calls.

**30**. An analysis control system according to claim **17**, wherein said communication facility automatically provides signals indicative of calling terminal digital data for at least certain of said individual callers.

**31**. An analysis control system according to claim **30**, wherein said record structure stores said calling terminal digital data.

**32**. An analysis control system for use with a communication facility according to claim **30** wherein the calling digital data controls at least certain aspects of said interface based on at least a portion of said caller's telephone number.

**33**. An analysis control system according to claim **17**, wherein said customer number provided by an individual caller is the same as the customer number indicated on said individual caller's mail order catalog.

**34**. An analysis control system according to claim **17**, wherein said credit verification is performed on-line.

**35**. An analysis control system according to claim **17**, wherein said communication facility further provides called terminal DNIS signals to identify a specific format from a plurality of formats.

**36**. An analysis control system according to claim **35**, wherein said specific format is a television initiated mail order format.

**37**. An analysis control system according to claim **36**, wherein said answer data signals include signals indicative of mail-order order data.

**38**. An analysis control system according to claim **37**, wherein said mail-order order data is indicative of an item number.

**39**. An analysis control system according to claim **37**, wherein said mail-order order data is indicative of further data related to said item number.

**40**. An analysis control system according to claim **37** wherein said mail-order order data is indicative of color and size of an item.

**41**. An analysis control system for use in a mail order facility or the like, said analysis control system for use with a communication facility including remote terminals for individual callers, wherein each of said remote terminals comprises voice communication means and digital input means in the form of an array of buttons for providing data, comprising:

interface structure coupled to said communication facility to interface said remote terminals for voice and digital communication and including means to provide answer data signals provided by said individual callers from said remote terminals including signals indicative of an individual caller's customer number;

credit verification structure to verify on-line said individual caller's customer number to determine said individual caller's credit;

record structure including memory and control means connected to said interface structure to receive and store data provided by said individual callers;

5,898,762

## 25

acknowledgement generator structure for providing a computer generated acknowledgement number to said individual callers;

switching structure for transferring certain of said individual callers to a live operator; and

central processing station coupled to said record structure to receive accumulated data on said individual callers.

**42.** An analysis control system according to claim **17**, further including a plurality of interface structures, at least certain of said interface structures being located at geographic locations which are different from each other, and at least one interface structure is remote from the central processing station, wherein said data is downloaded from at least one of said interface structures to said central processing station.

**43.** An analysis control system according to claim **42**, wherein said data is downloaded via telephonic communication.

**44.** An analysis control system according to claim **43**, wherein said data is downloaded by telephone polling coupling.

**45.** An analysis control system according to claim **41**, wherein said credit verification structure additionally verifies said individual caller's credit card number.

**46.** An analysis control system according to claim **45**, wherein said credit verification structure verifies said individual caller's credit card number on-line.

**47.** An analysis control system according to claim **45**, wherein said credit verification structure additionally verifies an expiration date for said individual caller's credit card.

**48.** An analysis control system according to claim **41**, wherein said data provided by said individual callers includes audio data indicative of a name or address or both for said individual caller for subsequent processing.

**49.** An analysis control system according to claim **48**, wherein said answer data signals include signals indicative of item data regarding items for order.

**50.** An analysis control system according to claim **49**, wherein an individual caller further provides additional answer data signals with respect to said items.

**51.** An analysis control system according to claim **49**, wherein at least certain of said answer data signals and said additional answer data signals are stored and processed.

**52.** An analysis control system according to claim **49** wherein said answer data signals include signals indicative of color and size of an item.

**53.** An analysis control system according to claim **41**, wherein said computer generated acknowledgement number is indicative of a sequence number.

**54.** An analysis control system according to claim **41**, further comprising:

qualification structure coupled to said record structure to qualify said individual callers based upon a limit on use.

**55.** An analysis control system according to claim **54**, wherein said limit on use specifies a one time use.

## 26

**56.** An analysis control system according to claim **54**, wherein said limit on use specifies a limited number of uses.

**57.** An analysis control system according to claim **54**, wherein said limit on use is with respect to a dollar amount.

**58.** An analysis control system according to claim **41**, wherein said communication facility further provides called terminal DNIS signals to identify a specific format from a plurality of formats.

**59.** An analysis control system according to claim **58**, further comprising:

a call distributor to receive said called digital data (DNIS).

**60.** An analysis control system according to claim **59**, wherein said call distributor receives calling digital data provided automatically by said communication facility indicative of said individual caller's telephone number.

**61.** An analysis control system for use with a communication facility according to claim **76** wherein the calling digital data controls at least certain aspects of said interface based on at least a portion of said caller's telephone number.

**62.** An analysis control system according to claim **58**, wherein said specific format is a television initiated mail order format.

**63.** An analysis control system according to claim **62**, wherein said answer data signals include signals indicative of mail-order order data.

**64.** An analysis control system according to claim **63**, wherein said mail-order order data is indicative of an item number.

**65.** An analysis control system according to claim **63**, wherein said mail-order order data is indicative of further data related to said item number.

**66.** An analysis control system according to claim **63** wherein said mail-order order data is indicative of color and size of an item.

**67.** An analysis control system according to claim **41**, wherein said interface structure receives calling digital data provided automatically by said communication facility indicative of said individual caller's telephone number.

**68.** An analysis control system for use with a communication facility according to claim **53** wherein the calling digital data controls at least certain aspects of said interface based on at least a portion of said caller's telephone number.

**69.** An analysis control system according to claim **41**, further including a plurality of interface structures, at least certain of said interface structures being located at different geographic locations from each other, and at least one interface structure is remote from the central processing station, wherein said accumulated data is downloaded from at least one of said interface structures to said central processing station.

**70.** An analysis control system according to claim **69**, wherein said accumulated data is downloaded via telephonic communication.

\* \* \* \* \*

# 𝔘nited 𝔖tates 𝔠ourt of 𝔄ppeals
## for the 𝔉ederal 𝔠ircuit
*IN RE RONALD KATZ,* 2013-1428

## CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by COOLEY, LLP, Attorneys for Appellant to print this document.  I am an employee of Counsel Press.

On **August 28, 2013**, Counsel for Appellant has authorized me to electronically file the foregoing **Appellant's Opening Brief** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

Nathan K. Kelley
Stacy B. Margolies
Thomas W. Krause
UNITED STATES PATENT AND TRADEMARK OFFICE
OFFICE OF THE SOLICITOR
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22213-1450
(202) 496-7500
nathan.kelley@uspto.gov
stacy.margolies@uspto.gov
thomas.krause@uspto.gov
*Attorneys for Appellee*

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

August 28, 2013                                    /s/ John C. Kruesi, Jr._____
                                                   Counsel Press

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).   The brief contains *8,380* words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).   The brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14 point Times New Roman Font.   As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count of this word-processing system in preparing this certificate.


/s/ Frank V. Pietrantonio
Frank V. Pietrantonio
Attorney for Katz
August 28, 2013